# 22-2022

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### for the

## 𝔉𝔬𝔲𝔯𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

MITCHELL GARNET EVANS, Executor of the Estate of
Sallie Copeland Evans,

*Plaintiff – Appellant,*

– v. –

UNITED STATES OF AMERICA,

*Defendant – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT GREENVILLE

## JOINT APPENDIX

WALTON EVERETT LUPTON
SLAUGHTER & LUPTON LAW, PLLC
5601 Virginia Beach Boulevard
  Suite 100
Virginia Beach, Virginia 23462
(757) 699-7101

*Counsel for Appellant*

SHARON C. WILSON
OFFICE OF THE U.S. ATTORNEY
150 Fayetteville Street
  Suite 205
Raleigh, North Carolina 27601
(919) 856-4530

*Counsel for Appellee*



# TABLE OF CONTENTS
## VOLUME I OF II

**Appendix Page**

Docket Entries.................................................................................JA1

Amended Complaint,
With Exhibits
    filed August 27, 2021 ...............................................................JA6

Exhibits:

A.    Denial Letter from the Department of the Navy
    To Mitchell G. Evans
        dated December 8, 2020 ...................................................JA18

B.    Communications Event Report
        dated April 1, 2018.............................................................JA22

C.    Screenshots of Facebook Posts
        undated ...............................................................................JA24

D.    Text Messages
        dated April 17-23, 2018 .....................................................JA26

Defendant's Motion to Dismiss
    filed September 22, 2021 ...........................................................JA27

Defendant's Memorandum in Support of Motion to Dismiss
    filed September 22, 2021 ...........................................................JA30

Plaintiff's Memorandum in Response to Defendant's Motion to Dismiss
    filed October 25, 2021 ..............................................................JA48

Defendant's Reply to Plaintiff's Memorandum in Response to Defendant's
Motion to Dismiss
    filed November 24, 2021 ...........................................................JA61

Transcript of Motion Hearing before
The Honorable Robert T. Numbers, II
          on February 18, 2022............................................................JA72

Memorandum and Recommendation of
The Honorable Robert T. Numbers, II
          filed June 6, 2022................................................................JA98

Plaintiff's Objections to the Magistrate Judge's
Memorandum and Recommendation
          filed June 17, 2022 ............................................................ JA109

Defendant's Response to Plaintiff's Objections to
The Magistrate Judge's Memorandum and Recommendation
          filed July 1, 2022 ................................................................JA116

Order of
The Honorable Louise W. Flanagan
Re:  Granting Defendant's Motion to Dismiss and
Dismissing the Action Without Prejudice
          filed August 30, 2022......................................................... JA124

Judgment
          filed August 30, 2022......................................................... JA134

Plaintiff's Notice of Appeal
          filed September 27, 2022.................................................... JA135

# U.S. District Court
## EASTERN DISTRICT OF NORTH CAROLINA (Eastern Division)
## CIVIL DOCKET FOR CASE #: 4:21−cv−00045−FL

Evans v. United States of America
Assigned to: District Judge Louise Wood Flanagan
Demand: $3,000,000
 Case in other court:  USCA, 22−02022
Cause: 28:2671 Federal Tort Claims Act

Date Filed: 04/08/2021
Date Terminated: 08/30/2022
Jury Demand: None
Nature of Suit: 360 P.I.: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Mitchell Garnet Evans**
*Executor of the Estate of Sallie Copeland Evans*

represented by **Christopher R. Hedrick**
Mason, Mason, Walker & Hedrick
118484 Rock Landing Drive, Suite 201
Newport News, VA 23606
757−873−3909
Fax: 757−873−1781
Email: chedrick@masonwalker.com
*ATTORNEY TO BE NOTICED*

**Robert C. Slaughter , III**
Slaughter & Lupton Law, PLLC
117 West Eden Street
Edenton, NC 27932
252−439−0070
Fax: 252−689−8400
Email: rslaughter@slaughterlupton.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UNITED STATES OF AMERICA**

represented by **Sharon C. Wilson**
United States Attorney's Office − EDNC
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
919−856−4026
Fax: 919−856−4821
Email: Sharon.Wilson2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/08/2021 | 1 | COMPLAINT against UNITED STATES OF AMERICA ( Filing fee $ 402 receipt number 0417−5976890.), filed by Mitchell Garnet Evans. (Attachments: # 1 Exhibit A − Denial Letter, # 2 Exhibit B − Communications Event Report, # 3 Exhibit C − Facebook Posts, # 4 Exhibit D − Text Message, # 5 Civil Cover Sheet) (Slaughter, Robert) (Entered: 04/08/2021) |
| 04/09/2021 | | Notice to Counsel − No Summons provided for issuance or Waiver of Service filed. (Rudd, D.) (Entered: 04/09/2021) |
| 04/09/2021 | | NOTICE OF DEFICIENCY − Failure to File Financial Disclosure Statement as to Mitchell Garnet Evans. Pursuant to 7.1 of the Federal Rules of Civil Procedure and Local Civil Rule 7.3, all parties shall file a financial disclosure statement. A negative statement is required if a party has no disclosures to make. The disclosure statement must be on a form provided by the clerk. This form is available at the clerk's office and on the court's website. (Rudd, D.) (Entered: 04/09/2021) |

| | | |
|---|---|---|
| 04/09/2021 | | Notice to Counsel – Counsel should file a Notice of Appearance pursuant to Local Civil Ruel 5.2(a). (Rudd, D.) (Entered: 04/09/2021) |
| 04/09/2021 | 2 | Notice of Appearance filed by Robert C. Slaughter, III on behalf of Mitchell Garnet Evans. (Slaughter, Robert) (Main Document 2 flattened and replaced on 4/22/2021) (Edwards, S.). (Entered: 04/09/2021) |
| 04/09/2021 | 3 | Financial Disclosure Statement by Mitchell Garnet Evans (Slaughter, Robert) (Entered: 04/09/2021) |
| 04/12/2021 | 4 | Notice filed by Mitchell Garnet Evans regarding 1 Complaint, *Proposed Summonses*. (Slaughter, Robert) (Entered: 04/12/2021) |
| 04/13/2021 | | Notice to Counsel regarding: 2 Notice of Appearance. Counsel is reminded that the filing user must lock or "flatten" the PDF document. Failure to flatten documents may result in the clerk's office issuing a notice of deficiency.Counsel should "flatten" the document prior to attaching it in accordance with Section IV.B of the CM/ECF Policies and Procedures Manual. No action necessary at this time. (Collins, S.) (Entered: 04/13/2021) |
| 04/13/2021 | 5 | Summons Issued as to UNITED STATES OF AMERICA, U.S. Attorney and U.S. Attorney General. (*NOTICE: Counsel shall print the attached summons and serve with other case opening documents in accordance with Fed.R.Civ.P. 4.*) (Collins, S.) (Entered: 04/13/2021) |
| 04/21/2021 | 6 | Affidavit of Service for Affidavit of Service filed by Mitchell Garnet Evans served on Sue Beasley, U.S. Attorney's office on 4/20/2021. (Slaughter, Robert) (Entered: 04/21/2021) |
| 04/27/2021 | 7 | Affidavit of Service for Summons and Complaint filed by Mitchell Garnet Evans served on Civil Process Clerk, U.S. Attorney's Office on 4/19/2021. (Slaughter, Robert) (Entered: 04/27/2021) |
| 04/29/2021 | 8 | Notice of Appearance filed by Christopher R. Hedrick on behalf of Mitchell Garnet Evans. (Hedrick, Christopher) (Entered: 04/29/2021) |
| 04/29/2021 | 9 | Affidavit of Service for Summons and Complaint filed by Mitchell Garnet Evans served on Merrick B. Garland, Attorney General of the U.S. on 4/26/2021. (Slaughter, Robert) (Entered: 04/29/2021) |
| 06/16/2021 | 10 | Notice of Appearance filed by Sharon C. Wilson on behalf of UNITED STATES OF AMERICA. (Wilson, Sharon) (Entered: 06/16/2021) |
| 06/16/2021 | 11 | Consent MOTION for Extension of Time *to File Responsive Pleading* filed by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order) (Wilson, Sharon) Modified on 6/18/2021 to correct event to Motion for Extension of Time to File Answer (Hockaday, A.). (Entered: 06/16/2021) |
| 06/18/2021 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 11 Consent MOTION for Extension of Time *to File Responsive Pleading.* (Collins, S.) (Entered: 06/18/2021) |
| 06/18/2021 | | **TEXT ORDER granting Defendant's Consent Motion for Extension of Time 11 . For good cause shown, it is ordered that Defendant has up to and including July 30, 2021, within which to answer or otherwise respond to the Complaint 1 . Signed by Peter A. Moore, Jr., Clerk of Court on 6/18/2021.** (Hockaday, A.) (Entered: 06/18/2021) |
| 07/29/2021 | 12 | Consent MOTION for Extension of Time *to File Responsive Pleading 1 Complaint* filed by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order) (Wilson, Sharon) Modified on 7/29/2021 to change filing event and to create docket entry relationship to 1 Complaint. (Collins, S.) (Entered: 07/29/2021) |
| 07/29/2021 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 12 Second MOTION for Extension of Time to File Answer. (Collins, S.) (Entered: 07/29/2021) |
| 07/30/2021 | | **TEXT ORDER granting Defendant's Second Consent Motion for Extension of Time 12 . For good cause shown, it is ordered that Defendant has up to and including August 27, 2021, within which to answer or otherwise respond to the** |

| | | |
|---|---|---|
| | | **Complaint 1 . Signed by Peter A. Moore, Jr., Clerk of Court on 7/30/2021.** (Hockaday, A.) (Entered: 07/30/2021) |
| 08/25/2021 | 13 | Consent MOTION to Amend/Correct 1 Complaint, filed by Mitchell Garnet Evans. (Attachments: # 1 Exhibit A – Proposed Amended Complaint, # 2 Exhibit B– Proposed Amended Complaint w. Redline Edits) (Hedrick, Christopher) (Entered: 08/25/2021) |
| 08/25/2021 | 14 | Proposed Order regarding 13 Consent MOTION to Amend/Correct 1 Complaint, filed by Mitchell Garnet Evans. (Hedrick, Christopher) (Entered: 08/25/2021) |
| 08/26/2021 | | Motion Submitted to District Judge Louise Wood Flanagan regarding 13 Consent MOTION to Amend/Correct 1 Complaint. (Collins, S.) (Entered: 08/26/2021) |
| 08/27/2021 | 15 | **ORDER granting 13 Consent MOTION to Amend/Correct 1 Complaint. Plaintiff shall file the Amended Complaint attached as Exhibit A to Plaintiff's Motion to Amend Complaint, within 5 days of the date of this order. Signed by District Judge Louise Wood Flanagan on 8/27/2021.** (Collins, S.) (Entered: 08/27/2021) |
| 08/27/2021 | 16 | **AMENDED COMPLAINT** against Mitchell Garnet Evans, filed by Mitchell Garnet Evans. (Attachments: # 1 Exhibit A – Denial Letter w. Envelope, # 2 Exhibit B – Communications Event Report, # 3 Exhibit C – Facebook Posts, # 4 Exhibit D – Text Message) (Hedrick, Christopher) (Entered: 08/27/2021) |
| 08/27/2021 | 17 | MOTION for Extension of Time *to File Responsive Pleading to Amended Complaint* filed by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order) (Wilson, Sharon) Modified on 8/30/2021 to correct event to Motion for Extension of Time to File Answer(Hockaday, A.). (Entered: 08/27/2021) |
| 08/27/2021 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 17 MOTION for Extension of Time *to File Responsive Pleading to Amended Complaint*. (Collins, S.) (Entered: 08/27/2021) |
| 08/30/2021 | | **TEXT ORDER granting Defendant's Consent Motion for Extension of Time 17 . For good cause shown, it is ordered that Defendant has up to and including September 22, 2021, within which to answer or otherwise respond to the Amended Complaint 16 . Signed by Peter A. Moore, Jr., Clerk of Court on 8/30/2021.** (Hockaday, A.) (Entered: 08/30/2021) |
| 09/22/2021 | 18 | MOTION to Dismiss for Lack of Jurisdiction , MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by UNITED STATES OF AMERICA. (Wilson, Sharon) (Entered: 09/22/2021) |
| 09/22/2021 | 19 | Memorandum in Support regarding 18 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by UNITED STATES OF AMERICA. (Wilson, Sharon) (Entered: 09/22/2021) |
| 10/01/2021 | | Notice to Counsel regarding: 18 Motion to Dismiss/Lack of Jurisdiction, Motion to Dismiss for Failure to State a Claim, 19 Memorandum in Support. Counsel indicated the incorrect division. In future filings, please reference the Eastern Division in the case caption. No action by counsel required. (Collins, S.) (Entered: 10/01/2021) |
| 10/01/2021 | | **TEXT ORDER – Ordinarily at this juncture the court would trigger the parties' scheduling conference activities, and deadline for provision of their joint report and plan through issuance of initial order regarding planning and scheduling. Where defendant has filed motions to dismiss, good cause appears to delay these activities. Unless a party raises objection in filing due within 14 days from this date, the court stays the parties' scheduling conference activities pending decision on motions filed 9/22/21. Signed by District Judge Louise Wood Flanagan on 10/1/2021.** (Collins, S.) (Entered: 10/01/2021) |
| 10/07/2021 | 20 | Consent MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Mitchell Garnet Evans. (Attachments: # 1 Text of Proposed Order Proposed Consent Order) (Hedrick, Christopher) (Entered: 10/07/2021) |
| 10/08/2021 | 21 | **ORDER granting 20 Consent Motion for Extension of Time to File Response/Reply regarding 18 MOTION to Dismiss for Lack of Jurisdiction,** |

| | | |
|---|---|---|
| | | **MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM – Responses due by 10/27/2021. Signed by District Judge Louise Wood Flanagan on 10/8/2021.** (Tripp, S.) (Entered: 10/08/2021) |
| 10/25/2021 | 22 | Memorandum in Opposition regarding 18 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Plaintiff's Memorandum in Opposition to United States' Motion to Dismiss* filed by Mitchell Garnet Evans. (Hedrick, Christopher) (Entered: 10/25/2021) |
| 11/05/2021 | 23 | Consent MOTION for Extension of Time to File Reply as to 18 Motion to Dismiss filed by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order) (Wilson, Sharon) Modified on 11/8/2021 to revise docket text and link to motion 18 . (Collins, S.) (Entered: 11/05/2021) |
| 11/08/2021 | 24 | **ORDER granting 23 Consent Motion for Extension of Time to File Reply regarding 18 MOTION to Dismiss for Lack of Jurisdiction, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. Reply due by 11/24/2021. Signed by District Judge Louise Wood Flanagan on 11/8/2021.** (Collins, S.) (Entered: 11/08/2021) |
| 11/08/2021 | | Notice to Counsel. As a helpful reminder, pursuant to the CM/ECF Policies and Procedures Manual, counsel should note that documents should be linked to the motion to which it relates, ie, memorandum in support or opposition, or reply as well as requests for extensions of time. (Collins, S.) (Entered: 11/08/2021) |
| 11/24/2021 | 25 | REPLY to Response to Motion regarding 18 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by UNITED STATES OF AMERICA. (Wilson, Sharon) (Entered: 11/24/2021) |
| 12/01/2021 | | Motion Submitted to District Judge Louise Wood Flanagan regarding 18 MOTION to Dismiss for Lack of Jurisdiction, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Collins, S.) (Entered: 12/01/2021) |
| 01/11/2022 | | Motion No Longer Submitted to District Judge Louise Wood Flanagan: regarding 18 MOTION to Dismiss for Lack of Jurisdiction, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Collins, S.) (Entered: 01/11/2022) |
| 01/11/2022 | | Motion Referred to US Magistrate Judge Robert T. Numbers, II regarding 18 MOTION to Dismiss for Lack of Jurisdiction, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Collins, S.) (Entered: 01/11/2022) |
| 01/24/2022 | | **Text Order: The court will hold a hearing on the United States Motion to Dismiss on Friday, February 18, 2022, at 1:30 p.m. in the Terry Sanford Federal Building and Courthouse in Raleigh, North Carolina. Entered by Magistrate Judge Robert T. Numbers, II on 1/24/2022. (Brewer, C) (Entered: 01/24/2022)** |
| 02/18/2022 | | ***CHANGE IN HEARING TIME***Reset Hearing as to 18 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . Motion Hearing reset for 2/18/2022 at 02:30 PM in Raleigh – 5th Floor Courtroom before Magistrate Judge Robert T. Numbers II. (Brewer, C) (Entered: 02/18/2022) |
| 02/18/2022 | 26 | Minute Entry for proceedings held before Magistrate Judge Robert T. Numbers, II in Raleigh – Motion Hearing held on 2/18/2022 regarding 18 . Counsel present for plaintiff and defendant. Parties speak to their respective positions on the motion. Written order to follow. (Court Reporter – Michelle McGirr) (Brewer, C) (Entered: 02/18/2022) |
| 06/06/2022 | 27 | **MEMORANDUM AND RECOMMENDATIONS regarding 18 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by UNITED STATES OF AMERICA. Objections to Memorandum and Recommendations due by 6/20/2022. Signed by Magistrate Judge Robert T. Numbers, II on 6/6/2022.** (Collins, S.) (Entered: 06/06/2022) |
| 06/17/2022 | 28 | OBJECTION to 27 Memorandum and Recommendations by Mitchell Garnet Evans. (Hedrick, Christopher) (Entered: 06/17/2022) |

| 07/01/2022 | 29 | RESPONSE regarding 27 MEMORANDUM AND RECOMMENDATIONS regarding 18 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by UNITED STATES OF AMERICA filed by UNITED STATES OF AMERICA. (Wilson, Sharon) (Entered: 07/01/2022) |
|---|---|---|
| 07/05/2022 | | Motions Submitted to District Judge Louise Wood Flanagan regarding 18 MOTION to Dismiss for Lack of Jurisdiction, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, 27 MEMORANDUM AND RECOMMENDATIONS. (Collins, S.) (Entered: 07/05/2022) |
| 08/30/2022 | 30 | **ORDER – Defendant's motion DE 18 is GRANTED. This action is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1). The clerk is DIRECTED to close this case. Signed by District Judge Louise Wood Flanagan on 8/30/2022.** (Collins, S.) (Entered: 08/30/2022) |
| 08/30/2022 | 31 | **JUDGMENT – In accordance with the court's order entered August 30, 2022, and for the reasons set forth more specifically therein, defendants' motion to dismiss is GRANTED. Plaintiff's complaint is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction. Signed by Peter A. Moore, Jr., Clerk of Court on 8/30/2022.** (Collins, S.) (Entered: 08/30/2022) |
| 09/27/2022 | 32 | Notice of Appeal filed by Mitchell Garnet Evans as to 30 Order on Memorandum and Recommendations,, Order on Motion to Dismiss/Lack of Jurisdiction,, Order on Motion to Dismiss for Failure to State a Claim, 31 Judgment,. Filing fee, receipt number ANCEDC–6748550. (Slaughter, Robert) (Entered: 09/27/2022) |
| 09/27/2022 | 33 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 32 Notice of Appeal. (Foell, S.) (Additional attachment(s) added on 9/27/2022: # 1 Corrected Transmittal Form (Judge))) (Foell, S.). (Entered: 09/27/2022) |
| 09/29/2022 | 34 | US Court of Appeals Case Number 22–2022 (Rachel Phillips, Case Manager) as to 32 Notice of Appeal, filed by Mitchell Garnet Evans. (Foell, S.) (Entered: 09/29/2022) |
| 10/21/2022 | 35 | OFFICIAL TRANSCRIPT of MOTION HEARING held on February 18, 2022, before United States Magistrate Judge Robert T. Numbers, II. Court Reporter ~ Michelle McGirr. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website Redaction Request due 11/14/2022. Redacted Transcript Deadline set for 11/24/2022. Release of Transcript Restriction set for 1/22/2023. (McGirr, M.) (Entered: 10/21/2022) |
| 10/21/2022 | | NOTICE of Filing of Official Transcript 35 Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (McGirr, M.) (Entered: 10/21/2022) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### Eastern Division
### No. 4:21-CV-00045

MITCHELL GARNET EVANS, Executor of )
the Estate of Sallie Copeland Evans, )
                                    )
       **Plaintiff,** )
                                    )         **AMENDED COMPLAINT**
**v.** )
                                      )
**UNITED STATES OF AMERICA,** )
                                      )
       **Defendant.** )
                                      )
_____ )

Plaintiff, Mitchell Garnet Evans, Executor of the Estate of Sallie Copeland Evans ("Decedent"), brings this action against Defendant, United States of America, under the Federal Tort Claims Act ("FTCA"). This is an action for Decedent's wrongful death caused by the negligent and wrongful acts and omissions of employees of the United States Government while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to Plaintiff in accordance with the law of the place where the acts and omissions occurred. Plaintiff alleges the following:

### Jurisdiction

1. Under 28 U.S.C. § 1346(b)(1), this Court has jurisdiction of this action.

2. Under 28 U.S.C. § 2675(a), Plaintiff has exhausted his FTCA administrative remedies by first presenting his claim on Form SF-95 to the appropriate Federal agency and by then not filing this action until his claim was finally denied by that agency in writing and sent by certified mail. *See* Ex. A (denial letter with envelope copy).

1

JA6

## Venue

3. Plaintiff is the Executor of the Estate of Decedent, who died in Halifax County, North Carolina, on or about April 24, 2018.

4. Plaintiff is a citizen and resident of Halifax County, North Carolina.

5. At the time of all the acts and omissions complained of in this Complaint, and at the time of Decedent's death, Plaintiff and Decedent were citizens and residents of Halifax County, North Carolina.

6. Halifax County, North Carolina, is within the Eastern District of North Carolina.

7. Venue in the Eastern District of North Carolina is proper under 28 U.S.C. § 1402(b).

## Facts

8. Decedent was the grandmother of Isaiah Evans Ceaser ("Ceaser").

9. In March and April 2018, Ceaser was a member of the United States Marine Corps ("Marine Corps") and held the rank of lance corporal.

10. On or about March 30, 2018, Ceaser, without permission, left his duty station at Fort Benning, Georgia, where he and members of his unit were participating in a combat training school. Upon information and belief, the Marine Corps characterized Ceaser as an absentee, meaning he was absent without authority from his unit or other place of required duty. Upon leaving his unit, he left a note stating that he was going to end it all and kill himself. A classmate found Ceaser's note. Ceaser's commander, Marine Corps Captain Smith ("Smith"), participating in the Fort Benning training, was aware of the note.

2

11. On April 1, 2018, Sergeant Glascow of Ceaser's unit contacted local law enforcement officials in Nash County, North Carolina, where Cesar's girlfriend and other friends lived. Sergeant Glascow told law enforcement officials that Ceaser had gotten into trouble and left a note indicating that he was going to end it all, but before committing suicide, Ceaser wanted to visit his mother. *See* Ex. B (Communications Event Report). On or about April 1, 2018, Ceaser's mother, Samaria Evans ("Samaria"), was an inpatient at a medical facility in Halifax County, North Carolina.

12. After leaving Fort Benning, Ceaser traveled to North Carolina. The following people contacted Smith by telephone to advise that Ceaser had returned to North Carolina and needed to be picked up by the Marine Corps: Decedent; Plaintiff (son of Decedent and uncle of Ceaser); Plaintiff's wife, Monica Evans ("Monica"); and Decedent's sister, Mattie Copeland Parker.

13. Smith arranged for Ceaser to fly from Raleigh-Durham International Airport ("RDU") in North Carolina to Atlanta, Georgia, unsupervised, on or about April 5, 2018.

14. On April 5, 2018, Ceaser boarded his scheduled flight.

15. On or about April 10, 2018, Plaintiff, Monica, and Samaria learned that Ceaser had returned to North Carolina and was in Halifax County, North Carolina, at the home of his grandfather, William Evans.

16. On or about April 10, 2018, Decedent, Plaintiff, and Monica told Smith by telephone that Ceaser was in Halifax County, North Carolina and that they were concerned and afraid something could happen.

17. On or about April 10, 2018, Decedent asked Smith by telephone why the Marine Corps had not picked up Ceaser and asked Smith to have local North Carolina law enforcement officials pick up Ceaser, but Smith failed to do so.

18. On or about April 11, 2018, Decedent and Monica both spoke to Smith by telephone. Smith advised Decedent and Monica that Ceaser was being investigated for fraud. Smith said that he found several letters and notes from Ceaser that Smith considered disturbing. Smith stated that the letters and notes expressed Ceaser's intent of violence against Ceaser and others. Smith stated that he was very concerned because of these notes' contents and advised that Decedent should be careful if she came in contact with Ceaser.

19. On or about April 11, 2018, Decedent again by telephone requested Smith to have Ceaser detained. Smith advised her that the Marine Corps had already exhausted a large amount of resources trying to pick up Ceaser at the airport and would not commit to making any further effort to find and detain Ceaser.

20. On or about April 17, 2018, Plaintiff and Monica called Smith. Plaintiff and Monica again inquired why the Marine Corps had not picked up Ceaser. Plaintiff and Monica advised Smith that they had found grenade parts they believed Ceaser had acquired and that Ceaser was making posts on Facebook indicating that he had purchased guns. *See* Ex. C (Facebook posts). Decedent and Monica told Smith they were concerned because Ceaser was acting aggressive and was easily agitated. Decedent and Monica again specifically requested that the Marine Corps have Ceaser detained by local law enforcement officials. Decedent and Monica advised that they were concerned something would happen. Smith stated that this was concerning, and he would see what he could do, but that the Marine Corps had already

exhausted resources trying to have Ceaser picked up when Ceaser was supposed to fly to Georgia.

21. On or about April 22, 2018, Decedent and Plaintiff transported Ceaser to RDU, where they watched Ceaser board another flight to Atlanta, Georgia.

22. On April 22, 2018, by phone, Decedent and Plaintiff told Smith that Ceaser was on a plane to Atlanta, Georgia, and needed to be detained at the airport. Smith again stated that he did not have the resources to pick up Ceaser at the airport. Decedent and Plaintiff advised him that they and other family members had requested the Marine Corps numerous times to have the local law enforcement officials pick up Ceaser before something happened to him or someone else. Smith said he would see what he could do and would call them back. In a subsequent telephone call on April 22, 2018, Smith advised that he could not have Ceaser detained at the airport, and Ceaser would need to take a shuttle or a bus to the Marine Corps training location. Decedent again asked Smith why, since he was concerned about the suicide note, guns, and grenade parts, he could not just have local law enforcement officials detain Ceaser.

23. On April 23, 2018, Ceaser returned to Halifax County instead of returning to his Marine Corps unit at Fort Benning. Decedent again contacted Smith, who refused to take any action to have Ceaser detained and instructed Decedent to take Ceaser to Marine Corps Base Camp Lejeune in or near Jacksonville, North Carolina.

24. On or about April 23, 2018, Plaintiff saw Decedent crying and complaining that the Marine Corps was not taking action and instructed her to drive Ceaser to Camp Lejeune. Plaintiff then sent this text message to Smith: "We put Isaiah on a plane yesterday flew him back to

5

you once again And you didn't pick him up cause he's back here in NC at moms house She worried I'm worried Y'all need to pick his ASS up before something happens!!" *See* Ex. D (text message).

25. On or about April 24, 2018, Smith again instructed Decedent to drive Ceaser to Marine Corps Base Camp Lejeune.

26. While Decedent, at her home in Halifax County, North Carolina, was attempting to convince Ceaser to gather his belongings for the trip to Marine Corps Base Camp Lejeune, Ceaser shot Decedent in the back of the head with a 9 mm pistol, causing her death. Her dead body was discovered several days later.

27. Law enforcement officials arrested Ceaser at a hotel. At the time of the arrest, Ceaser possessed Decedent's car and credit card. Ceaser was also in possession explosive devices. Ceaser was charged with the first-degree murder of Decedent. Ceaser's case is pending in the Halifax County Superior Court.

28. Upon information and belief, neither Smith nor any other Marine Corps member took any action to have Ceaser apprehended and transported to a Marine Corps installation other than possibly making arrangements to pick him up at the Atlanta airport on or about April 5, 2018.

29. The Marine Corps is engaged in substantial activity within North Carolina and was engaged in substantial activity within North Carolina at all times referred to in this Complaint.

30. At all times referred to in this Complaint, the Marine Corps operated at least two major installations in North Carolina: Marine Corps Base Camp Lejeune and Marine Corps Air Station Cherry Point.

31. At all times referred to in this Complaint, the Marine Corps, at those two installations and elsewhere, had ample resources to promptly apprehend and detain Ceaser, regardless of his location in North Carolina, and transport him to a Marine Corps installation.

32. Upon information and belief, Smith reported to his superior Marine Corps officers in his chain of command ("his superiors") the information he received about the whereabouts and danger of Ceaser.

33. Upon information and belief, if Smith or any Marine Corps officer had requested Halifax County law enforcement officials to apprehend Ceaser and detain him for pickup by Marine Corps officials, Halifax County law enforcement officials would have done so.

### Claim: Wrongful Death

34. Plaintiff adopts by reference paragraphs 1 through 33 above.

35. At all times alleged in this Complaint, Smith and his superior officers were members of the Marine Corps and were employees of Defendant acting within the scope of their office or employment.

36. Smith and his superiors knew or should have known that Ceaser had violent propensities and posed an immediate risk of harm, including death, to himself, Decedent, and others.

37. It was reasonably foreseeable to Smith and his superiors that Ceaser would physically harm himself, Decedent, or others.

38. It was reasonably foreseeable to Smith and his superiors that Ceaser would kill himself, Decedent, or others.

39. Under the laws of North Carolina, where negligent and wrongful acts and omissions alleged in this Complaint occurred, the Marine Corps, through its employees in North Carolina and elsewhere, had the ability, opportunity, legal right, and legal duty to apprehend and control Ceaser at his North Carolina locations and to protect Decedent and others from him.

40. Under the laws of North Carolina, the Marine Corps, through its employees in North Carolina and elsewhere, assumed the legal right and legal duty to apprehend and control Ceaser at his North Carolina locations and to protect Decedent and others from him.

41. Under the laws of North Carolina, by instructing Decedent to take or drive Ceaser to Marine Corps Base Camp Lejeune, Smith voluntarily assumed a legal duty to protect Decedent from Ceaser.

42. When Smith entered upon the active course of conduct of instructing Decedent to take or drive Ceaser to Marine Corps Base Camp Lejeune, the law of North Carolina imposed upon Smith a positive duty to exercise ordinary care to protect Decedent from harm.

43. Under the laws of North Carolina, a special relationship between Ceaser and the Marine Corps gave rise to a legal right and legal duty of the Marine Corps, through its employees

in North Carolina and elsewhere, to apprehend and control Ceaser at his North Carolina locations and to protect Decedent and others from him.

44. The Marine Corps had the ability to control Ceaser pursuant to legal authority independent of Ceaser's employment status as a Marine.

45. Because Ceaser was a danger to himself, Decedent, and others, the Marine Corps, through its employees, had the legal authority, independent of Ceaser's employment status as a Marine, to apprehend and control him at any location.

46. Because Ceaser was an absentee, the Marine Corps, through its law enforcement officials, commissioned officers, warrant officers, and noncommissioned officers, had the legal authority, independent of Ceaser's employment status as a Marine, to apprehend him at any location, military or civilian (with some limitations for private dwellings).

47. Because Ceaser was an absentee, civilian law enforcement authorities could have apprehended him if requested to do so by military authorities.

48. The Marine Corps, through its employees in North Carolina and elsewhere, breached its legal duties and, thus, was negligent, in:

a. Failing repeatedly to apprehend and control Ceaser at his North Carolina locations, when the Marine Corps, through its employees, knew or should have known that he posed an immediate risk of harm, including death, to himself, Decedent, or others;

b.   Failing repeatedly to request North Carolina law enforcement officials to apprehend Ceaser at his North Carolina locations and hold him for pickup by Marine Corps officials, when the Marine Corps, through its employees, knew or should have known that he posed an immediate risk of harm, including death, to himself, Decedent, or others; and

c.   Instructing Decedent to take or drive Ceaser to Marine Corps Base Camp Lejeune when the Marine Corps, through its employees, knew or should have known that he posed an immediate risk of harm, including death, to himself, Decedent, or others.

49. The negligence of the Marine Corps, through its employees, was a proximate cause of Decedent's death.

50. All negligent and wrongful acts and omission alleged in this Complaint were by employees of the United States Government while acting within the scope of their office or employment.

51. In accordance with the laws of North Carolina, Defendant, if a private person, would be liable to Plaintiff for Decedent's wrongful death.

52. Under the FTCA, Defendant is liable to Plaintiff for compensatory damages for the wrongful death of Decedent caused by negligent and wrongful acts and omissions of the Marine Corps through its employees acting within the scope of their offices or employment.

53. Under North Carolina law, for Decedent's wrongful death, Plaintiff is entitled to recover:

a. Expenses for care, treatment, and hospitalization (if any) incident to the injury resulting in Decedent's death;

b. Compensation for pain and suffering of Decedent;

c. The reasonable funeral expenses of Decedent; and

d. The present monetary value of Decedent to the persons entitled to receive the damages recovered, including but not limited to the compensation for the loss of reasonably expected:

    i. Net income of Decedent;

    ii. Services, protection, care, and assistance of Decedent, whether voluntary or obligatory, to the persons entitled to the damages recovered; and

    iii. Society, companionship, comfort, guidance, kindly offices, and advice of Decedent to the persons entitled to the damages recovered.

## **Demand for Relief**

Wherefore, Plaintiff demands:

a. Judgment against Defendant for compensatory damages of three million dollars ($3,000,000);

b. Post-judgment interest and costs; and

c. Any further relief the Court deems appropriate.

This the 27th day of August 2021.

**MITCHELL GARNETT EVANS**

_____/s/ Robert C. Slaughter, III
Robert C. Slaughter, III
Slaughter Law Firm, PLLC
117 West Eden Street
Edenton, NC 27932
Phone: (252) 506-6284
Fax: (252)-689-8400
rslaughter@slaughterlaw.net
NC State Bar No.: 16515
*Attorney for Plaintiff*


_____/s/ Christopher R. Hedrick
Christopher R. Hedrick
Mason, Mason, Walker & Hedrick, P.C.
11848 Rock Landing Drive, Suite 201
Newport News, VA 23606
Phone: (757) 873-3909
Fax: (757) 873-1781
chedrick@masonwalker,com
NC State Bar No.: 19574
*Attorney for Plaintiff*



**DEPARTMENT OF THE NAVY**
OFFICE OF THE JUDGE ADVOCATE GENERAL
TORT CLAIMS UNIT NORFOLK
9620 MARYLAND AVENUE SUITE 205
NORFOLK, VA 23511-2949

5890
Ser J201246
December 8, 2020

MR MITCHELL G EVANS
1236 NC HWY 903
ROANOKE RAPIDS NC 27870

Dear Mr. Evans:

SUBJECT:     CLAIM OF MITCHELL G. EVANS AS PERSONAL REPRESENTATIVE /
             EXECUTOR OF THE ESTATE OF SALLIE ANN EVANS: OUR FILE NO.
             J201246

    This responds to your administrative claim in the amount of $3,000,000.00 for the
wrongful death of Sallie Ann Evans, who was shot and killed by LCPL Isaiah Kahleal Evans
Ceaser (LCPL Ceaser), her grandson, on April 27, 2018.

    Our original letter dated October 13, 2020 was returned marked as "Return to Sender. No
such street. Unable to forward" (an envelope copy is enclosed). In your e-mail dated November
17, 2020 (a copy is enclosed), you confirmed that it is your correct current address. In addition,
on December 7, 2020, I left you a voice message at phone #252-578-0473 requesting to return
my call regarding your address.

    I am re-sending the October 13, 2020 letter by regular mail. I am also e-mailing you the
same. Please confirm receipt.

    Further, please note that if you do not agree with the decision denying your FTCA claim
for the reasons as set forth in the October 13, 2020 letter, you have 6 (six) months **from the date
of mailing (October 14, 2020) of the original letter dated October 13, 2020** to file suit in the
appropriate Federal District Court. If you have any questions, please contact me by phone at
(757) 341-4561 or email at maria.grise@navy.mil.

                                        Sincerely,

                                        *Maria B. Grise*

                                        MARIA B. GRISE
                                        Tort Claims Attorney

Enclosures:  1. Our original denial letter dated October 13, 2020.
             2. A copy of the envelope "Return to Sender. No such Street. Unable to forward."
             3. Your November 17, 2020 e-mail confirming the delivery address.

Pl. Am. Compl.   Case 4:21-cv-00045-FL   Document 16-1   Filed 08/27/21   Page 1 of 4   Exhibit A-1

JA18



**DEPARTMENT OF THE NAVY**
OFFICE OF THE JUDGE ADVOCATE GENERAL
TORT CLAIMS UNIT NORFOLK
9620 MARYLAND AVENUE SUITE 205
NORFOLK, VA 23511-2949

5890
Ser J201246
October 13, 2020

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

MR MITCHELL G EVANS
1236 NC HWY 903
ROANOKE RAPIDS NC 27870

Dear Mr. Evans:

SUBJECT:    CLAIM OF MITCHELL G. EVANS AS PERSONAL REPRESENTATIVE /
            EXECUTOR OF THE ESTATE OF SALLIE ANN EVANS: OUR FILE NO.
            J201246

        This responds to your administrative claim in the amount of $3,000,000.00 for the
wrongful death of Sallie Ann Evans, who was shot and killed by LCPL Isaiah Kahleal Evans
Ceaser (LCPL Ceaser), her grandson, on April 27, 2018. You alleged that the US
Government/USMC is liable for this incident because one or more of its employees (i) were
aware that LCPL Ceaser posed a safety risk and threat to others, including Sallie Ann Evans, (ii)
knew or should have known of LCPL Ceaser's violent propensities, (iii) had the ability (i.e. legal
duty) and opportunity to control LCPL Ceaser, (iv) voluntarily assumed/had a legal duty to
protect others, including Sallie Ann Evans, from LCPL Ceaser, and (v) breached their duty to
protect others, including Sallie Ann Evans, and/or to control LCPL Ceaser.

        Your claim was analyzed under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§
1346(b), 2401(b), and 2671-2680. Our investigation has determined that your claim does not fall
within the FTCA's limited waiver of sovereign immunity, and the United States is not liable,
under the FTCA, for the damages claimed.

        The United States may be liable under the FTCA for damages caused by the negligent or
wrongful act of an employee of a Federal agency <u>acting in the course and within the scope of
their federal employment</u>. By your own admission, LCPL Ceaser was absent from his place of
duty without proper authority (unauthorized absence), and was not under the control and
supervision of military authorities at the time of the commission of the offense. At the time of
his criminal act, he was acting entirely outside the course and scope of his military employment.

Pl. Am. Compl. Case 4:21-cv-00045-FL    Document 16-1    Filed 08/27/21    Page 2 of 4 Exhibit A-2

JA19

In addition, the general waiver of sovereign immunity granted by the FTCA specifically excludes any claim arising out of assault or battery. See 28 U.S.C. § 2680(h). Your claim alleges a cause of action not cognizable under the FTCA. Accordingly, your claim is denied.

Under the controlling North Carolina law, in general, there is neither a duty to control the actions of a third party, nor to protect another from a third party. Scadden v. Holt, 733 S.E.2d 90, 92 (N.C. Ct. App.2012). The US Court of Appeals for the 4th Circuit held that "the ability and opportunity to control a third party must be more than mere physical ability to control. Rather, it must rise to the level of custody, or legal right to control." (Durden v. US, 736 F. 3d. 296, 305, citing Scadden, 733 S.E. 2d at 93). "Were the law otherwise, the exception would swallow the rule and any person could be held liable for the foreseeable, harmful acts of another person in physical proximity." Scadden, 733 S.E. 2d at 93. The Durden Court of Appeals further held that the government's ability (i.e. legal duty) to control a tortfeasor/assailant must be independent of the tortfeasor's employment status as a government employee for purposes of an FTCA claim. Id.

If you do not agree with this decision, be advised you have 6 (six) months from the date of mailing of this letter to file suit in the appropriate Federal District Court. If you have any questions, please contact me by phone at (757) 341-4561 or email at maria.grise@navy.mil.

Sincerely,

*Maria B. Grise*

MARIA B. GRISE
Tort Claims Attorney

Pl. Am. Compl.   Case 4:21-cv-00045-FL   Document 16-1   Filed 08/27/21   Page 3 of 4   Exhibit A-3

JA20

**DEPARTMENT OF THE NAVY**

OFFICE OF THE JUDGE ADVOCATE GENERAL
TORT CLAIMS UNIT NORFOLK
9620 MARYLAND AVENUE SUITE 205
NORFOLK, VA 23511-3949

OFFICIAL BUSINESS

**CERTIFIED MAIL**

ATP
BMN
10-16-2-



U.S. POSTAGE ⟩⟩ PITNEY BOWES

ZIP 23511 $ 006.90⁰
0001362781 OCT 14 2020

7018 0040 0001 0658 0556



MR MITCHELL G EVANS
1236 NC HWY 903
ROANOKE RAPIDS NC 27870



10-21
-31

NIXIE        276   DE 1          0011/20/20

RETURN TO SENDER
NO SUCH STREET
UNABLE TO FORWARD

.. 9400922780321298

NSS
23511>2949
27870$8976 R

BC: 23511294955    *0892-03055-14-47

JA21

## Communications

### Event Report

Event ID: **18-00031178**        Call Ref #: 421                Date/Time Received: 04/01/18 21:21:43

| Rpt #: | Prime 234 | Services Involved | | | |
|---|---|---|---|---|---|
| Call Source: PHONE | Unit: HEDGEPETH, CHAD ASHLEY | **LAW** | | | |

Location: **330 S CHURCH ST**

| X-ST: | NASH ST | | Jur: RM | Service: LAW | Agency: RMPD |
|---|---|---|---|---|---|
| | HAMMOND ST | | St/Beat: P34 | District: W | RA: L014 |
| Business: CRM POLICE DEPT | | Phone: | | | GP: L014 |

| Nature: **POLICE SERVICE** | Alarm Lvl: 1 | Priority: 3 | Medical Priority: |
|---|---|---|---|

Reclassified Nature:

| Caller: SGT GLASGOW | | Alarm: |
|---|---|---|
| Addr: FORT BENNETT GA | Phone: (706) 545-5223 | Alarm Type: |

| Vehicle #: | St: | Report Only: No | Race: | Sex: | Age: |
|---|---|---|---|---|---|

| Call Taker: SHARPEN | Console: CONSOLE5 |
|---|---|

| Geo-Verified Addr.: Yes | Nature Summary Code: | Disposition: C | Close Comments: |
|---|---|---|---|

Notes:   436 legacy dr plng from phone. nothing found when checked. [04/02/18 00:04:03 Unit:234]
this Is the location that the latitude longitude gave me when i put it in [04/01/18 21:41:13 SHARPEN]
male subj`s mother`s name is Samaria Evans [04/01/18 21:30:58 SHARPEN]
his cellphone number is 252-529-3804 and it`s with t-moblie and they adv that it`s pinging at the long/lat of 35-96441 and
-77.887294 [04/01/18 21:30:15 SHARPEN]
caller stated that the male subj stated that he was going to end it all but wanted to go and visit his mother first to say goodbye
[04/01/18 21:29:23 SHARPEN]
he adv that the last time someone saw him was on thursday and he text one of his classmates and told them to look under the
pillow and they found the suicide note [04/01/18 21:27:47 SHARPEN]
Caller adv that the marines name is Isaiah Evans-Ceaser and he got into some trouble and then found out the his mother had
checked herself into rehab [04/01/16 21:27:07 SHARPEN]
Rec`v call from Sgt. Glasgow from Fort Bennett GA reference to one of their marines that has gone AWOL and left a suicide
note behind [04/01/18 21:23:21 SHARPEN]

### Times

| Call Received: 04/01/18 21:21:43 | Time From Call Received | | |
|---|---|---|---|
| Call Routed: 04/01/18 21:30:33 | 000:08:50 | Unit Reaction: | (1st Dispatch to 1st Arrive) |
| Call Take Finished: 04/01/18 21:30:33 | 000:08:50 | En-Route: | (1st Dispatch to 1st En-Route) |
| 1st Dispatch: 04/01/18 22:31:32 | 001:09:49   (Time Held) | On-Scene: | 002:04:12 (1st Arrive to Last Clear) |
| 1st En-Route: 04/01/18 22:31:32 | 001:09:49 | | |
| 1st Arrive: 04/01/18 22:31:32 | 001:09:49   (Reaction Time) | | |
| Last Clear: 04/02/18 00:35:44 | 003:14:01 | | |

### Radio Log

| Unit | Empl ID | Type | Description | Time Stamp | Comments | Close Code | User |
|---|---|---|---|---|---|---|---|
| 234 | 6975 | D | Dispatched | 04/01/18 22:31:32 | Stat/Beat: P34 | | Unit:234 |
| 234 | 6975 | E | En-Route | 04/01/18 22:31:32 | Stat/Beat: P34 | | Unit:234 |

Pl. Am. Compl.   Case 4:21-cv-00045-FL   Document 16-2   Filed 08/27/21   Page 1 of 2   Exhibit B-1

**JA22**

| Event ID: 18-00031178 | Call Ref #: 421 | POLICE SERVICE at 330 S CHURCH ST |
|---|---|---|

| 234 | 6975 | A | Arrived | 04/01/18 22:31:32 | Stat/Beat: P34 | | Unit:234 |
|---|---|---|---|---|---|---|---|
| 234 | 6975 | X | Canceled | 04/01/18 22:31:41 | | | LYONSE |
| 234 | 6975 | D | Dispatched | 04/01/18 22:31:44 | Stat/Beat: P34 | | LYONSE |
| 234 | 6975 | E | En-Route | 04/01/18 22:31:47 | | | LYONSE |
| 222 | 7088 | D | Dispatched | 04/01/18 22:40:00 | Stat/Beat: P22 | | Unit:222 |
| 222 | 7088 | E | En-Route | 04/01/18 22:40:00 | Stat/Beat: P22 | | Unit:222 |
| 222 | 7088 | C | Cleared | 04/01/18 22:40:32 | | H | Unit:222 |
| 231 | 6863 | D | Dispatched | 04/01/18 22:57:20 | Stat/Beat: P31 | | LYONSE |
| 231 | 6863 | E | En-Route | 04/01/18 22:57:22 | | | LYONSE |
| 231 | 6863 | A | Arrived | 04/01/18 23:12:09 | | | LYONSE |
| 234 | 6975 | A | Arrived | 04/01/18 23:12:10 | | | LYONSE |
| 231 | 6863 | C | Cleared | 04/01/18 23:27:46 | | H | Unit:231 |
| 234 | 6975 | X | Canceled | 04/01/18 23:42:11 | Pre-empted to Event # 1800031200 | | Unit:234 |
| 234 | 6975 | D | Dispatched | 04/02/18 00:03:13 | Stat/Beat: P34 | | Unit:234 |
| 234 | 6975 | E | En-Route | 04/02/18 00:03:13 | Stat/Beat: P34 | | Unit:234 |
| 234 | 6975 | A | Arrived | 04/02/18 00:03:13 | Stat/Beat: P34 | | Unit:234 |
| 234 | 6975 | C | Cleared | 04/02/18 00:35:44 | | C | Unit:234 |

| Event Log | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unit | Empl ID | Type | Description | Time Stamp | Comments | Close Code | User |
| | | TR | Time Received | 04/01/18 21:21:43 | By: PHONE | | SHARPEN |
| | | ENT | Entered Street | 04/01/18 21:21:45 | 436 LEGACY DR | | SHARPEN |
| | | ENT | Entered Nature | 04/01/18 21:22:01 | POLICE SERVICE | | SHARPEN |
| | | ARM | Added Remarks | 04/01/18 21:23:21 | | | SHARPEN |
| | | ARM | Added Remarks | 04/01/18 21:27:07 | | | SHARPEN |
| | | ARM | Added Remarks | 04/01/18 21:27:47 | | | SHARPEN |
| | | ARM | Added Remarks | 04/01/18 21:29:23 | | | SHARPEN |
| | | ARM | Added Remarks | 04/01/18 21:30:15 | | | SHARPEN |
| | | ENT | Entered CallerName_Ca | 04/01/18 21:30:27 | SGT GLASGOW | | SHARPEN |
| | | CHG | Changed CallerAddress | 04/01/18 21:30:29 | 436 LEGACY DR --> | | SHARPEN |
| | | ENT | Entered CallerPhone | 04/01/18 21:30:33 | 7065455223 | | SHARPEN |
| | | ENT | Entered CallerPhone | 04/01/18 21:30:33 | 7065455223 | | SHARPEN |
| | | FIN | Finished Call Taking | 04/01/18 21:30:33 | | | SHARPEN |
| | | ARM | Added Remarks | 04/01/18 21:30:58 | | | SHARPEN |
| | | ARM | Added Remarks | 04/01/18 21:41:13 | | | SHARPEN |
| | | ENT | Entered CallerAddress | 04/01/18 21:41:22 | FORT BENNETT GA | | SHARPEN |
| | | CHG | Changed Street | 04/02/18 00:03:36 | 436 LEGACY DR --> 330 S CHURCH ST | | SHARPEN |
| | | ARM | Added Remarks | 04/02/18 00:04:03 | | | Unit:234 |

Pl. Am. Compl. 4:21-cv-00045-FL   Document 16-2   Filed 08/27/21   Page 2 of 2 Exhibit B-2

JA23



JA24



Verizon LTE 5:39 PM

C

Captain Smith

iMessage

April 17, 2018 5:39 PM

These are grenade
parts and guns we
talked about
Y'all need to come get
him we are all
concerned

Delivered

iMessage

Pl. Am. Compl.   Case 4:21-cv-00045-FL   Document 16-3   Filed 08/27/21   Page 2 of 2   Exhibit C-2

JA25

iMessage

**April 23, 2018, 5:50 PM**

We put Isaiah on a plane yesterday flew him back to you once again
And you didn't pick him up cause he's back here in NC at moms house
She worried I'm worried
Y'all need to pick his ASS up before something happens !!

Read 5:50 PM |

Pl. Am. Compl.   Case 4:21-cv-00045-FL   Document 16-4   Filed 08/27/21   Page 1 of 1   Exhibit D-1

**JA26**

No. 4:21-CV-45-FL

|  |  |  |
|---|---|---|
| MITCHELL GARNET EVANS, EXECUTOR OF THE ESTATE OF SALLIE COPELAND EVANS, | ) ) ) ) | UNITED STATES' MOTION TO DISMISS |
| PLAINTIFF, | ) ) | |
| V. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| DEFENDANT. | ) | |

## INTRODUCTION

The United States moves to dismiss Plaintiff Evans' Federal Tort Claims Act (FTCA) claim on two bases.

First, this Court lacks subject matter jurisdiction because Plaintiff's FTCA claim arises out of an assault or battery and thus is barred under 28 U.S.C. § 2680(h). Plaintiff's claim, therefore, must be dismissed for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)().

Alternatively, Plaintiff fails to allege a plausible claim of negligence because there are no allegations demonstrating the government owed a duty to Decedent. Accordingly, Plaintiff's claim should be dismissed for failure state a claim. Fed. R. Civ. P. 12(b)(6).

A memorandum in support is filed contemporaneously.

1

Respectfully submitted, this 22nd day of September, 2021.

G. NORMAN ACKER, III.
Acting United States Attorney


By:  /s/ Sharon C. Wilson
SHARON C. WILSON
Assistant United States Attorney
Civil Division
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4826
E-Mail: sharon.wilson2@usdoj.gov
N.C. Bar No. 18435
Attorney for Defendant

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this 22nd day of September, 2021, served a copy of the foregoing by placing a copy of the same in the U.S. Mail and/or electronically, addressed as follows:

Robert C. Slaughter, III
Slaughter Law Firm, PLLC
117 West Eden Street
Edenton, NC 27932

Christopher R. Hedrick
Mason, Mason, Walker, & Hedrick, P.C.
11848 Rock Landing Drive, Suite 201
Newport News, Va 23606

BY: <u>/s/ Sharon C. Wilson</u>
SHARON C. WILSON
Assistant United States Attorney
Civil Division
Attorney for Defendants

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 4:21-CV-45-FL

| | |
|---|---|
| MITCHELL GARNET EVANS, ) EXECUTOR OF THE ESTATE OF ) SALLIE COPELAND EVANS, ) | UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS |
| PLAINTIFF, ) | |
| V. ) | |
| UNITED STATES OF AMERICA, ) | |
| DEFENDANT. ) | |

**INTRODUCTION**

Plaintiff brings a wrongful death claim under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, for the murder of Decedent Sallie Evans (Decedent) by Isaiah Evans Ceaser (Ceaser), who was Decedent's grandson and at the time of the murder a Lance Corporal (LCPL) in the United States Marine Corps (USMC). However, this court lacks jurisdiction over Plaintiff's claim because it falls under the Intentional Torts Exception (ITE) to the FTCA, 28 U.S.C § 2680(h). Alternatively, Plaintiff's Amended Complaint should be dismissed for failure to state a claim because Plaintiff fails to plead facts establishing the United States breached a duty owed to Decedent independent of the government's employment of Ceaser.

1

In March and April 2018, LCPL Ceaser was on active duty with the USMC and was "under investigat[ion] for fraud." (DE 16, at ¶¶ 9, 10, 18). On or about March 30, 2018 (Friday), without authorization, Ceaser left his duty station at Fort Benning Georgia where his unit, including his commander, Captain Smith, was participating in "combat training school." (DE 16, at ¶ 10). At some point in time, Captain Smith "was made aware of the note" Ceaser left "stating he was going to end it all and kill himself." (DE 16, at ¶¶ 10-11).

On April 1, 2018 (Sunday, 9:23 pm), "Sergeant Glascow of Ceaser's unit" notified Nash County, North Carolina law enforcement, "where Ceaser's girlfriend and other friends lived . . . that Ceaser had gotten into trouble and left a note indicating he was going to end it all, but before committing suicide, Ceaser wanted to visit his mother . . . [who] was an inpatient in a medical facility in Halifax County, North Carolina." (DE 16, at ¶ 11; DE 16-2, at ¶ 1).

On an unspecified date, Plaintiff and other family members, including Decedent, notified Captain Smith that Ceaser "had returned to North Carolina and needed to be picked up by the Marine Corps." (DE 16, at ¶12). Captain Smith arranged for Ceaser to fly from Raleigh Durham (RDU) to the Atlanta Airport, "unsupervised," and Ceaser boarded the flight on April 5, 2018. (DE 16, at ¶¶ 13-14).

On or about April 10, 2018, Plaintiff and other family members learned that Ceaser was staying at his grandfather's home in Halifax County. (DE 16, at ¶ 15). At that time, Plaintiff and other family members, including Decedent, told Captain

Smith "that Ceaser was in Halifax County, North Carolina and that they were concerned and afraid something could happen." (DE 16, at ¶ 16). Decedent asked Captain Smith why the Marines had not picked up Ceaser and asked Captain Smith to have local law enforcement pick up Ceaser. (DE 16, at ¶ 17).

On April 11, 2018, Captain Smith told Decedent and another family member that Ceaser was being investigated for fraud and that Ceaser wrote disturbing letters/notes expressing "Ceaser's intent of violence against Ceaser and others." (DE 16, at ¶ 18). Captain Smith stated that "he was very concerned because of these notes' contents and advised that Decedent should be careful if she came into contact with Ceaser." (Id.). Decedent again requested that Smith "have Ceaser detained. [Captain] Smith advised her that the Marine Corps had already exhausted a large amount of resources trying to pick up Ceaser at the airport and would not commit to making any further effort to find and detain Ceaser." (DE 16, at ¶ 19).

On April 17, 2018, Plaintiff and another family member called Captain Smith, asked why the Marines had not picked up Ceaser, advised they "found grenade parts they believed Ceaser had acquired and that Ceaser was making posts on Facebook indicating he had purchased guns." (DE 16, at ¶ 20). Decedent and the other family member told Captain Smith "they were concerned something would happen," Ceaser was "acting aggressive and easily agitated," and they "requested that the Marine Corps have Ceaser detained by local law enforcement." (Id.). Captain Smith "stated that this was concerning, and he would see what he could do, but that the Marine

Corps had already exhausted resources trying to have Ceaser picked up when Ceaser was supposed to fly to Georgia." (Id.).

On or about April 22, 2018, Plaintiff and Decedent "transported Ceaser to [the Raleigh Durham Airport (RDU)], where they watched Ceaser board another flight to Atlanta, Georgia." (DE 16, at ¶ 21). Thereafter, Plaintiff and Decedent "told [Captain] Smith that Ceaser was on a plane to Atlanta, Georgia and needed to be detained at the airport. [Captain] Smith again stated that he did not have the resources to pick up Ceaser at the airport." (DE 16, at ¶ 22). Captain Smith "said he would see what he could do and would call them back." (Id.). Later that day, Captain Smith "advised that he could not have Ceaser detained at the airport, and Ceaser would need to take the shuttle or bus to the Marine Corps training location." (Id.).

On April 23, 2018, Decedent told Captain Smith that Ceaser returned to Halifax County and Captain Smith "refused to take any action to have Ceaser detained and instructed Decedent to take Ceaser to Marine Corps Base Camp Lejeune." (DE 16, at ¶ 23). Via text message on this date, Plaintiff demanded Captain Smith "pick [Ceaser] up cause he's back here in NC at mom's house. She worried. I'm worried. Y'all need to pick his [***] up before something happens!!" (DE 16, at ¶ 24).

On or about April 24, 2018, Captain Smith "again instructed Decedent to drive Ceaser to Marine Corps Base Camp Lejeune." (DE 16, at ¶ 25). On this same date, while in her home in Halifax County "while attempting to convince Ceaser to gather his belongings for the trip to Marine Corps Base Camp Lejeune, Ceaser shot Decedent in the back of the head with a 9 mm pistol, causing her death." (DE 16, at ¶¶ 3, 26).

**ARGUMENT**

I.    STANDARDS OF REVIEW.

    A.    Rule 12(b)(1).

The existence of subject-matter jurisdiction is a threshold question that a court must address before considering a case's merits. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88–89 (1998). "Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt." Ashcroft v. Iqbal, 556 U.S. 662, 671 (2009) (citation omitted). When subject-matter jurisdiction is challenged, the plaintiff has the burden of proving jurisdiction to survive the motion. Evans v. B.F. Perkins Co., 166 F.3d 642, 647–50 (4th Cir. 1999).

There are two subject matter challenges: veracity and facial. Durden v. United States, 736 F.3d 296, 300 (4th Cir. 2013). In the former, the veracity of the allegations presented in the complaint are challenged. (Id.) In the latter, the allegations are assumed to be true and, still, the complaint fails to set out facts that establish the existence of subject matter jurisdiction. (Id.). "When a facial challenge to subject-matter jurisdiction is raised, the facts alleged by the plaintiff in the complaint are taken as true, 'and the motion must be denied if the complaint alleges sufficient facts to invoke subject-matter jurisdiction.'" Kerns v. U.S., 585 F.3d 187, 192 (4th Cir. 2009). Here, the United States makes a facial challenge.

    B.    Rule 12(b)(6).

When considering a motion to dismiss under Rule 12(b)(6), "the court should accept as true all well-pleaded allegations and should view the

complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). A complaint must state a claim for relief that is facially plausible. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). Facial plausibility means that the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged," as merely reciting the elements of a cause of action with the support of conclusory statements does not suffice. Iqbal, 556 U.S. at 678. The Court need not accept the plaintiff's legal conclusions drawn from the facts, nor need it accept unwarranted inferences, unreasonable conclusions, or arguments. Philips v. Pitt County Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

II.    THE COURT LACKS JURISDICTION OVER PLAINTIFF'S CLAIM BECAUSE IT IS BARRED BY THE FTCA'S INTENTIONAL TORTS EXCEPTION.

The United States is immune from "suits for damages at common law" unless it waives sovereign immunity. Perkins v. United States, 55 F.3d 910, 913 (4th Cir.1995). Here, Plaintiff attempts to meet his burden to demonstrate this Court's subject matter jurisdiction, Kerns, at 194, by invoking the FTCA (DE 16, at ¶ 1). The FTCA "creates a limited waiver of the United States' sovereign immunity by authorizing damages actions for injuries caused by the tortious conduct of federal employees acting within the scope of their employment, when a private person would be liable for such conduct under state law." Suter v. United States, 441 F.3d 306, 310 (4th Cir.2006); 28 U.S.C. § 1346(b)(1).

However, the FTCA waiver of sovereign immunity excepts from its "broad grant of [subject matter] jurisdiction . . . 'any claim arising out of assault, battery' or other specified intentional torts." Sheridan v. United States, 487 U.S. 392, 398 (1988)(citing 28 U.S.C. § 2680(h)). This exception applies to exclude from the waiver of sovereign immunity claims based on the conduct, the assault and battery, of the intentionally tortious federal employee tortfeasor. "Congress believed that § 2680(h) would bar claims arising out of . . . deliberate attacks by Government employees." United States v. Shearer, 472 U.S. 52, 55 (1985). So, in this wrongful death claim where death resulted from murder there is no waiver of sovereign immunity and, thereby, the claim based on the acts of the alleged murderer, Ceaser, are barred by the intentional torts exception. Sheridan, at 398.

The government acknowledges that a Plaintiff's negligence claim can fall outside of the FTCA's intentional torts exceptions if it was "entirely independent of [the assailant's] employment status." Sheridan, 487 U.S. at 401. However, that is not the case here.

In Sheridan, the Supreme Court held that government liability may exist where a plaintiff proves negligent acts which are antecedent to a foreseeable assault or battery and "entirely independent" of the assailant's employment status. Sheridan, 487 U.S. at 401. In Durden, the Fourth Circuit clarified that it is "the government's ability (i.e. legal duty) to control [an assailant that] must be independent of the [assailant's] status as a government employee." Id. at 309. Central to the Supreme Court's analysis in Sheridan was the concern that "in a case in which the employment

7

status of the assailant has nothing to do with the basis for imposing liability on the Government, it would seem perverse to exonerate the Government because of the happenstance that [the assailant] was on a federal payroll." <u>Id.</u> at 402.

In the case at bar, Plaintiff's claim is based exclusively on the employment relationship between Ceaser and the USMC. (DE 16). Plaintiff did not plead any facts (DE 16) that support a basis for the USMC's legal duty to apprehend or control Ceaser other than, or independent of, Ceaser's status as active-duty enlisted personnel. <u>Durden</u>, at 309. Indeed, Plaintiff pled the USMC's authority to take Ceaser into custody was based on the USMC's knowledge that he was a danger to himself and others (DE 16, at ¶ 45) and because Ceaser was an absentee (DE 16, at ¶ 46). The only reason to ask the USMC to take Ceaser into custody was because, as pled, he was a federal employee (Marine) absent from the workplace (base). The same is true of the allegation that the USMC "instructed" Decedent to take Ceaser to Camp LeJeune. If Ceaser's employment status were eliminated, there would be no other reason for Decedent or her family to ask the USMC to detain Ceaser, for Ceaser to go to Camp Lejeune, or to even involve the Marine Corps.

The facts of this case are unlike <u>Sheridan</u> where the ITE was held not to apply. Unlike the facts in <u>Sheridan</u>, where federal personnel encountered the assailant, inebriated and brandishing a weapon on federal property, Ceaser was not on USMC property and USMC personnel did not interact with Ceaser when he was acting in an "aggressive" manner. (DE 16, at ¶ 20). Here, since Ceaser's federal employment status is central to Plaintiff's negligence claim, the FTCA intentional torts exception

bars Plaintiff's claim and it must be dismissed for lack of subject matter jurisdiction.

Fed. R. Civ. P. 12(b)(1).

III.   ALTERNATIVELY, PLAINTIFF'S FTCA CLAIM SHOULD BE DISMISSED
       FOR FAILURE TO PLEAD A CLAIM PLAUSIBLE UNDER NORTH
       CAROLINA LAW.

   A. North Carolina Law Applies To This FTCA Claim.

   "An action [for negligence] under the FTCA may only be maintained if the

Government would be liable as an individual under the law of the state where the

negligent act occurred."   Kerns, 585 F.3d at 194 (citing 28 U.S.C. § 1346(b)(1)).

Though the omissions pled were by Ceaser's command in Georgia, Georgia's choice-

of-law in tort cases looks to the law of the place of injury.  Auld v. Forbes, 309 Ga.

893, 894 (2020).  In this wrongful death case, the injury occurred in North Carolina

so North Carolina's tort law governs this case.

   B. There Was No Duty Owed By The Government To Decedent Under North
      Carolina Law.

   "In North Carolina . . . a defendant cannot be held liable for negligence absent

a duty owed to the plaintiff and breach of that duty." Durden, at 300 (citing  Stein v.

Asheville City Bd. of Educ., 360 N.C. 321, 626 (2006)). Under North Carolina law,

"[i]n general, there is neither a duty to control the actions of a third party, nor to

protect another from a third party." Durden,  at 304 (quoting Scadden v. Holt, 733

S.E.2d 90, 92 (N.C. Ct. App. 2012)). An exception to the general rule occurs when a

"special relationship" exists between the defendant and plaintiff or between

defendant and a third party. Id.

9

Under North Carolina law, "[s]pecial relationships create a responsibility to take affirmative action for the aid or protection of another, and they arise only in narrow circumstances." Durden, at 304-05 (citing Bridges v. Parrish, 742 S.E.2d 794, 797 (N.C.2013)). Recognized special relationships in North Carolina include: (1) parent-child, (2) master-servant, (3) landowner-licensee, (4) custodian-prisoner, and (5) institution-involuntarily committed mental patient. King v. Durham Cnty. Mental Health Dev. Disabilities & Substance Abuse Auth., 113 N.C. App. 341, 346, 439 S.E.2d 771, 774 (1994). When a "special relationship" arises between defendant and a third-party tortfeasor, "'there is a duty upon the actor to control the [tortfeasor's] conduct and to guard other persons against his dangerous propensities.'" Durden, at 305 (citing  King v. Durham Cnty. Mental Health Developmental Disabilities & Substance Abuse Auth., 113 N.C.App. 341, 439 S.E.2d 771, 774 (1994)).  In order to determine if a special relationship exists, a court will examine whether (1) the defendant knows or should know of the third person's violent propensities and (2) the defendant has the ability to control the third person at the time of the third person's criminal activity. Stein v. Asheville City Bd. Of Educ., 360 N.C. 321, 330, 626 S.E.2d 263, 269 (2006).

In Durden, the Fourth Circuit applied Stein's two-prong test to a fact pattern substantially similar to that presented in the instant case and declined to find a "special relationship" between the military and an on-base-residing active duty serviceman due to lack of control over the tortfeasor-serviceman. Durden, a base resident, was raped by an active duty Army serviceman who had just been released

10

from civilian jail for burglarizing an off-base home and assaulting the occupants with a pellet gun. Id. at 299. After his parents posted bail, the Army returned the serviceman to base issuing orders restricting him to barracks and mandating hourly room checks. Id. The Army knew the orders were not being enforced and did nothing. Id. Nearly two months after his return to base, the serviceman raped Durden in her on-base home. Id. at 300. A DNA sample collected during the investigation of the rape, for the first time, identified the serviceman as "being involved in burglaries and sexual assaults" in the prior year. Id. Prior to the rape, several times the serviceman informed his command and peers that he "wanted to kill himself and eleven members of his unit." Id. at 299. Based thereon, Plaintiff alleged "the Army had a special relationship with [the serviceman] insofar as the Army (1) '[knew] or should [have] know[n] of [serviceman's] violent propensities' and (2) 'ha[d] the ability and opportunity to control [serviceman] at the time' that he raped Durden." Id. at 305.

The Fourth Circuit declined to find liability under the FTCA. The Court held that, even assuming, arguendo, that Durden could satisfy both prongs of the Stein special relationship test and was negligent in failing to control the assailant, Durden's claim still failed to demonstrate the government was liable pursuant to the FTCA. Durden, 736 F.3d at 304. The Court held, in pertinent part:

> "[t]he ability and opportunity to control [a third party] must be more than mere physical ability to control. Rather, it must rise to the level of custody, or legal right to control." Scadden, 733 S.E.2d at 93. The FTCA is clear, however, that the government is liable only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (emphasis added). Thus, setting aside the Army's ability to control [the serviceman] that

attached solely pursuant to his employment status as a soldier, the Army must have had **some other legal authority to control him**. But Durden cannot demonstrate (nor has she alleged) that the Army had the ability to control [the serviceman] pursuant to some legal authority independent of [the serviceman's] employment status and, accordingly, the Army cannot be said to have a "special relationship" with him for purposes of an FTCA claim.

Id. (citing Stein, 626 S.E.2d at 269) (emphasis added).

Here, just as in Durden, Plaintiff fails to allege facts demonstrating the USMC had some other legal authority to control Ceaser. Specifically, Plaintiff pled that Ceaser had fled not only the military base, but also the state. (DE 16, at ¶¶10-15, 23). Indeed, the facts were much stronger for Durden who pled that the assailant was housed on base, ordered confined to the barracks, and limited to escorted movement outside the barracks.

The fact that Ceasar was an absentee does not save Plaintiff's claim because any basis to control him would then derive exclusively from his employment relationship. In Durden, the Court specifically rejected this as a sufficient basis to create a special relationship stating, "setting aside the Army's ability to control [the serviceman] that attached solely pursuant to his employment status as a soldier, the Army **must** have had **some other legal authority** to control him." Durden at 305 (emphases added). Here, Plaintiff failed to plead "some other legal authority," beyond the USMC simply being Ceaser's employer. In essence, at the time that Ceaser left Fort Benning, the USMC had no legal basis to take him into custody, physically restrain him, and/or deprive him of his constitutional rights in a way similar to the accepted categories of special relationships under North Carolina law. See King, 439

S.E.2d at 774. Accordingly, like in Durden, the government cannot be said to have a "special relationship" with Ceaser for purposes of an FTCA claim. Durden, at 305 (citing Stein, 626 S.E.2d at 269).

Plaintiff also fails to meet his burden on the knowledge prong of the Stein test because, although Ceaser made statements regarding suicide and, perhaps harm against unspecified others, Plaintiff failed to allege Ceaser ever took any step toward committing such an act prior to the incident on April 24, 2018. Even if Ceaser had committed violent acts, or taken steps in furtherance of his statements, prior to the events of April 24, 2018, Plaintiff also failed to allege that the USMC had any knowledge of those happenings. Thus, Plaintiff's claim fails for this additional reason.

Alternatively, Plaintiff alleged the United States "assumed" a duty to protect Decedent when a USMC officer "instructed" Decedent to take Ceaser to a USMC base in North Carolina. (DE 16, at ¶¶ 40-42). However, Plaintiff failed to plead sufficient facts giving rise to such a duty that was independent of Ceaser's employment status and thus fails to state a claim.

North Carolina recognizes assumption of a duty to protect. "[U]nder certain circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person for injuries resulting from his failure to exercise reasonable care in such undertaking." Durden, at 305 (citing Quail Hollow E. Condo. Ass'n v. Donald J. Scholz Co., 47 N.C.App. 518, 268 S.E.2d 12, 15 (1980)). Such a duty

is triggered whenever "a party [places] himself in a position where his affirmative conduct may be expected to affect the interest of another person." , Ingle v. Allen, 71 N.C.App. 20, 27, 321 S.E.2d 588, 594 (1984), overruled on other ground by Dep't of Transp. v. Rowe, 351 N.C. 172, 521 S.E.2d 707 (1999).

Here, Plaintiff fails to allege facts demonstrating that the USMC assumed a duty to protect Decedent. As pled, the USMC did not have control over Ceaser during the time relevant to the complaint. (DE 16). Ceaser left the military base and, even, the state where his command was stationed. It is axiomatic that Ceaser was not in USMC custody; indeed, he was not even on barracks restriction as in Durden. Ceaser also had not been arrested and jailed based on probable cause that he committed a felony, including any assaultive behavior to others. According to Plaintiff's allegations, Ceaser had been away from the base in Georgia for several weeks prior to the murder, apparently with his family in Halifax County.

Additionally, Plaintiff's allegation that the USMC instructed Ceaser be taken to Camp Lejuene fails to support assumption of a duty to protect Decedent. Specifically, there are no facts indicating that this instruction was necessary for the protection of Ceaser's family, particularly Decedent. Plaintiff pled that Captain Smith advised Plaintiff and Decedent to be careful in dealing with Ceaser as Ceaser had been under stress while on base: Ceaser was under investigation for fraud. (DE 16, at ¶ 18). Smith advised that Ceaser had reacted badly, including drafting a disturbing note forecasting violence against himself and "others" (id., at 10, 11), but ultimately Ceaser left the military base to see his mother (DE 16, at ¶ 11). While

14

Plaintiff alleges he and Decedent were "concerned and afraid something would happen" there are no allegations that the USMS was aware of any threats or acts of violence made toward Ceaser's family, and specifically Decedent, or that there even, in fact, were such threats or acts of violence. Instead, according to Plaintiff, Decedent and Ceaser's family allowed Cesar into their home(s), and Plaintiff and Decedent had ridden with Ceaser in the confined space of a vehicle for hours from Halifax County to RDU, specifically to return Ceaser to the military. (DE 16, at ¶ 21).

The Fourth Circuit's decision in <u>Durden</u> supports the conclusion that the government did not assume a duty here. In <u>Durden</u>, Plaintiff alleged that "by undertaking the task of monitoring and controlling [the serviceman] following his release from civilian confinement, the Army voluntarily assumed a duty to protect her from [the serviceman] and breached that duty when [the serviceman] raped her." <u>Id.</u> The Fourth Circuit rejected this argument.

The Court held that Durden's assumption-of-a-duty-to-protect argument failed because Durden could not "demonstrate that the Army should have recognized that enforcing [confinement to barracks and escorted movement] orders . . . was necessary for the protection of others." <u>Durden</u>, at 305. The serviceman had been released from jail for more than six weeks prior to the rape, and there was nothing in the record to indicate that the Army should have known the serviceman posed a threat to Durden, including the Army's knowledge of one prior burglary and his expressed desires to kill himself and members of his unit. <u>Durden</u>, at 306. The Court specifically noted that, at the time of the rape, the Army did not know of the several

other burglaries and sexual assaults in the prior year. Id. The Court noted that if the Army had known that one of its soldiers and, specifically Durden's rapist, committed the sexual assaults in the prior year, then the Army "may have had reason to know that the serviceman was a serial offender and thus [it] owed to Durden a duty to control the serviceman upon his release from civilian confinement." Durden at 306 (citing Lumsden v. United States, 555 F.Supp.2d 580, 582 (E.D.N.C.2008)). For the same reasons Durden's claim failed, Plaintiff's failure to plead facts indicating any action by the USMC was necessary for the protection of Ceaser's family, including Decedent, is fatal to his claim.

Further, even if Plaintiff could establish the government's instruction to the family to take Ceaser to Camp Lejeune gave rise to a duty to protect Decedent under North Carolina law, such a duty would not be independent of Ceasar's employment status. Any ability to restrain Ceasar once he returned to Camp Lejeune would stem solely from Ceaser being a government employee.

In sum, Plaintiff fails to allege facts indicating the government owed a duty to Decedent. Accordingly, Plaintiff's claim should be dismissed for failure to state a claim.

## CONCLUSION

This Court lacks subject matter jurisdiction over Plaintiff's FTCA claim because the claim arises out of an assault or battery and thus is barred under 28 U.S.C. § 2680(h). Hence, Plaintiff's claim must be dismissed for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

16

Alternatively, Plaintiff fails to allege a plausible claim of negligence because there are no allegations demonstrating the government owed a duty to Decedent. Accordingly, Plaintiff's claim should be dismissed for failure state a claim.

Respectfully submitted, this 22nd day of September, 2021.

G. NORMAN ACKER, III.
Acting United States Attorney


By: /s/ Sharon C. Wilson
SHARON C. WILSON
Assistant United States Attorney
Civil Division
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4826
E-Mail: sharon.wilson2@usdoj.gov
N.C. Bar No. 18435
Attorney for Defendant

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this 22nd day of September, 2021, served a copy

of the foregoing by placing a copy of the same in the U.S. Mail and/or electronically,

addressed as follows:

Robert C. Slaughter, III
Slaughter Law Firm, PLLC
117 West Eden Street
Edenton, NC 27932

Christopher R. Hedrick
Mason, Mason, Walker, & Hedrick, P.C.
11848 Rock Landing Drive, Suite 201
Newport News, Va 23606


BY: <u>/s/ Sharon C. Wilson</u>
SHARON C. WILSON
Attorney for Defendants
Assistant United States Attorney
Civil Division

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### Eastern Division
### No. 4:21-CV-00045-FL

| | | |
|---|---|---|
| MITCHELL GARNET EVANS, | ) | |
| Executor of the Estate of Sallie | ) | |
| Copeland Evans, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM IN** |
| v. | ) | **RESPONSE TO UNITED STATES'** |
| | ) | **MOTION TO DISMISS** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### INTRODUCTION

Defendant has moved for dismissal of this Federal Torts Claim Act ("FTCA") case on

two bases: lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and

failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated

below, the Court should deny Defendant's motion to dismiss.

### NATURE OF CASE

Plaintiff seeks money damages for the wrongful death of his mother, Sallie Copeland

Evans ("the decedent"), who was shot and killed by her grandson Isaiah Evans Ceaser

("Ceaser"), a member of the United States Marine Corps ("Marine Corps"). In his Amended

Complaint, Plaintiff alleges that the decedent's death was caused by the negligence of Marine

Corps members while acting within the scope of their office or employment, under

circumstances where the United States, if a private person, would be liable to Plaintiff in

accordance with the law of the State of North Carolina. Plaintiff alleges that a proximate cause of

the decedent's death was the negligence of Marine Corps members in their acts and omissions in

1

response to requests by the decedent, Plaintiff, and others for protection from Ceaser, who the Marine Corps members knew or should have known was highly dangerous. The final act of Marine Corps negligence that Plaintiff alleges was instructing the decedent to drive Ceaser to Marine Corps Base Camp Lejeune. Ceaser shot the decedent while she was trying to convince him to take that trip with her.

## FACTS

Plaintiff adopts by reference the Facts section of United States' Memorandum in Support of Motion to Dismiss (DE 19 at pp. 2–4), which is an accurate statement of the facts.

## ARGUMENT

### I. Standards of Review

Plaintiff agrees with the standards of review stated in the Argument section of United States' Memorandum in Support of Motion to Dismiss (DE 19 at pp. 5–6).

### II. Rule 12(b)(1)

Defendant moves the Court to dismiss this action under Rule 12(b)(1) on the ground that Plaintiff's action is barred by 28 U.S.C. § 2680(h), under which the provisions of the FTCA do not apply to claims arising out of assaults or batteries. This exception does not apply to all claims arising out of assaults or batteries; it applies only to claims arising out of assaults or batteries by federal employees. *Sheridan v. United States*, 487 U.S. 392, 400 (1988). And the exception does not apply to all FTCA claims in which harm was caused by an assault or battery by a federal employee. The negligence of other federal employees who allow a foreseeable assault or battery by a federal employee to occur can furnish a basis for FTCA liability that is entirely independent of the assailant's employment status. *Id*. at 401.

In *Sheridan*, a drunk off-duty naval medical aide named Carr fired rifle shots into an

automobile near a naval hospital. The FTCA action was based on the negligence of naval corpsmen in allowing Carr to leave the hospital while possessing a loaded rifle. The Court found it clear that Carr's being a federal employee instead of a hospital patient or visitor should not provide a basis for protecting the government from liability. *Id.* at 402. Thus, the Court held that "Because neither Carr's employment status nor his state of mind has any bearing on the basis for petitioners' claim for money damages, the intentional tort exception to the FTCA is not applicable in this case." *Id.* at 403.

Defendant relies extensively on *Durden v. United States*, 736 F.3d 296 (4th Cir. 2013) in its Rule 12(b)(1) and Rule 12(b)(6) arguments. According to Defendant, the *Durden* fact pattern was "substantially similar" to that presented in this case. (DE 19 at p. 10). In *Durden*, an Army member named Pernell raped the plaintiff, Maria Durden, in her Fort Bragg, North Carolina home. Durden brought an FTCA action based on the Army's negligence. In her complaint, she alleged that the Army was aware that Pernell posed a safety risk, had a duty to protect her, and breached that duty. The government moved for dismissal for lack of subject matter jurisdiction and for failure to state a claim. The government asserted that the Army breached no duty to Durden under North Carolina law and that the claim was barred by the FTCA's intentional tort exception. Holding that Durden's negligence theories failed and that the intentional tort exception applied, the district court granted the motion to dismiss. The court of appeals agreed that Durden's negligence theories failed and affirmed the dismissal, but the court held that the district court erred in dismissing the case under the alternative basis of the intentional tort exception.[1]

---

[1] The district court dismissed the case for lack of subject matter jurisdiction, The court of appeals found that the district court's statement that the dismissal was for lack of subject matter jurisdiction was technically incorrect and that the district court considered the negligence issue as if it were the basis of a Rule 12(b)(6) motion that had been converted

In *Durden*, the court of appeals noted that the district court held that Pernell's government employee status was a but-for element of Durden's negligence claim, so her claim was barred. *Durden* at 308-09. The district court reasoned that since the Army's knowledge of Pernell's criminal propensities came solely from his government employment, the Army's breach of any duty to Durden was not independent of the employment. *Id.*at 309. The court of appeals, though, in finding that the district court's but-for reasoning was flawed, stated:

> The same could be said, however, about the corpsmen's knowledge of the intoxicated tortfeasor in <u>Sheridan</u>: presumably, the corpsmen alleged to have acted negligently would not have been present in the naval hospital that night —and thus would not have gained knowledge of the drunken tortfeasor and put themselves in a position to be negligent in the first instance—were it not for their government employment.

*Id.*

*Lumsden v. United States*, 555 F. Supp. 2d 580 (E.D.N.C. 2008) is discussed in *Durden*. In *Lumsden*, the FTCA complaint alleged that Marine Corps agents or officers impounded Marine Corps Private Lucas Borges' car, which contained cylinders of government ether, knowing that he had acquired and inhaled government ether on several occasions. Several days later, Marine Corps officers released to Borges the car, still containing the cylinders of ether. Then Borges became intoxicated on ether and drove in the wrong lane of a highway, causing a head-on collision with another car. One person in the other car was killed and others were injured. Borges was convicted in state court of second-degree murder, four counts of assault with a deadly weapon, and driving while impaired.

---

into a summary judgment motion. So the court of appeals applied the standard for granting summary judgment: whether the government was entitled to judgment as a matter of law.

4

The *Lumsden* complaint alleged negligence by the government officers and agents who released to Borges the car containing ether, knowing of his propensity to abuse ether and become dangerously intoxicated. The government moved to dismiss the complaint under Rule 12(b)(1) on the ground of the intentional tort exception and under Rule 12(b)(6) on the ground that the complaint did not state a claim. The district court denied the motion to dismiss.

On the Rule 12(b)(1) issue, the court in *Lumsden* found that the complaint could not be reasonably read to allege that the plaintiffs were seeking relief arising from an intentional assault by Borges. *Id.* at 584. The court further found that Borges's government employment was irrelevant to the plaintiff's liability theory. *Id.* Quoting *Sheridan*, the court held that because neither Borges's employment status nor his state of mind had any bearing on the claim for money damages, the FTCA intentional tort exception was not applicable. *Lumsden* at 585. The court dismissed the Rule 12(b)(1) motion to dismiss as baseless. *Id.*

In the present case, Plaintiff's action is purely for money damages for negligence. In the Amended Complaint, he alleges that Marine Corps members, particularly Ceaser's commander, Captain Smith ("Smith"), were negligent in failing to protect the decedent from Ceaser in response to numerous requests made by her, Plaintiff, and others for help. As in *Sheridan*, *Durden*, and *Lumsden*, Ceaser's employment status had no bearing on Plaintiff's claim for money damages.

According to Plaintiff's Amended Complaint, the Marine Corps' negligence in response to the repeated cries for help for protection from the dangerous Ceaser reached a high point of disgrace in the final days of the decedent's life. By then, Smith knew full well that Ceaser posed an immediate risk of harm to the decedent and others. (DE 16 at ¶¶ 10, 16, 18, 20, 22). He had even expressed his concern to the decedent and Plaintiff's wife. (DE 16 at ¶ 18). The decedent

5

and members of her family simply wanted the Marine Corps to pick up Ceaser or have him detained by local law enforcement officials, either of which the Marine Corps could have readily done, but failed to do. (DE 16 at ¶¶ 12, 17, 19, 20, 22, 31, 33). On April 23, 2018, Ceaser was back in Halifax County, North Carolina, after boarding a plane at Raleigh-Durham International Airport ("RDU") to fly to Atlanta the day before, supposedly to return to his military duty station. (DE 16 at ¶¶ 22, 23). That day the decedent again contacted Smith, and Smith again refused to take any action to have Ceaser detained. (DE 16 at ¶ 23). Instead, Smith instructed the decedent to take Ceaser to Camp Lejeune in or near Jacksonville, North Carolina. (DE 16 at ¶ 23). On or about April 23, 2018, Plaintiff saw the decedent crying, and she was complaining that Smith had instructed her to drive Ceaser to Camp Lejeune. (DE 16 at ¶ 24). Plaintiff then sent this text message to Smith: "We put Isaiah on a plane yesterday flew him back to you once again And you didn't pick him up cause he's back here in NC at moms house She worried I'm worried Y'all need to pick his ASS up before something happens!!" (DE 16 at ¶ 24). On or about April 24, 2018, Smith again instructed the decedent to drive Ceaser to Camp Lejeune. (DE 16 at ¶ 25). Then, while the decedent was with Ceaser at her Halifax County home attempting to convince him to gather his belongings for the trip to Camp Lejeune, he shot her in the head with a 9 mm pistol, killing her. (DE 16 at ¶ 26).

The Amended Complaint alleges shockingly poor judgment by Smith. Knowing Ceaser posed a great danger to the decedent, Smith instructed her to drive him to Camp Lejeune. No reasonable person would have given Ceaser's grandmother that instruction under the circumstances. Smith knew Ceaser was dangerous and had to have known he would not want to take that trip. Foreseeably, Ceaser resisted the trip by committing a violent act.

Plaintiff's action does not depend on Ceaser's status as a government employee any more than did the actions in *Sheridan*, *Durden*, and *Lumsden.* At the heart of Plaintiff's action is that the immediate cause of the decedent's death was Smith's instructing her to get the dangerous Ceaser into a car for a trip to a location to which, as shown by his actions, he did not want to go. That would have been negligent instructions whether Ceaser was a Marine or not.

Defendant makes the type of but-for argument rejected by the courts: "If Ceaser's employment status were eliminated, there would be no other reason for Decedent or her family to ask the USMC to detain Ceaser, for Ceaser to go to Camp Lejeune, or to even involve the Marine Corps." (DE 19 at p. 8). But that sort of argument was made and rejected in *Sheridan*, *Durden*, and *Lumsden.* In *Sheridan*, but-for Carr's employment status, he would not have been at the hospital. In *Durden*, but for Pernell's employment status as a soldier, the Army would not have had any involvement with him. In *Lumsden*, but-for Borges' employment status as a Marine, he would not have had government ether, and the Marine Corps would not have had any involvement with his car. The court in *Lumsden* found that Borges's government employment was irrelevant to the plaintiff's liability theory. Since that was true in *Lumsden*, it is surely also true in this case.

Because the intentional tort exception to the FTCA is inapplicable in this case, the Court should deny Defendant's motion to dismiss under Rule 12(b)(1).

**III. Rule 12(b)(6)**

Defendant moves the Court to dismiss this action under Rule 12(b)(6) for failure to state a claim. Defendant argues, correctly, that this issue is controlled by North Carolina law and that under North Carolina law, generally a party has no duty to protect another from a third party. As stated by Defendant, recognized exceptions are where (1) a special relationship creates a

responsibility to protect another, and (2) a party assumes a duty to protect another from a third party. Without conceding that the first exception is inapplicable, Plaintiff will address only the second exception, which is clearly applicable.

North Carolina "law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence." *Council v. Dickerson's Inc.*, 233 N.C. 472, 474, 64 S.E.2d 551, 553 (1951).

> As a general proposition of the law of torts, it is settled that, under certain circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person, for injuries resulting from his failure to exercise reasonable care in such undertaking.[2]

*Quail Hollow East Condominium Asso. v. Donald J. Scholz Co.*, 47 N.C. App. 518, 522, 268 S.E.2d 12, 15 (1980).

The allegations in Plaintiff's Amended Complaint show that Smith entered upon an active course of conduct in his dealings with the decedent and her family. After the decedent and other family members advised Smith that Ceaser had returned to North Carolina, Smith arranged for Ceaser to fly from RDU to Atlanta, unsupervised, on or about April 5, 2018. (DE 16 at ¶¶ 12, 13). On or about April 11, 2018, Smith told the decedent and Plaintiff's wife that he found disturbing letters and notes from Ceaser in which he expressed intent to harm himself and others, and Smith stated he was very concerned about the notes' content and advised that the decedent should be careful if she came in contact with Ceaser. (DE 16 at ¶ 18). Finally and fatally, Smith twice instructed the decedent to take Ceaser to Camp Lejeune. (DE 16 at ¶¶ 23, 25).

---

[2] In recognizing the assumption of duty exception, *Durden* quotes from this sentence.

In his Amended Complaint, Plaintiff has alleged that, under North Carolina law, the Marine Corps assumed the legal right and duty to apprehend and control Ceaser and protect the decedent and others from him. (DE 16 at ¶ 40). Plaintiff has also alleged that, under North Carolina law, by instructing the decedent to drive or take Ceaser to Camp Lejeune, Smith voluntarily assumed a legal duty to protect the decedent from Ceaser. (DE 16 at ¶ 41). Furthermore, Plaintiff has alleged that when Smith entered upon the active course of conduct of instructing the decedent to drive or take the decedent to Camp Lejeune, North Carolina law imposed upon him a positive duty to exercise ordinary care to protect the decedent from harm. (DE 16 at ¶ 42).

Plaintiff cannot prevail in this FTCA action unless the United States, if a private person, would be liable to Plaintiff in accordance with North Carolina law. 28 U.S.C. § 2672. Plaintiff has alleged that to be true (DE 16 at ¶ 51) and has alleged specific facts supporting that proposition.

While acknowledging that "North Carolina recognizes assumption of a duty to protect" (DE 19 at p. 13), Defendant argues that "As pled, the USMC did not have control over Ceaser during the time relevant to the complaint." (DE 19 at p. 14). But that is not the pertinent issue. The pertinent issue is whether the Marine Corps (or Smith in particular), if a private person, would be liable to Plaintiff under North Carolina law in these circumstances. If, under North Carolina law, the Marine Corps or Smith voluntarily assumed a duty to protect the decedent, and a breach of that duty proximately caused the decedent's death, then Defendant is liable for the decedent's wrongful death. Plaintiff has pled, among other allegations, that the Marine Corps was negligent in instructing the decedent to drive or take Ceaser to Camp Lejeune when the Marine Corps knew or should have known that he posed an immediate risk of harm, including

death, to himself, the decedent, or others (DE 16 at ¶ 48c) and that the negligence of the Marine Corps was a proximate cause of the decedents' death (DE 16 at ¶ 49). According to the allegations of the Amended Complaint, the direct result of those instructions was the decedent's death. The allegations of the Amended Complaint would be sufficient to state a claim under North Carolina law if the Marine Corps or Smith were a private person. Plaintiff has alleged that the Marine Corps had the ability and legal authority to control Ceaser. (DE 16 at ¶¶ 44, 45). The lack of an allegation that the Marine Corps had actual control over Ceaser "during the time relevant to the complaint" has no legal consequence.

Defendant also argues that Plaintiff makes no allegation that the instruction to take Ceaser to Camp Lejeune was necessary for the protection of Ceaser's family, particularly the decedent. (DE 19 at p. 14). Defendant misses the point, which is that the instruction was not only unnecessary for the protection of anyone, but was also ill-advised, negligent, and a proximate cause of the decedent's death.

Defendant further argues that *Durden* "supports the conclusion that the government did not assume a duty here." (DE 19 at p. 15). Defendant states that the court in *Durden* noted that at the time of the rape, the Army did not know of several other burglaries and sexual assaults in the prior year and that if the Army had known that Pernell was a serial offender, the Army may have had a duty to control him upon his release from civilian confinement. (DE 19 at pp. 15–16). If anything, *Durden* supports Plaintiff's position. Smith had notice of imminent danger when he received this text: "We put Isaiah on a plane yesterday flew him back to you once again And you didn't pick him up cause he's back here in NC at moms house She worried I'm worried Y'all need to pick his ASS up before something happens!!" Under *Durden*, that text, combined with

what Smith already knew about Ceaser's dangerous propensities, was sufficient to give rise to a duty of the Marine Corps and Smith to protect the decedent.

Defendant finally argues that "even if Plaintiff could establish the government's instruction to the family to take Cesar to Camp Lejeune gave rise to a duty to protect Decedent under North Carolina law, such a duty would not be independent of Ceaser's employment status." (DE 19 at p. 16). That argument fails for the same reason it fails in connection with the government's Rule 12(b)(1) argument. Plaintiff's action simply does not depend on Ceaser's status as a government employee.

Because Plaintiff has stated a valid FTCA claim, the Court should deny Defendant's motion to dismiss under Rule 12(b)(6).

**CONCLUSION**

Taking the allegations of the Amended Complaint as true, the Court should find that Plaintiff's FTCA claim does not arise out of an assault or battery and, thus, is not barred by the intentional tort exception to the FTCA under 28 U.S.C. § 2680(h). Therefore, the Court should deny Defendant's motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction.

The Court, taking the allegations of the Amended Complaint as true, should find that (1) Smith, acting within the scope of his government employment, entered upon an active course of conduct that imposed upon him the positive duty under North Carolina law to exercise ordinary care to protect the decedent from harm by Ceaser; (2) Smith breached that duty; (3) Smith's breach of that duty was a proximate cause of the decedent's death; and (4) Smith, if a private person, would be liable under North Carolina law to Plaintiff for the decedent's wrongful death. Because Plaintiff has stated an FTCA claim upon which relief can be granted, the Court should deny Defendant's motion to dismiss under Rule 12(b)(6).

11

This the 25th day of October 2021.

MITCHELL GARNETT EVANS

_____/s/ Robert C. Slaughter, III
Robert C. Slaughter, III
Slaughter & Lupton Law, PLLC
117 West Eden Street
Edenton, NC 27932
Phone: (252) 439-0700
Fax: (252)-689-8400
rslaughter@slaughterlupton.com
NC State Bar No.: 16515
*Attorney for Plaintiff*

_____/s/ Christopher R. Hedrick
Christopher R. Hedrick
Mason, Mason, Walker & Hedrick, P.C.
11848 Rock Landing Drive, Suite 201
Newport News, VA 23606
Phone: (757) 873-3909
Fax: (757) 873-1781
chedrick@masonwalker,com
NC State Bar No.: 19574
*Attorney for Plaintiff*

**Certificate of Service**

I certify that on October 25, 2021, I served this document electronically, using the

CM/ECF system, upon:

Sharon C. Wilson
Attorney for Defendant
United States Attorney's Office
Wells Fargo Building
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601

_____/s/ Christopher R. Hedrick
Christopher R. Hedrick
Mason, Mason, Walker & Hedrick, P.C.
11848 Rock Landing Drive, Suite 201
Newport News, VA 23606
Phone: (757) 873-3909

12

Fax: (757) 873-1781
chedrick@masonwalker.com
NC State Bar No.: 19574
*Attorney for Plaintiff*

No. 4:21-CV-45-FL

| | | |
|---|---|---|
| MITCHELL GARNET EVANS, | ) | |
| EXECUTOR OF THE ESTATE OF | ) | |
| SALLIE COPELAND EVANS, | ) | |
| | ) | UNITED STATES' |
| PLAINTIFF, | ) | REPLY |
| | ) | |
| V. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Plaintiff opposes the United States' motion to dismiss arguing his claim is not barred by the intentional tort exception (ITE) to waiver of sovereign immunity in the Federal Tort Claims Act (FTCA) because his claim does not depend on Ceaser's employment. This argument fails because the United States' ability, its legal duty to control Ceaser in this case, is not independent of Ceaser's federal employment. Thus this court lacks jurisdiction.

Plaintiff opposes the alternative argument, failure to state a claim, by arguing that he pled facts that support the Marines were negligent in failing to retrieve Ceaser upon Plaintiff and Decedent's several requests to do so and by instructing Decedent to take Ceaser to Camp Lejeune. These arguments fail for lack of legal duty and thus Plaintiff fails to state a claim.

Last, under the ordinary negligence standard argued in Plaintiff's response, the FTCA claim is barred by Decedent's contributory negligence and should be dismissed for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

1

I.    THE ITE BARS PLAINTIFF'S CLAIM BECAUSE THE UNITED STATES DID NOT HAVE THE ABILITY OR DUTY TO CONTROL CEASER INDEPENDENT OF HIS FEDERAL EMPLOYMENT STATUS.

Plaintiff argues the ITE does not apply because his claim is based on negligence of employees other than Ceaser. (DE 22, at 5-7). Plaintiff's argument fails because his claim is based wholly on, not independent of, the fact that Ceaser was a Marine, a federal employee. If Ceaser were not a Marine, there would have been no basis to contact the Marines to retrieve him, for the Marines to instruct his return to a Marine base, to find the United States had a duty to act or to find the United States liable for the assault. Accordingly, the FTCA's ITE applies and Plaintiff's claim must be dismissed for lack of subject matter jurisdiction.

The ITE excludes from the waiver of sovereign immunity claims based on the assault and battery of federal employee tortfeasors except where "[t]he negligence of other Government employees . . . allowed a foreseeable assault and battery to occur" if that antecedent negligence "is entirely independent of [the tortfeasor's] employment status." Sheridan, 487 U.S. at 401. The crux of the holding is that the assailant's federal employment can "ha[ve] nothing to do with the basis for imposing liability on the Government". Id. at 402. Further, it is the government's ability or legal duty to control the tortfeasor that "must be independent of the tortfeasor's status as a government employee". Durden, at 309. Here any ability to control Ceaser is not independent of Ceaser's employment so Plaintiff's claim must be dismissed. Fed. R. Civ. P. 12(b)(1).

Plaintiff argues that his pleadings demonstrate that Ceaser's federal employment status is irrelevant to his claim and his claim relies exclusively on negligent acts of Marines other than Ceaser. (DE 22, at 5-7). Plaintiff points to his allegations in the Amended Complaint that Ceaser's Marine Corps' Commander, Captain Smith, expressed his concerns about Ceaser to the Decedent and her family; Smith cautioned Decedent to take care in dealing with Ceaser; Smith knew Ceaser's family had made several attempts to get Ceaser

2

back to his duty station, Ft. Benning, but Ceaser kept returning to his family home in North Carolina; and Plaintiff sent a text to Smith noting his and Decedent's "worry" about Ceaser and that something might happen. (DE 22, at 5-6). These pleadings fail to meet Plaintiff's burden because the bottom line is that the sole reason Plaintiff contacted the Marines about Ceaser, who was located in a private residence, in a state other than his duty station, was because Ceaser was still a Marine. Further, the sole basis for the Marines to exercise control over Ceaser, to retrieve Ceaser from a private residence, to ask law enforcement to take Ceaser into custody, or even to ask a private citizen, like Decedent, to bring Ceaser to a Marine base was because of the employment relationship between Ceaser and the Marines. If Ceaser were a bank teller, a store clerk, or a dog walker, there would have been no reason to contact the Marines to apprehend Ceaser. Because the Marines lacked the ability or legal duty to control Ceaser exclusive of his federal employment, Plaintiff's claim is not "entirely independent" of Ceaser's federal employment. As such, it is barred by the ITE and must be dismissed. Fed. R. Civ. P. 12(b)(1).

Plaintiff argues that <u>Sheridan</u> and <u>Lumsden</u>, where the ITE was held to be inapplicable, support his argument that the ITE does not apply to bar his claim. (DE 22, at 7). <u>Sheridan</u> and <u>Lumsden</u> are distinguishable. The common thread that distinguishes those cases from this case is, in each of those cases, the government had the ability to control the tortfeasor separate from his government employment.

In <u>Sheridan</u>, government employees found the federal employee-assailant on government property, in an "obviously" inebriated state, in possession of a firearm, other federal employees' attempts to take him into custody failed, and no further preventive measures were taken. <u>Sheridan</u>, at 393-94. In <u>Lumsden</u>, government employees found the federal employee-assailant on government property, driving under the influence (ether intoxication), government employees took him into custody, and, upon release, the

government returned his car with the government's property, the ether canister, in the trunk. Lumsden, at 582.

Here, the Marines did not have the ability or legal duty to control Ceaser exclusive of the employment relationship. Unlike in both Sheridan and Lumsden, Ceaser was not on government property and the Marines did not encounter Ceaser immediately prior to the assault or when he was intoxicated or otherwise of diminished capacity or when he was in possession of the instrumentality of injury (gun). Instead, Ceaser was in his family home in North Carolina far away from his duty station on Ft. Benning, Georgia. Plaintiff did not plead any facts that support a basis for the Marines' legal duty to apprehend[1] or to ask local law enforcement to apprehend Ceaser in his home or to disarm Ceaser of his personal firearm, located in Ceaser's residence, other than, or independent of, Ceaser's status as active-duty enlisted personnel. Durden, at 309.

Further, unlike in Lumsden, the instrumentality of injury (i.e., the gun used in the fatal shooting of Decedent) was not alleged to have been in the government's custody and negligently returned to him immediately preceding the incident thereby "empower[ing]" the tortfeasor. Lumsden, at 596. The Marines' ability or legal duty to control Ceaser in this case arose, if at all, exclusively from its employment relationship with Ceaser. Therefore, liability here is not "premised on something other than the employment relationship[,]" and Plaintiff's claim falls squarely within section 2680(h). Sheridan, at 826. Hence, the ITE bars his FTCA claim and it must be dismissed. Fed. R. Civ P. 12(b)(1).

---

[1] The United States military does not have jurisdiction to act as a police force domestically See United States v. Johnson, 410 F.3d 137, 146 (4th Cir. 2005) (discussing the *Posse Comitatus* Act, 18 U.S.C. § 1385 (2000), as amended by the Military Support for Civilian Law Enforcement Agencies Act, codified at 10 U.S.C. § 371 *et seq.*).

## II. PLAINTIFF FAILED TO PLEAD FACTS THAT SUPPORT THE MARINES ASSUMED A DUTY TO PROTECT UNDER NORTH CAROLINA LAW.

In order to overcome the ITE, Plaintiff must establish his claim does not arise out of Ceaser's intentional tort by plausibly pleading facts that support the Marines breached a duty imposed upon them that was "entirely independent" of Ceaser's employment status and the breach "allowed a foreseeable assault and battery to occur." <u>Sheridan</u>, 487 U.S. at 401. Under North Carolina law, a defendant cannot be held liable for negligence without owing a duty to plaintiff, breaching that duty, and proximately causing an injury. <u>Stein v. Asheville City Bd. of Educ.</u>, 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006)). Plaintiff argues the Marines voluntarily "assumed" a duty to protect Decedent from Ceaser when Captain Smith "instructed" Decedent to take Ceaser to Camp Lejeune.[2] (DE 22 at 9). Plaintiff argues this instruction was negligent because it violated North Carolina's requirement to exercise "ordinary care" when interacting with others. (DE 22, at 8). Plaintiff alleges the instruction lacked ordinary care because Smith "knew" or "should have known" that Ceaser posed an "immediate risk of harm" to Decedent and others. (DE 22, at 9-10).

Plaintiff's assumption-of-duty argument fails for the reasons this argument was rejected by the Fourth Circuit in <u>Durden</u>. In <u>Durden</u>, the plaintiff failed to plead facts that demonstrated the Army should have recognized its actions, prior to the assault, were necessary to protect others. <u>Durden</u>, at 306. Additionally, plaintiff did not cite any legal support in opposition to the motion to dismiss that suggested a private person in North Carolina, under similar circumstances, "would be found to have owed a duty of ordinary care to persons in [Durden's] position." <u>Id.</u> at 306. For these reasons, Plaintiff's FTCA claim fails.

---

[2] Plaintiff abandoned his argument that a "special relationship" between the Marines and Ceaser gave rise to a duty to protect Decedent from Ceaser. (DE 22, at 8).

Just as in <u>Durden</u>, Plaintiff's assumption-of-duty-to-protect argument fails because Plaintiff did not plead facts that demonstrate the Marines should have recognized their actions, prior to the assault, were necessary to protect Decedent or affected her safety. In <u>Durden</u>, even though the Army knew the serviceman had committed a prior burglary and threatened to kill himself and members of his unit, the court rejected the assumption-of-duty argument based on length of time that had passed, six weeks, and lack of any pleading indicating that the Army should have known the serviceman posed a particular threat to Durden. <u>Durden</u>, at 306.

Here, Plaintiff did not plead facts that plausibly support that a duty arose.[3] Duty in the context of ordinary negligence arises out of knowledge that one's actions are likely to cause harm. <u>Fussell v. N.C. Farm Bureau Mut. Ins. Co.</u>, 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010). "The duty of ordinary care . . . does not require perfect prescience, but instead extends only to causes of injury that were reasonably foreseeable and avoidable through the exercise of due care." <u>Id.</u> In <u>Durden</u>, the Court explained that foreseeability under North Carolina law can be established by knowledge of a specific threat against an individual or through evidence of the tortfeasor's prior criminal activity. <u>Durden</u>, at 302. Here, there is no allegation of prior criminal activity by Ceaser. (DE 16). Further, there are no allegations that Ceaser made any threats toward Decedent. <u>Id.</u> Since the facts suggest that Ceaser was

---

[3] Plaintiff also did not plead the elements of assumption-of-a-duty. In North Carolina, one assumes a duty to protect "under certain circumstances, [where] one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property". <u>Durden</u>, at 305. This theory applies when a defendant "voluntarily undertakes to provide needed services to the plaintiff when otherwise she would have no obligation.'" <u>Davidson v. Univ. of North Carolina</u>, 142 N.C.App. 544, 543 S.E.2d 920 (2001) (defendant testified that it advised cheerleaders regarding safety). The United States disagrees that Captain Smith was rendering "needed" services to Decedent. Plaintiff's theory of the case rests on the fact that Ceaser was an "absentee" Marine. (DE 16, ¶ 46). Logically then, it was the Marines who "needed" their Marine back and Decedent who was voluntarily undertook to return the absentee to his employer. Hence, this theory fails.

permitted in Decedent's home, even when other family members were not present, this also supports a lack of threats or threatening behavior by Ceaser towards Decedent.

The facts pled here, likewise, do not support, at the time of the alleged negligence, when the alleged instructions were given, that the Marines "knew or should have known" that Ceaser presented an "immediate risk of harm" to anyone, no less to Decedent, his grandmother. Specifically, the pleadings with regard to the Marine actor's, Captain Smith's, knowledge about Ceaser prior to the assault do not support that Smith "knew or should have known" that Ceaser, Decedent's grandson, posed a threat to Decedent. As pled, Captain Smith knew that Ceaser ran from his troubles—having left his duty station under investigation for fraud[4], Ceaser was non-confrontational with his family—having taken several trips to RDU rather than say no to them; Ceaser had not acted on his suicidal or homicidal ideation during the many weeks since Ceaser's note was found; Ceaser consistently worked to get to and remain with his family; Ceaser lived several weeks with his family without violent word or deed against them after leaving his Georgia duty station; and the several trips with his family, ostensibly, to return to the Marines were uneventful. Contrary to Plaintiff's argument, these facts support that Smith knew or could forecast prior to the assault that Ceaser was a runner, not a shooter.

Further, the facts pled do not support that Ceaser did <u>not</u> want to go to Camp Lejeune or would resist to the point of violence a trip there. (DE 22, at 6). Ceaser voluntarily took several long and uneventful car trips with his family, ostensibly, to return to the Marines. No attempts to take Ceaser to Camp Lejeune were made prior to the fatal trip. Plaintiff did not plead a single threat or act of violence by Ceaser during the weeks since he left his duty station. (DE 16). While the facts strongly suggest that Ceaser did not want to return to Ft.

---

[4] See (DE 16, at 18).

Benning, where he would be forced to live among and go to school with the people with whom he had troubles[5], these facts do not give rise to a reasonable inference that Ceasar did not want to return to the Marines at a different location or would have committed a violent assault on his family if presented with a trip to Camp Lejeune.

Second, just as in Durden, Plaintiff also fails to cite any legal authority supporting his argument that a private person in North Carolina, under similar circumstances, would be found to have owed a duty of ordinary care to persons in Decedent's position. (DE 22). Plaintiff presents no legal support under North Carolina law for his argument that an employer, upon request of an employee's family, has a duty to retrieve an employee from the employee's residence or to have local law enforcement take an employee into custody. Plaintiff also offers no legal support for his argument that an employer assumes a duty to protect an employee's family member by stating the family member can deliver the family member-employee to a local branch of the employer. For Plaintiff's failure to cite to legal authority that supports a private person in North Carolina, under similar circumstances, "would be found to have owed a duty of ordinary care to persons in [Decedent's] position", Plaintiff's FTCA claim should be dismissed for failure to state a claim. Durden, at 306; Fed. R. Civ. P. 12(b)(6).

For these reasons, Plaintiff's FTCA claim must and should be dismissed. Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

III.    DECEDENT'S CONTRIBUTORY NEGLIGENCE BARS THIS CLAIM.

Under the ordinary negligence standard argued in Plaintiff's response, the FTCA claim is barred by Decedent's contributory negligence and should be dismissed for failure to state a claim. Fed. R. Civ. P. 12(b)(6). In this case where the pleadings document equal

---

[5] Plaintiff pled that Captain Smith informed Decedent that Ceasar was under investigation for fraud. (DE 16, at 18).

knowledge of Ceaser's alleged dangerousness, if Plaintiff is correct that it was negligent to advise Decedent to take Ceaser to a place Plaintiff argues the facts suggest Ceaser did not want to go, it was equally negligent to try to take him there.

Under North Carolina law, a plaintiff's contributory negligence bars recovery on ordinary negligence claims, but does not bar claims for gross negligence. <u>Sorrells v. M.Y.B. Hosp. Ventures of Asheville</u>, 332 N.C. 645, 648 (1992). However, when a plaintiff's contributory negligence rises to the level of a defendant's gross negligence, plaintiff's contributory negligence bars the claim. <u>Id.</u> A decedent's contributory negligence bars her estate's claim for injury that results from decedent's negligence. <u>Id.</u> at 649.

"[A] court may dismiss a complaint based on contributory negligence pursuant to Rule 12(b)(6) 'when the allegations of the complaint taken as true show negligence on the plaintiff's part proximately contributing to his injury, so clearly that no other conclusion can be reasonably drawn therefrom.'" <u>Mohr v. Matthews</u>, 237 N.C. App. 448, 451, 768 S.E.2d 10, 12–13 (2014); <u>Sorrells</u>, at 449 (Defendant's Rule 12(b)(6) "motion to dismiss was properly granted since plaintiff's complaint 'disclose[d] an unconditional affirmative defense which defeats the claim asserted [and] pleads facts which deny the right to any relief on the alleged claim'").

Here, this court should dismiss the FTCA claim because Decedent's actions contributed to the fatal outcome. North Carolina requires <u>all</u> persons to act with ordinary care under the circumstances. (DE 22, at 8). Here, there is no disparity in knowledge about the alleged dangerousness of the tortfeasor. Every fact pled in support of Plaintiff's argument that Ceaser was dangerous and posed an "immediate risk of harm" to Decedent was known to both Smith and Decedent. (DE 16). Smith informed Decedent of Ceaser's suicidal and homicidal note and warned Decedent to take care in dealing with Ceaser and Smith was informed of Decedent's concern that Ceaser was aggressive, agitated easily, and something might happen. (DE 16, at ¶¶ 10, 18, 20, 22). Decedent's knowledge of Ceaser was real-time

9

(and long term), while the Marines' was historical (and short term). Id. Hence, on that fatal day, North Carolina law required Decedent to use her best judgment to evaluate the circumstances and exercise ordinary care. Here, in the light most favorable to Plaintiff, taking the allegations of the complaint as true, plaintiff's complaint discloses the unconditional affirmative defense of contributory negligence which defeats Plaintiff's negligence claim and pleads facts which deny Plaintiff the right to any relief on the alleged claim. Sorrells, at 449. No other conclusion can be reasonably drawn other than plaintiff's part proximately contributed to her injury. Mohr, at 451, 768 S.E.2d at 12–13 (2014); Sorrells, at 449. Because Decedent's contributory negligence bars this FTCA wrongful death claim, it should be dismissed for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

Respectfully submitted, this 24th day of November, 2021.

G. NORMAN ACKER
Acting United States Attorney


By:  /s/ Sharon C. Wilson
SHARON C. WILSON
Assistant United States Attorney
Civil Division
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4826
E-Mail: sharon.wilson2@usdoj.gov
N.C. Bar No. 18435
Attorney for Defendant

10

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this 24th day of November, 2021, served a copy of the foregoing upon the below listed party electronically using the CM/ECF system or by placing a copy of the same in the U.S. Mail, addressed as follows:

Robert C. Slaughter, III
Slaughter Law Firm, PLLC
117 West Eden Street
Edenton, NC 27932
Email: rslaughter@slaughterlupton.com

Christopher R. Hedrick
Mason, Mason, Walker, & Hedrick, P.C.
11848 Rock Landing Drive, Suite 201
Newport News, Va 23606
Email: chedrick@masonwalker.com

By:   /s/ Sharon C. Wilson
SHARON C. WILSON
Assistant United States Attorney
Civil Division
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4826
E-Mail: sharon.wilson2@usdoj.gov
N.C. Bar No. 18435
Attorney for Defendant

JA71

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**

_____ )
MITCHELL GARNET EVANS,        )
Executor of the Estate of     )
Sallie Copeland Evans,        )
                              )
            Plaintiff,        )
                              )
            vs.               )      CASE NO. 4:21-CV-45-FL
                              )
                              )
THE UNITED STATES OF AMERICA, )
                              )
            Defendant.        )
_____ )


**FRIDAY, FEBRUARY 18, 2022**
**MOTION TO DISMISS**
**HELD IN RALEIGH, NORTH CAROLINA**
**BEFORE THE HONORABLE ROBERT T. NUMBERS, II**
**UNITED STATES MAGISTRATE JUDGE**


<u>APPEARANCES</u>:

<u>On Behalf of the Plaintiff</u>:
**ROBERT C. SLAUGHTER, III, Esquire**
**Slaughter & Lupton Law, PLLC**
117 West Eden Street
Edenton, North Carolina  27932

<u>On Behalf of the Defendant</u>:
**SHARON C. WILSON, Assistant United States Attorney**
**U.S. Attorney's Office - EDNC**
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina  27601


**MICHELLE A. McGIRR, RPR, CRR, CRC, RMR**
**Official Court Reporter**
**United States District Court**
**Raleigh, North Carolina**

```
 1                    (Friday, February 18, 2022)

 2                    P R O C E E D I N G S

 3

 4                    (Open Court at 2:37 p.m.)

 5          THE COURT:  Good afternoon, counsel.

 6          MS. WILSON:  Good afternoon.

 7          MR. SLAUGHTER:  Good afternoon, your Honor.  Rob

 8   Slaughter for the plaintiff.

 9          MS. WILSON:  Sharon Wilson for the United States.

10          THE COURT:  Good afternoon.  I appreciate everyone's

11   flexibility in the start time.  The criminal court ran longer than I

12   had hoped or anticipated this morning.  That's what necessitated

13   pushing this back a bit.

14          So we are here in Evans v. United States, 4:21-CV-45, for

15   a hearing on the defendant's motion to dismiss.

16          I had a few questions principally for plaintiff on the

17   matters that were raised in the briefing.

18          I want to start with the subject matter jurisdiction

19   question and whether the intentional tort exception applies.

20          In Durden v. United States, which is the Fourth Circuit

21   case kind of on this topic, the Fourth Circuit said, quote, we hold

22   that although the Government's ability, i.e., legal duty to control

23   a tortfeasor must be independent of the tortfeasor's status as a

24   government employee, knowledge of the tortfeasor's propensity for

25   violence, et cetera, et cetera, does not nullify an FTCA claim,
```

1 | close quote.

2 | And here, it appears that the allegations about the

3 | Marines' ability to control Ceaser are all based on his status as an

4 | AWOL Marine.

5 | So it would seem that the Government's legal duty to

6 | control him or legal ability to control him all arises out of his

7 | status as a government employee.  So why is that not the case?

8 | MR. SLAUGHTER:  Are you asking me to comment on that,

9 | your Honor?

10 | THE COURT:  Yes, please.

11 | MR. SLAUGHTER:  So we're talking now about the 12(b)(1)

12 | issue?

13 | THE COURT:  Yes, sir.

14 | MR. SLAUGHTER:  It seems the *Durden* case certainly does

15 | say that and I suggest that is dictum; and I find *Durden* confusing,

16 | I have to say.  And the -- what the Court quotes there, although the

17 | government's ability to -- i.e. legal duty to control a tortfeasor

18 | must be independent of the tortfeasor's status as a government

19 | employee does not come from *Sheridan*, the U.S. Supreme Court case

20 | which is the -- I say is the -- certainly the leading Supreme Court

21 | case on this issue.

22 | And the -- it's almost like that *Durden* is confusing that

23 | language -- is mixing up 12(b)(1) and 12(b)(6) -- both of those

24 | motions were before the Court -- but *Sheridan* simply said the

25 | negligence -- I'm quoting from the *Sheridan* case, which is referred

to in both of our briefs, at 487 U.S. 392.  This is -- at least of
what I've printed -- page 11, Government employees who allowed a
foreseeable assault and battery to occur may finish -- may furnish a
basis for government liability that is entirely independent of
Carr's -- the assailant's employment status.

So it looks to me like for 12(b)(1) purposes, the test in
our case is whether our theory is entirely independent of Carr's --
not Carr, but of -- the -- Ceaser's -- the assailant's employment
status.  And that --

THE COURT:  Well, in --

MR. SLAUGHTER:  I'm sorry, your Honor.

THE COURT:  -- in *Sheridan*, at page 403 of the opinion,
the Supreme Court says, quote, because neither Carr's employment
status nor his state of mind had any bearing on the basis for
petitioner's claim for money damages, the intentional tort
exceptions of the FTCA is not applicable in this case, close quote.

And again --

MR. SLAUGHTER:  Right.

THE COURT:  -- I'll dig into this more in a moment if we
don't get to it, but, again, his employment status and the fact he
was an AWOL Marine seems to underlie all your arguments as to why
there was a duty for the Marines to do something in response to the
calls from the decedent and her family.

MR. SLAUGHTER:  Well --

THE COURT:  And so doesn't his employment status have

1    bearing on your claim for monetary relief?

2            MR. SLAUGHTER:  We say it does not.  The heart of our

3    case is that Captain Smith, having been warned that Ceaser was

4    dangerous and having acknowledged that in a conversation -- as pled

5    and, your Honor, we have to accept this as true for purposes of

6    this -- told the decedent basically, be careful when you're around

7    him.

8            So clearly Captain Smith was on notice that this man had

9    exhibited some dangerous traits and the family was afraid of him and

10   they wanted the Marine Corps to come get him.

11           So surely we know his being a Marine is certainly a

12   factor in this case, as it is in all these other -- the other main

13   cases, *Durden* and *Lumsden*.  But really, the heart of our case is

14   when Smith directed the decedent to drive Ceaser to Camp Lejeune

15   knowing that Ceaser was dangerous or had exhibited those traits and

16   knowing that he didn't want to go to Camp Lejeune.

17           That, we say, if true, was dumb, outrageous and certainly

18   negligent to tell this grandmother to drive this dangerous man to

19   some location to which he did not want to go.  And it doesn't matter

20   whether that man happened to be a Marine or somebody else.

21           So we say that is independent of Ceaser's status as a

22   government employee.  We're not saying -- I mean, that in itself,

23   just telling the grandmother, the decedent, to drive this dangerous

24   man to Camp Lejeune we say is negligence.

25           And that's really the strong point of our allegations,

1    the strong point of our complaint.

2            THE COURT:  Well, I want to dig into that argument.  I'm

3    still trying to understand how you get around the intentionality

4    tort exception to FTCA.  Because even if they are negligent or were

5    negligent, that will still bar the claim here.

6            And I'm trying to understand what authority, absent his

7    employment as a Marine, the Marine Corps had over Ceaser.  I mean,

8    you say it repeatedly in paragraphs 44, 45 and 46 of your amended

9    complaint.

10           In paragraph 44, the amended complaint says, quote, the

11   Marine Corps had the ability to control Ceaser pursuant to legal

12   authority independent of Ceaser's employment status as a Marine,

13   close quote.

14           What is that legal authority that would allow the Marine

15   Corps to control someone except for the fact that they're a Marine?

16           MR. SLAUGHTER:  Well, he was AWOL and, you know, normally

17   you can't just go out and arrest somebody, but he was AWOL, so they

18   could.

19           And the Court certainly makes a good point, but what I'm

20   saying is when it gets down to it -- and *Sheridan* being

21   controlling -- says that if -- again, if the Government allows a

22   foreseeable assault and battery to occur, may furnish a basis for

23   government liability independent of Carr's employment status.

24           And we're just saying that particular allegation about

25   Smith telling the grandmother to drive this dangerous man to Camp

1    Lejeune is independent of the employee status.

2         Could I talk about *Lumsden*, your Honor?

3         THE COURT:  I mean, how is it independent of his status

4    as a government employee when it's someone from the Marines telling

5    a civilian to drive an AWOL Marine to a Marine Base.  Like, there is

6    a lot of government involvement there that, you now, if someone

7    calls me tonight and says, gosh, my friend is having a mental health

8    crisis.  My response isn't going to be, take them to Camp Lejeune,

9    unless they're a Marine, in which case that might make sense.

10         So I'm trying to separate -- figure out how to separate

11   the tort here from his status as a government employee.

12         MR. SLAUGHTER:  I understand.  I understand.  Well, you

13   could -- the Government argued pretty much the same thing in *Lumsden*

14   and the Court basically, you know, denied that 12(b)(1) motion.

15         I submit that there's no big distinction between *Lumsden*

16   and this case.  And I understand the Court's point.  And I don't --

17   this idea of what is independent of -- entirely independent of

18   employment status, the cases don't seem to clearly define what that

19   means.  But all I can say though in *Sheridan* and *Lumsden* and in

20   *Durden*, which the Government says is factually substantially similar

21   to this case, the Court denied the 12(b)(1) motion on jurisdiction.

22   Where all those assailants were military members and they were in

23   that status as a military member was certainly a key factor

24   throughout the case; but, again, in the end, the question is -- let

25   me read the *Lumsden* language if the Court doesn't mind.

1              May I go to *Lumsden*?

2              THE COURT:  You may.

3              MR. SLAUGHTER:  You remember, *Lumsden* is the Marine who

4    had -- was known to use ether and his car was confiscated and it had

5    ether in it, but then they gave -- the Marines gave it back to him

6    and then he drove and had a wreck and killed some -- killed one

7    person and injured another.

8              So the plaintiff in that case -- you know, it was a

9    similar type suit and the Court said, the negligent conduct

10   allegedly was that of the government's agents who delivered Borges'

11   car keys and the ether to Borges.

12             Borges' employment by the Government is irrelevant to the

13   plaintiff's theory of liability.  As in *Sheridan*, because neither

14   the intoxicated person's employment status nor his state of mind has

15   any bearing on the basis of petitioners' claim for money damages --

16             THE COURT REPORTER:  Excuse me --

17             MR. SLAUGHTER:  -- the intentional tort exception as in

18   *Sheridan* --

19             THE COURT REPORTER:  Excuse me --

20             MR. SLAUGHTER:  -- because neither the intoxicated

21   person's --

22             THE COURT:  Counsel --

23             MR. SLAUGHTER: -- employment status --

24             THE COURT:  Counsel --

25             MR. SLAUGHTER:  -- nor his state of mind has any bearing

1    on the --

2            THE COURT:  -- the court reporter --

3            MR. SLAUGHTER:  -- basis for petitioners' claim --

4            THE COURT REPORTER:  Would you please go back to:  The

5    petitioners' claim for.  That's where you were --

6            MR. SLAUGHTER:  I'm sorry.

7            THE COURT REPORTER:  Petitioners' claim for --

8            MR. SLAUGHTER:  As in Sheridan, because neither the

9    intoxicated person's employment status nor his state of mind has any

10   bearing on the basis for petitioners' claim for money damages, the

11   intentional tort exception to the FTCA is not applicable in this

12   case.

13           So I mean, in that case, the assailant was certainly a

14   military member.  The only reason the Government had to -- I mean,

15   to confiscate his car is because he's a -- he was a Marine.  The

16   government was -- the government tortfeasors were Marines.

17           It's just like in our case, that's just part of the case;

18   but the _Lumsden_ court said, though, that his employment by the

19   government was irrelevant to the plaintiff's theory of liability.

20           And so I'm saying, your Honor, that our -- that Ceaser's

21   employment by the Government is irrelevant to our theory of

22   liability.  Our theory of liability being Captain Smith directed the

23   decedent, grandmother, to take this known dangerous man to Camp

24   Lejeune knowing he didn't want to go there and knowing that he had

25   exhibited dangerous traits.

```
 1          THE COURT:  These cases all involve the person's status

 2    as a government employee being irrelevant to the theory of

 3    liability.  For example, in Lumsden, the Court -- I'm paraphrasing

 4    -- but the Court says, if a private person gives car keys to someone

 5    that they know has an alcohol problem or a drug problem and gives

 6    them that drug as well and then they go and crash the car, they're

 7    liable.  And that's true no matter what the person's status as a

 8    government employee or not.  And that's -- I understand that and I

 9    accept that.

10          What I'm trying to get at, it seems here that everything

11    that underlies your theory of liability is related to him being a

12    Marine and the Marine's ability to have him arrested or otherwise

13    apprehended because he was AWOL.

14          And I guess another way of asking this question is, what

15    legal authority would the Marines have had to apprehend Ceaser if he

16    was not a Marine so, thus, not AWOL?

17          Because that's what you've got here.  People who are just

18    involved with the military and military people are committing

19    negligent torts.  It doesn't matter if the tortfeasor, although the

20    individual who caused the harm, is a military member.  Here, it

21    seems to be tied together.

22          So what is it that is independent from his status as a

23    Marine that caused the harm?

24          MR. SLAUGHTER:  Well, I think if we didn't have the

25    allegation that he directed the decedent to drive this Ceaser to
```

1    Camp Lejeune, we would have more problems from a standpoint of

2    12(b)(6) because the authority for them to apprehend Ceaser

3    certainly is related to his status as a Marine.  I recognize that.

4            And much of what the family wanted was the Marines to

5    come get him or to notify a local law enforcement to pick him up and

6    those points certainly come closer to what the Court is saying.  How

7    can you separate that from his status as a Marine.

8            But I'm just saying, you just focus on that one -- those

9    two conversations that we've alleged.  Drive him to Camp Lejeune.

10   Drive this dangerous man to Camp Lejeune.  I'm saying from that act

11   of negligence, it doesn't matter whether he was a Marine or not.

12   He's a dangerous person that he's asking to be -- asking her to

13   drive to Camp Lejeune knowing he didn't want to go there.

14           THE COURT:  Well, let's look --

15           MR. SLAUGHTER:  That's independent from his status as a

16   Marine.

17           THE COURT:  So why did the decedent call Captain Smith?

18           MR. SLAUGHTER:  Well, she wanted Captain Smith to do

19   something about this.  I mean, she wanted him to come -- she wanted

20   the Marines to come pick him up or notify law enforcement officials.

21           THE COURT:  Why did Captain Smith suggest that she take

22   him to Camp Lejeune?

23           MR. SLAUGHTER:  It was a dumb thing to suggest obviously.

24           THE COURT:  Right.  Why would it be reasonable to take

25   Smith -- take Ceaser to Camp Lejeune?

1          MR. SLAUGHTER:  Well, he said he doesn't have the
2    resources to do anything about it.
3          THE COURT:  Is the answer because he's a Marine, that's
4    why you would take him to Camp Lejeune?
5          MR. SLAUGHTER:  Certainly he wouldn't have said, take a
6    civilian to Camp Lejeune.  I'm saying the point is driving him
7    anywhere he didn't want to go, that's just negligence in and of
8    itself.
9          THE COURT:  Well, the Government's only liable in cases
10   where a private person would also be liable.
11         MR. SLAUGHTER:  Right.
12         THE COURT:  So I want to go back to the example I
13   presented earlier.  I receive a call tonight from a friend saying,
14   our third -- you know, this other person we know is having a mental
15   health crisis.  And I say, gosh, you should really take him down to
16   WakeMed and have him committed because they're obviously having a
17   crisis.  And the person I'm talking to said, good idea.  Goes over
18   to the third parties' house and is tragically murdered like happened
19   here.
20         Is it your position that I am then liable in negligence
21   for that person's death?
22         MR. SLAUGHTER:  Because you assume the duty.
23         THE COURT:  So any time someone calls and asks someone
24   for advice on how to handle a crisis, they potentially face
25   liability for negligence if things go south?

1          MR. SLAUGHTER:  Well, I'd just go to the North Carolina

2    law on that.  North Carolina law -- and I'm reading from my brief.

3    North Carolina law imposes upon every person who enters upon an

4    active course of conduct --

5              THE COURT REPORTER:  Excuse me.  Please --

6              MR. SLAUGHTER:  I'm sorry, am I talking too fast?

7              THE COURT REPORTER:  Yes, you are.

8              I have:  North Carolina law...

9              MR. SLAUGHTER:  North Carolina law imposes upon every

10   person who enters upon an active course of conduct, the positive

11   duty to exercise ordinary care to protect others from harm and cause

12   a violation of that duty, negligence.

13         So we're saying that Smith, not only in those phone calls

14   but all along, had entered into an active course of conduct to help

15   the decedent.  There was one allegation about getting the -- Ceaser

16   to the airport to be flown back to Fort Benning.  He told her to be

17   careful when you're around him.

18         So we just said he did enter -- we're saying he did enter

19   upon an active course of conduct and, therefore, had the positive

20   duty to exercise ordinary care.

21         Now, in your example you're -- someone is calling you and

22   you are saying, why don't you try to do this.  And that -- I just

23   say that's okay.  And I would argue that you've entered upon an

24   active course of conduct, but I don't know that having a wreck would

25   be foreseeable and so I'm not sure that a suit against you would be

1    successful.

2            But in this case, what happened to the decedent was

3    certainly foreseeable and, therefore, we say the government's liable

4    for that.

5            THE COURT:  Let me hear from Ms. Wilson on this 12(b)(1)

6    matter.

7            Ms. Wilson, what I'm hearing from the plaintiff is that

8    if this is independent from Ceaser's status as a Marine and if you

9    look at these *Lumsden* cases and *Sheridan* and *Durden* cases, the fact

10   that a tort occurs involving a government official does not

11   automatically mean that the intentional tort bar applies.

12           So why is that not correct?

13           MS. WILSON:  Okay.  I actually lived *Lumsden*.  I happened

14   to be in the office at the time, and *Sheridan*.

15           Basically, the intention at tort exception -- the

16   intentional torts exception for battery.  So that gets rid of our

17   waiver of immunity.  And what *Sheridan* said was basically if you can

18   find other employees who somehow were negligent, that allowed a

19   foreseeable intentional tort and this was independent of the

20   employment status of the individual.

21           And when you look at *Sheridan*, that was basically on the

22   campus of Bethesda, a Navy property.  Lumsden, I believe, was Marine

23   Corps at Cherry Point.  It might have been Lejeune, but both

24   circumstances -- in *Sheridan*, we have two Navy corpsmen who

25   encounter a Navy employee who is just besotted.  He is inebriated.

1    He has a rifle and a garment bag.  They attempt to tackle him.  He

2    gets away and then they do nothing.  He then proceeds to the edge of

3    campus and he starts shooting at passing cars and injures someone.

4              On -- *Lumsden*, what we had was -- and Judge Fox --

5    there's not a whole lot of the facts in here and I'm afraid I'll put

6    too much of what I know into it, but what I recall from the opinion,

7    the canisters of ether actually belonged to the Navy or the Marine

8    Corps.  Lumsden was found inebriated having been huffing.  The

9    canisters were in his trunk so the Marine Corps impounded his car

10   and basically took control of him as well.

11             When he sobered up, they gave him the keys back, never

12   having removed the military's property, their canisters.

13             In each of *Sheridan* and in *Lumsden*, the actions of the

14   corpsmen and the actions of our Marines, their negligence -- the

15   status of the tortfeasor in each had nothing to do with whether or

16   not the person was an employee.  If the two corpsmen had come across

17   an inebriated Walmart employee with a gun, they should have done

18   something.  Even if they didn't tackle him, they should have made a

19   point of seeking the military police to help.  This was the

20   military's property.  These were military employees and here was

21   someone who was potentially dangerous.

22             Then in *Lumsden* it was military's property that was

23   definitely given back.  And it doesn't matter if the huffing Marine

24   was a Marine.  If it had been a local high school kid who had the

25   Marine's property and was huffing it and then was given back to him.

1        So that's why it's distinguishable from here because

2   here, as your Honor has said, everything here has to do with the

3   fact that Ceaser was a Marine.  The fact that you call Captain Smith

4   at all and ask him to do anything is because Ceaser's a Marine.

5   Asking Smith to make arrangements is because Ceaser is a Marine.

6        So I hope that answers your question.

7        THE COURT:  Well, I guess what I'm hearing from

8   plaintiffs is that even if Ceaser was not a Marine and the decedent

9   had called Smith and done all these same things, it still would have

10  been negligent for him to instruct her to take him anywhere.

11       MS. WILSON:  No.  In this circumstance, what we have pled

12  here as to Ceaser was that what Smith knew was that Ceaser, before

13  he left, at some point had written a note that he was going to take

14  his own life and potentially some unspecified others and then he

15  left.  Absconded.  So then we have weeks and weeks -- and in *Durden*,

16  the Court, when it was looking at foreseeability, it talked about

17  the fact that weeks and weeks had passed and here weeks and weeks

18  had passed without incident.

19       Ceaser was deliberately leaving the military to be with

20  his family.  In fact, when he left, he specifically said he

21  wanted -- you know, before he offed himself, he wanted to go see his

22  mother who -- so he wants to be with his family.  He spent weeks

23  with his family without alleged incident.

24       Twice when they asked him, hey, let's go to the airport

25  so you can go back to the Marines, there's no allegation that he

confronted them.  He went with them.  He got on the plane and each
time he came back.

There's never an allegation that Ceaser was in any way
demonstrating any violent propensities or tendencies or intentions
towards his family.

So in that case, it would be different and if it was --
if Ceaser was not a Marine, there would be no way that Smith would
know really anything about Ceaser.  So...

THE COURT:  Thank you.

So Mr. Slaughter --

MR. SLAUGHTER:  Yes.

THE COURT:  -- in response to the motion to dismiss,
there's this argument the United States or Captain Smith voluntarily
assumed a duty to the decedent.

Based on the allegations in the complaint, what are the
specific actions that he took that created the voluntary assumption
of the duty?

MR. SLAUGHTER:  Well, again, he directed the decedent to
drive Ceaser.  We've also alleged -- let me get my brief.
(Reviewing documents).

I submit that that alone would be sufficient, but also in
the complaint we allege, I believe, that he was working to get them
to put Smith on -- I mean, to put Ceaser on a plane to fly back to
Raleigh-Durham.  He had conversation with the decedent -- I mean
from Raleigh-Durham back to Fort Benning, I'm sorry.  Had a

1 conversation with the decedent saying, be careful when you're around

2 him, or something to that effect. I can find the specific

3 allegations if the Court would like.

4         THE COURT: Well, I'm trying to identify what the

5 specific act was that caused the voluntary assumption of duty. The

6 case law on this in North Carolina indicates someone begins doing

7 something and then have an obligation to do it reasonably well. If

8 they don't, they can be held for -- held liable for negligence.

9         I'm trying to figure out what is the act that Smith did

10 that created this duty?

11         MR. SLAUGHTER: Well, I say just in directing her to

12 drive Ceaser to Camp Lejeune, he -- by doing that, he has set upon a

13 positive course of action.

14         THE COURT: Well, okay. So --

15         MR. SLAUGHTER: I mean, I know you may be tired of my

16 repeating that but...

17         THE COURT: No. So if that is the action that creates

18 the voluntarily-assumed duty, what is the negligent act? Because

19 what I'm hearing from you as I read this is the negligent act and

20 the act that voluntarily created the duty are the same thing. And

21 I'm not sure that's a viable argument of negligence under North

22 Carolina law.

23         MR. SLAUGHTER: Well, that is also the negligent act,

24 directing her to drive some dangerous man to someplace he doesn't

25 want to go.

1          THE COURT:  I'm trying to figure out something that

2     created a -- the voluntary course of action that he engaged in that

3     then, by telling the decedent to take him to Camp Lejeune, that that

4     was a negligent act.  The way your complaint reads, the two are the

5     same thing.  The action that created the duty and the negligent act

6     are the same thing.  And I haven't found any cases in North Carolina

7     law that have similar set up.

8          MR. SLAUGHTER:  Well, I'm referring now to page 8 in my

9     brief.  The allegations of plaintiff's submitting complaint show

10    Smith entered upon an active course -- I'm reading too fast, I'm

11    sorry.

12         Here's what we -- in our brief, we point these out.

13    After the decedent and other family members advised Smith that

14    Ceaser had returned to North Carolina, Smith arranged for Ceaser to

15    fly from RDU to Atlanta unsupervised.

16         And then on or about April 11th, 2018, Smith told the

17    decedent and plaintiff's wife that he found disturbing letters and

18    notes from Ceaser in which he expressed intent to harm himself and

19    others.  And Smith stated he was very concerned about the note's

20    content and advised that the decedent should be careful if she came

21    into contact with Ceaser.  That's paragraph 18 of the complaint.

22    The first one I referred to is paragraph 12 of the complaint.

23         Then finally, twice instructed the decedent to take

24    Ceaser to Camp Lejeune.  Those are paragraphs 23 and 25 of the

25    complaint.

1        So I'm just saying, it wasn't just the last thing --

2   although those two conversations, it was several other times before

3   then he had -- he had taken on an active duty -- an active course of

4   conduct in his dealings with the decedent and her family.  I'm just

5   saying all that together is an active course of conduct and the

6   final one was the most significant.

7        I mean, Smith was involved with this family.  I mean,

8   they were calling him frequently and he was talking to them based on

9   these allegations and he was -- and in some way he was attempting to

10  help in a limited degree, but he was trying to help.  And I suppose,

11  even in the end he was trying to help, but it was certainly a

12  negligent way of trying to help.

13       So I'm just saying all that shows that he entered upon an

14  active course of conduct in his dealings with the decedent and her

15  family.

16       THE COURT:  Does it matter that he wasn't the one who

17  called the decedent and her family, that they reached out to him?

18  He did not initiate the course of conduct.  The family initiated the

19  course of conduct and said, we've got this guy who's AWOL and what

20  should we do, right.

21       So, I mean, did Smith really engage in a voluntary course

22  of conduct or was it the family who did?

23       MR. SLAUGHTER:  I say that he does, your Honor, by

24  responding in the way that he did.  If he had just said in response

25  to those calls, I'm sorry, I can't help you, I have no duty to help

1   you, or anything like that.  Instead of doing that, he did attempt

2   to help in a limited way.  He was giving them advice and, in the

3   end, a directive.

4           THE COURT:  So what would you say the voluntary course of

5   conduct -- how would you describe it?  Because I've got to write an

6   opinion here and I have to say, the voluntary course of conduct

7   Captain Smith embarked on was X.  What do I put in that X?

8           MR. SLAUGHTER:  It was trying to assist them in their

9   problem.  Even though he said he had limited resources, he still --

10  he did arrange for Ceaser to fly from Raleigh-Durham airport to

11  Atlanta.

12          He did express concern to the -- he had found the -- that

13  he had found the disturbing letters and note from Ceaser and he said

14  he was concerned and advised the decedent she should be careful if

15  she comes into contact with Ceaser.  And then he tells her to drive.

16          So on all those occasions, he's not just saying, it's not

17  my problem, he is trying to help and -- in those ways.  And so I'm

18  saying that -- I guess you were looking for a quick characterization

19  of that.  I would just say he was trying to help in a limited way.

20          THE COURT:  Thank you.

21          So Ms. Wilson, did Captain Smith enter into a voluntary

22  course of conduct by trying to assist the family?

23          MS. WILSON:  Actually, your Honor, I don't think so, no.

24  The way we attacked it was -- sorry, the way we defended this

25  allegation was -- plaintiff's allegation was basically that

1   instructing was negligent because Smith knew that Ceaser was

2   dangerous.  And basically the same answer that I gave before, that

3   the facts that are pled are simply what Smith knew about Ceaser from

4   the note that Ceaser left about wanting to harm himself and

5   potentially some others.

6        THE COURT:  Well, I don't want to talk about

7   foreseeability because I don't believe foreseeability was addressed

8   in your initial brief.  I'm talking about the voluntary assumption

9   of the duty.  And what I've heard from the plaintiffs is that

10  there's a voluntary assumption of the duty by engaging with the

11  family to try to get Ceaser back to the Marines.

12       So why is that not engaging in a voluntary course of

13  conduct that he then has to not be negligent during?

14       MS. WILSON:  Well, as a Marine receiving phone calls, he

15  has an obligation to respond to the questions.  And whenever you

16  deal with -- so, yes, he would have to answer their questions.  And

17  to the best of his ability, he would have to meet his mission.

18       But as far as negligence goes, there's always -- in every

19  negligence action, there's duty, breach, foreseeability and --

20  sorry, duty, breach, proximate cause and damages.

21       So did he answer and do his job to the best he could

22  answering questions?  Yes, but it's not negligent because there

23  really was no foreseeability.  Apologies.

24       THE COURT:  I'm just focusing on that first element, the

25  duty element, right.

1          MS. WILSON:  Right.

2          THE COURT:  Again, why does the -- answering the call

3    from the family and saying, okay, we'll put him on a plane twice and

4    then you should take him to Camp Lejeune.  Why is all of that not

5    engaging in a voluntary course of conduct that then creates a legal

6    duty to do that in a non-negligent manner?

7          MS. WILSON:  Other than to say that our answer is, is

8    he -- any time a human does anything, it's engaging in a course.  So

9    is it negligent?  I don't know how to answer your question other

10   than that.

11         THE COURT:  Okay.

12         Mr. Slaughter, anything else you wish to share with the

13   Court on this motion?

14         MR. SLAUGHTER:  Well, your Honor, we just say we've

15   certainly pled this case sufficiently.

16         You've heard my theory on the 12(b)(1) motion.

17         The theory on the 12(b)(6) or the response to the

18   12(b)(6) motion is that -- in our brief -- if Smith was a private

19   person, would he be liable under North Carolina law.  If so, then

20   that would lead to the facial tort claim liability.  And, again,

21   North Carolina law, duty, breach of duty, proximate cause.

22         And we've explained that Smith, by entering upon an

23   active course of conduct, assumed the duty to help.  He breached

24   that duty by negligently doing so particularly in directing the

25   decedent to take that trip.  That was foreseeable, that was a

1 proximate cause of the death.

2          And I want to refer one more time to _Lumsden_ if I could.

3 And I'm quoting from Lumsden in the 12(b)(6) portion.  _Lumsden_ was

4 not just a 12(b)(1) case, it was also a 12(b)(6) case.

5          The test is no more than whether government agents in

6 undertaking to perform an active course of conduct, exercise such

7 ordinary care as is required of a reasonable and prudent person

8 under the circumstances.  Taken as true, the allegations contained

9 in the complaint, the Court concludes that under similar

10 circumstances, a private person in North Carolina would be found to

11 have owed a duty of ordinary care to persons in the plaintiff's

12 position.  And the Court overruled the motion.

13          I think it's really as simple as that.  And we pled all

14 that.  And we say, again, that that was an active course of conduct

15 and that should be as simple as that, your Honor.

16          So we say we've pled this case sufficiently to withstand

17 the 12(b)(1) motion and the 12(b)(6) motion and we're just ready to

18 proceed to discovery.

19          THE COURT:  Just so I'm clear, explain to me one more

20 time why Ceaser's employment by the Government is irrelevant to your

21 theory of liability?

22          MR. SLAUGHTER:  Because when it gets down to the most

23 important part of our allegations, the directing of the decedent to

24 drive Ceaser to Camp Lejeune, it doesn't matter whether he was a

25 Marine or not.  The negligence was in directing her to drive this

1   dangerous man to somewhere he didn't want to go.

2           THE COURT:  Thank you.

3           Ms. Wilson, anything else you'd like to share with the

4   Court on this motion?

5           MS. WILSON:  The only thing we haven't covered is

6   contrib.  We did plead that at the end --

7           THE COURT:  It wasn't raised in your principal brief so

8   I'm not going to consider it.

9           Thank you very much, counsel.  I'll try to get an opinion

10  out as promptly as possible.

11          We'll be in recess.

12          MR. SLAUGHTER:  Thank you, your Honor.

13

14                  (Hearing concluding at 3:17 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF NORTH CAROLINA

3

4                  CERTIFICATE OF OFFICIAL REPORTER

5

6              I, Michelle A. McGirr, RPR, CRR, CRC, RMR, Federal

7      Official Court Reporter, in and for the United States District Court

8      for the Eastern District of North Carolina, do hereby certify that

9      pursuant to Section 753, Title 28, United States Code, that the

10     foregoing is a true and accurate transcript of my stenographically

11     reported proceedings held in the above-entitled matter and that the

12     transcript page format is in conformance with the regulations of the

13     Judicial Conference of the United States.

14

15     Dated this 21st day of October, 2022

16

17                                  /s/ Michelle A. McGirr
                                    MICHELLE A. McGIRR
18                                  RPR, CRR, CRC, RMR
                                    U.S. Official Court Reporter
19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:21-CV-00045-FL

**Mitchell Garnet Evans**, Executor of the
Estate of Sallie Copeland Evans,

                Plaintiff,

v.

**United States**,

                Defendant.

**Memorandum & Recommendation**

This case asks the court to determine whether the United States can be held liable for the death of Sallie Evans. While Sallie was allegedly shot to death by her grandson, Isaiah Ceaser, her estate maintains that the United States' negligence led to this tragic outcome.

In March 2018, Ceaser, a Lance Corporal in the United States Marine Corps, was supposed to be at a training school with his unit at Fort Benning, Georgia. But he left Georgia without permission, leaving behind writings that suggested he wanted to harm himself and others.

Ceaser ended up in Halifax County, North Carolina near his family. Over the next several weeks his family repeatedly (and unsuccessfully) attempted to get the Marine Corps to take custody of him.

Ultimately, Ceasar's commanding officer told Sallie that she should take Ceaser to Marine Corps Base Camp Lejeune. And it was while Sallie was attempting to persuade Ceaser to go with her that she was murdered. The amended complaint alleges that the Marine Corps acted negligently by not taking custody of Ceaser and by not protecting Sallie from him.

The United States now asks the court to dismiss the complaint for lack of subject matter jurisdiction and, alternatively, for failure to state a claim. It claims that it is immune from suit and that the amended complaint fails to state a negligence claim.

The United States is correct that its sovereign immunity deprives the court of subject-matter jurisdiction over the Estate's claims. While the Federal Tort Claims Act provides a limited waiver of the United States' sovereign immunity, that waiver does not apply to the Estate's claims. The basis for imposing liability on the United States is directly related to Ceaser's status as government employee, so this claim is barred by the FTCA's intentional tort exception. Thus the district court should grant the United States' motion to dismiss.

## I.     Background

In March 2018, Isaiah Ceaser was stationed at Fort Benning in Georgia to attend combat training school with his unit. Am. Compl. ¶¶ 9, 10. At the end of the month, he left Georgia without permission and made his way to North Carolina. *Id.* ¶¶ 10, 12. Among the things that Ceaser left behind at Fort Benning was "a note stating that he was going to end it all and kill himself." *Id.* ¶ 10. Ceaser's commanding officer, Captain Smith, learned about the note. *Id.* ¶ 10.

In response, a sergeant in Ceaser's unit contacted law enforcement in Nash County, North Carolina where some of Ceaser's acquaintances lived. *Id.* He shared that "Ceaser had gotten into trouble and left a note indicating that he was going to end it all[.]" *Id.* ¶ 11. The note also stated that Ceaser wanted to visit his mother who was at an inpatient medical facility in Halifax County, North Carolina. *Id.*

Several of Ceaser's family members called Smith to let him know that Ceaser was in North Carolina "and needed to be picked up by the Marine Corps[.]" *Id.* ¶ 12. In response, Smith arranged

2

for Ceaser to fly from North Carolina back to Georgia. *Id.* ¶ 13. Ceaser boarded the flight, but within a few days he returned to his grandfather's home in Halifax County. *Id.* ¶¶ 14, 15.

Upon Ceaser's return to the area, his family members again reached out to Smith. *Id.* ¶ 16. They told him that Ceaser was in Halifax County and that they "were concerned and afraid something could happen." *Id.* ¶ 16. Sallie asked Smith why the Marine Corps had not apprehended Ceaser and asked if Smith could have local law enforcement pick Ceaser up. *Id.* ¶ 17.

Sallie, along with her daughter-in-law, spoke to Smith again the next day. Smith shared that Ceaser was under investigation for fraud. *Id.* ¶ 18. He also told them he had found several "disturbing" letters and notes from Ceaser. *Id.* These writings revealed that Ceaser intended to harm himself and others. *Id.* Smith said that he was "very concerned" by the notes and advised Sallie to be careful around Ceaser. *Id.*

That same day, Sallie again reached out to Smith. *Id.* ¶ 19. She asked "Smith to have Ceaser detained." *Id.* He said that the Marine Corps had exhausted substantial resources trying to pick Ceaser up at the airport and would not commit to doing anything else. *Id.* ¶ 19.

A few days passed and Ceaser's family again called Smith to ask why Ceaser had not yet been picked up. *Id.* ¶ 20. They told him that they had found grenade parts that they believed belonged to Ceaser. *Id.* They also shared that Ceaser was acting aggressively, was easily agitated, and was posting on social media that he had purchased guns. *Id.* Despite acknowledging that these were concerning developments and saying that he "would see what he could do," Smith would not commit to doing anything in particular. *Id.*

Then, about three weeks after he arrived in North Carolina, Ceaser's family once again took him to the airport so he could fly back to Georgia. *Id.* ¶ 21. Ceaser boarded the flight and his family then called Smith. *Id.* ¶¶ 21, 22. They told him that Ceaser was on a plane to Atlanta and

would need to be picked up at the airport. *Id.* ¶ 22. Smith eventually responded that "he could not have Ceaser detained at the airport, and Ceaser would need to" make his own way back to Fort Benning. *Id.*

But rather than make his way to Fort Benning, Ceaser made his way back to North Carolina the next day. *Id.* ¶ 23. Sallie once again contacted Smith and expressed her frustration with the situation and her concern that something bad would happen. *Id.*

In response, Smith told Sallie to take Ceaser to Camp Lejeune. *Id.* As Sallie was trying to persuade Ceaser to pack up and go with her to Camp Lejeune, he fatally shot her. *Id.* ¶ 26.

Sallie's estate sued the United States for wrongful death. In the amended complaint Evans alleges that the Marine Corps breached its duty, and thus was negligent, when it repeatedly failed to apprehend Ceaser. *Id.* ¶ 48. It also claims that since Smith instructed Sallie to take Ceaser to Camp Lejeune, the United States had a duty to protect her from Ceaser while she was doing so. *Id.*

The United States moved to dismiss the amended complaint arguing that the court lacks subject-matter jurisdiction because this claim is outside the scope of the FTCA. Alternatively, the Government argues that Evans has failed to state a claim because the United States did not breach a duty to Sallie. Mot. to Dismiss, D.E. 18; Mem. in Supp., D.E. 19 at 1.

**II.    Discussion**

The United States generally enjoys sovereign immunity against civil tort claims. *Kerns* v. *United States*, 585 F.3d 187, 193–94 (4th Cir. 2009). What this means is that courts lack jurisdiction to hear cases against the United States except when it has consented to being sued. *F.D.I.C.* v. *Meyer*, 510 U.S. 471, 475 (1994).

4

In its motion, the United States claims that it has not consented to be sued for the type of claim the Estate brought, so the court lacks subject-matter jurisdiction over this dispute. Since the United States' motion challenges the sufficiency of the allegations in the amended complaint, the court will accept the allegations as true just as if this were a motion to dismiss for failure to state a claim. *Adams* v. *Bain*, 697 F.2d 1214, 1219 (4th Cir. 1982). The Estate must show that its factual allegations establish subject matter jurisdiction. *Id.* at 1219 ("The burden of proving subject matter jurisdiction . . . is on the plaintiff, the party asserting jurisdiction.").

The parties dispute whether the Estate's claim falls within the waiver of sovereign immunity provided by the FTCA. Under that Act, federal courts have exclusive jurisdiction over civil actions against the United States seeking monetary damages for, among other things, wrongful death "caused by the negligent or wrongful act or omission of any employee of the Government while acting withing the scope of his office or employment." 28 U.S.C. § 1346(b)(1).

But that waiver of sovereign immunity does not apply to all tort claims. The United States has retained its immunity for "[a]ny claim arising out of assault, battery," and other intentional torts. 28 U.S.C. § 2680(h). This provision is known as the intentional tort exception. So, for example, the FTCA would not allow this court to hear a claim against the United States based directly on Ceaser's alleged murder of Sallie. *See United States* v. *Sheridan*, 487 U.S. 392, 398 (1988) (noting § 2680(h) "[is] unquestionably broad enough to bar all claims based *entirely* on an assault or battery.").

But, according to the Supreme Court, the FTCA does allow courts to hear some claims against the United States for injuries arising out of an assault or battery. The intentional tort exception does not apply when the government "negligently allow[s] the assault to occur" and the

5

assailant's "employment status. . .has nothing to do with the basis for imposing liability on the Government[.]" *Id.* at 389, 402.

*Sheridan* provides an example of how this exception can apply. In that case a naval medical aide, Carr, got drunk after finishing his shift at the hospital. *Id.* at 395. He gathered his belongings, including a rifle and ammunition, and left his quarters. *Id.* Three naval corpsmen later found Carr drunk and lying face down in the hospital. *Id.* They tried to take him to the emergency room, but he resisted. *Id.* As Carr began to flee, the corpsmen saw a rifle in his bag. *Id.* Though regulations that required the corpsmen to report the presence of firearms on the premises, they left the scene without taking any further action. *Id.* Carr later shot into a car, injuring a person and damaging the car. *Id.* The injured party sued the government under the theory that the corpsmen acted negligently when they allowed Carr to leave the hospital with a loaded rifle.

While the injury arose out of an assault by a government employee, the Supreme Court found that the claim could proceed under the FTCA. It held that the intentional tort exception did not apply because the basis for the United States' liability was "entirely independent of [the assailant's] employment status." *Id.* at 401. It noted that the firearms regulations "prohibit[ed] the possession of firearms on the naval base and that require[d] all personnel to report the presence of any such firearm[.]" *Id.* at 401. So "the government's liability resulted not from the mere fact that it was [the assailant's] employer, but rather from the fact that it had undertaken 'good Samaritan' responsibilities to ensure that nobody on the naval base possessed a firearm without authorization and that visibly drunken and dangerous persons were restrained." *Bembenista* v. *United States*, 866 F.2d 493, 497 (D.C. Cir. 1989). Thus the corpsmen were under a duty to report anyone who possessed a firearm, regardless of their employment status, and were under a duty to restrain anyone who was visibly drunk and dangerous, even if they were a private citizen.

6

So whether this court has jurisdiction over the Estate's claims turns on whether Smith's alleged negligence was independent of Ceaser's status as a Marine. The records proves that it was not.[1]

The Estate's theory of the case revolves around Ceaser's status as a Marine. The central theme of the amended complaint is that the Marine Corps could have and should have taken Ceaser into custody or asked local law enforcement to do so. *See* Am. Compl. ¶¶ 12, 17, 20, 22, 23, 30, 31, 33. And the military can do so with respect to service members who are considered absentees or deserters. *See* Department of Defense Instruction on Desertion and Unauthorized Absence, No. 1325.02 (Mar. 31, 2017). But the Estate has identified no authority allowing or requiring the Marine Corps to arrest or arrange for the arrest of a civilian who left their job without authorization. And when asked what legal authority would authorize the Marine Corps to control someone independent of their status as a Marine, the Estate responded, "[Ceaser] was AWOL and. . .normally you can't just go out and arrest somebody, but he was AWOL, so they could." Hr. Tr. at 6:14–18. So the basis for imposing liability on the United States implicates Ceaser's status as a Marine.

Ceaser's military status is just as relevant to the Estate's arguments about Smith instructing Sallie to take Ceaser to Camp Lejeune. Ceaser's family repeatedly reached out to a military officer about what to do with a service member who had left his duty station without permission from his chain of command. The answer they received was to take the service member to a military base. There is no reason to believe that the military would help Sallie deal with Ceaser if not for his

---

[1] At various places the amended complaint asserts that the United States had the ability to control or seize Ceaser for reasons independent of his status as a Marine. *See, e.g.*, Am. Compl. ¶¶ 40, 44, 45, 46. These allegations are not entitled to the presumption of truth because they are legal conclusions. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).

military status. And there is no reason that Smith would have told Sallie to take Ceaser to Camp Lejeune if not for his military status.

As with its earlier argument, the Estate concedes these points. When asked why Sallie contacted Smith, the Estate said that "she wanted the Marines to pick him up or notify law enforcement officials." Hr. Tr. at 11:17–20. And it also recognized that Smith "[c]ertainly. . .wouldn't have said, take a civilian to Camp Lejeune." *Id.* a 11:21–12:8.

The Estate has not met its burden to show that Ceaser's employment status has nothing to do with the basis for imposing liability on the United States. So the Estate cannot rely on *Sheridan* to avoid the FTCA's intentional tort exception. Thus the court lacks subject-matter jurisdiction over the Estate's claim and it should be dismissed.

In an attempt to avoid this conclusion, the Estate points to two cases applying Sheridan: *Durden* v. *United States*, 736 F.3d 296 (4th Cir. 2013) and *Lumsden* v. *United States*, 555 F. Supp. 2d 580 (E.D.N.C. 2008). But neither case requires a different outcome here.

*Durden* involved an FTCA claim based on an Army specialist named Purnell drunkenly breaking into Durden's home and raping her. 736 F.3d 296. Durden claimed that the Army knew "Pernell posed a safety risk to others, had a duty to protect her from Pernell, and breached that duty by failing to execute. . .orders that. . . required that Pernell be escorted at all times while on Fort Bragg and be checked on hourly when in his barracks." *Id.* at 300. The government moved to dismiss the case for lack of subject-matter jurisdiction and for failing to state a claim. *Id.* at 298. The district court dismissed the complaint for lack of subject matter jurisdiction and Durden appealed. *Id.* at 298–99.

The Fourth Circuit's opinion proceed in two parts. To begin with, it began by considering "whether, under North Carolina law, the Army owed any duty to Durden and, if it did, whether it

8

breached that duty." *Id.* at 301. It then moved on to the district court's alternate holding that it lacked subject matter jurisdiction due to "the FTCA's intentional-tort exception." *Id.* at 308.

Since the outcome here turns on the intentional tort exception, only the latter portion of the Fourth Circuit's opinion is relevant to the analysis. The appellate court's holding with respect to the intentional tort exception was that "although the government's ability (i.e., legal duty) to control a tortfeasor must be independent of the tortfeasor's status as a government employee, knowledge of the tortfeasor's propensity for violence or criminal history gained as a result of such status does not, per se, nullify an FTCA claim." *Id.* at 309. Since this case does not present a similar issue, *Durden* does not compel a different conclusion.

*Lumsden* is just as unhelpful to the Estate's argument. That case involved a claim that the United States was liable for a Marine Corps private getting into a fatal crash after driving while intoxicated. 555 F. Supp. 2d 580, 582 (E.D.N.C. 2008). The complaint alleged that the Marine Corps knew that the private "had, on several occasions, acquired and inhaled the chemical compound, ether, belonging to the Government." *Id.* In fact, the Marine Corps impounded the private's car after discovering him "inhaling ether that belonged to the United States." *Id.* After holding on to the car for about two weeks, the Marine Corps returned the car, which contained cylinders of ether, to the private. *Id.* The private then inhaled enough of the ether to become intoxicated, began driving, and ended up crashing into another car. *Id.*

The United States tried to have the case dismissed based on the FTCA's intentional tort exception. *Id.* at 584. The district court rejected this argument based on *Sheridan*. It noted that the plaintiff's theory of liability was based on government agents delivering both the car keys and ether to the private. *Id.* The court found that based on these facts, the private's "employment by

9

the Government is irrelevant to the plaintiffs' theory of liability." *Id.* So it held that the FTCA's intentional tort exception did not bar the plaintiffs' claim. *Id.*

*Lumsden* presents a straightforward application of *Sheridan*. The private's status as a government employee was irrelevant to the claims, so the intentional tort exception did not apply. But as discussed above, Ceaser's status as a Marine is at the heart of this case. So *Lumsden* does not suggest a different outcome here.

Instead, this case presents circumstances like those in *LaFrancis* v. *United States*, 66 F. Supp. 2d 335 (D. Conn. 1999). In that case, LaFrancis sued the government after she was assaulted by her former husband, a member of the United States Navy. *Id.* at 335–36. LaFrancis had reported to her husband's commanding officers that he had assaulted her and threatened her previously. *Id.* Eventually her husband was admitted to a psychiatric facility, yet he continued to threaten her during that time. *Id.* She told his commanding officers that she was afraid he would harm her when he left the facility and asked the Navy to take measures to protect her. *Id.* Allegedly, the Navy told LaFrancis that it would issue a no-contact order directing LaFrancis's husband not to return to the residence once released. *Id.* But that order was never issued. *Id.* at 337. And when he was released, he assaulted LaFrancis causing several injuries. *Id.*

LaFrancis alleged that the government was negligent in failing to issue the appropriate orders and try to ensure LaFrancis's husband did not assault her. *Id.* at 341. She argued that the Navy owed her a duty to protect her that independent of her husband's employment. *Id.* But the court disagreed, concluding that the duty to her was dependent on her husband's employment with the government because "the control over [her husband] by his superiors was dependent upon that employment relationship." *Id.* Without it, "the Navy would not have had the authority to supervise the conduct of [her husband] or to issue the 'no contact order.'" *Id.*

10

Just like in *LaFrancis*, Smith's ability to control or detain Ceaser was dependent on his employment relationship with the United States. Without that relationship, there would have been no basis for Smith to arrange for Ceaser's arrest or to suggest he be returned to Camp Lejeune. So just like in *LaFrancis*, the Estate has failed to show that it's claims are independent of Ceaser's employment status. That shortcoming requires the court to dismiss the case for lack of subject matter jurisdiction.[2]

## III.    Conclusion

For the reasons described above, the court lacks subject-matter jurisdiction over this case. Thus it should grant the United States' motion and dismiss this action. D.E. 18.

The Clerk of Court must serve a copy of this Memorandum and Recommendation ("M&R") on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated:  June 6, 2022

*Robert T Numbers II*
_____
Robert T. Numbers, II
United States Magistrate Judge

---

[2] Due to this conclusion, this opinion will not address the United States' alternative argument that the amended complaint's allegations fail to state a negligence claim.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### Eastern Division
### No. 4:21-CV-00045-FL

MITCHELL GARNET EVANS,     )
**Executor of the Estate of Sallie**     )
**Copeland Evans,**     )
     )
     **Plaintiff,**     )
     )     **PLAINTIFF'S OBJECTIONS TO**
**v.**     )     **THE MAGISTRATE JUDGE'S**
     )     **MEMORANDUM & RECOMMENDATION**
**UNITED STATES OF AMERICA,**     )
     )
     **Defendant.**     )
_____)

Plaintiff respectfully objects as follows to the magistrate judge's Memorandum and Recommendation ("M&R"):

## Specific Objections

Plaintiff objects to the following portions of the magistrate judge's Memorandum & Recommendation ("M&R"):

1. The findings and conclusions that:

> The United States is correct that its sovereign immunity deprives the court of subject-matter jurisdiction over the Estate's claims. While the Federal Tort Claims Act provides a limited waiver of the United States' sovereign immunity, that waiver does not apply to the Estate's Claims. The basis for imposing liability on the United States is directly related to Ceaser's status as government employee, so this claim is barred by the FTCA's intentional tort exception.

M&R, D.E. 27 at 2.

2. The finding and conclusion that Smith's negligence was not independent of Ceaser's status as a Marine. M&R, D.E. 27 at 7.

3. The finding and conclusion that "The Estate theory of the case revolves around

1

Ceaser's status as a Marine." M&R, D.E. 27 at 7.

4. The finding and conclusion that "the basis for imposing liability on the United States implicates Ceaser's status as a Marine." M&R, D.E. 27 at 7.

5. The finding and conclusion that "Ceaser's military status is just as relevant to the Estate's arguments about Smith instructing Sallie to take Ceaser to Camp Lejeune." M&R, D.E. 27 at 7.

6. The finding and conclusion that "there is no reason that Smith would have told Sallie to take Ceaser to Camp Lejeune if not for his military status." M&R, D.E. 27 at 8.

7. The findings and conclusions that "the Estate concedes these points." M&R, D.E. 27 at 8, line 3, apparently referring to some or all of the quoted language in Specific Objections 4, 5, and 6.

8. The findings and conclusions that:

> The Estate has not met its burden to show that Ceaser's employment status has nothing to do with the basis for imposing liability on the United States. So the Estate cannot rely on [*United States v.*] *Sheridan* to avoid the FTCA's intentional tort exception. Thus, the court lacks subject-matter jurisdiction over the Estate's claim, and it should be dismissed.

M&R, D.E. 27 at 8.

9. The findings and conclusions that *Durden v. United States* and *Lumsden v. United States* do not require an outcome different from dismissal of the Plaintiff's claim for lack of subject-matter jurisdiction and are unhelpful to Plaintiff's arguments and positions. M&R, D.E. 27 at 8–10.

10. The findings and conclusions that "this case presents circumstances like those in *LaFrancis v. United States*, 66 F. Supp. 2d 335 (D. Conn. 1999)." M&R, D.E. 27 at 10.

11. The findings and conclusions that:

> Just like in *LaFrancis*, Smith's ability to control or detain Ceaser
> was dependent on his employment relationship with the United States.
> Without that relationship, there would have been no basis for Smith to
> arrange for Ceaser's arrest or to suggest he be returned to Camp Lejeune.
> So just like in *LaFrancis*, the Estate has failed to show that it's [sic] claims
> are independent of Ceaser's employment status. That shortcoming requires
> the court to dismiss the case for lack of subject matter jurisdiction.

M&R, D.E. 27 at 11.

12. The finding and conclusion that "the court lacks subject matter jurisdiction over this case.

13. The conclusion and recommendation that the court "should grant the United States' motion and dismiss this action." M&R, D.E. 27 at 11.

14. Any finding, conclusion, or recommendation that is substantially the same as, or supportive of, the ones listed above.

## Bases of Objections

The sole basis, in substance, for the magistrate judge's recommendation for the dismissal of the case for lack of subject matter jurisdiction is his finding that Captain Smith's negligence was not independent of Cesar's status as a Marine.[1] That finding is erroneous.

First, the M&R fails to recognize the significance of Captain Smith twice instructing Sallie Copeland Evans to put the dangerous Ceaser in a car for a trip he did not want to take. Am. Compl., D.E. 16 at ¶¶ 23, 25.

North Carolina "law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence." *Council v. Dickerson's Inc.*, 233 N.C. 472, 474, 64 S.E.2d

---

[1] Plaintiff's Memorandum in Response to United States' Motion to Dismiss, D.E. 22, which he adopts by reference, addresses this issue. Plaintiff does not intend to abandon any argument or contention he made in his Memorandum that he does not make in this Objections to the Magistrate Judge's Memorandum & Recommendation.

551, 553 (1951). Plaintiff alleges that when Smith entered upon the active course of conduct of instructing Sallie to take Ceaser to Camp Lejeune, North Carolina law imposed upon him a positive duty to exercise ordinary care to protect Sallie from harm. Am. Compl., D.E. 16 at ¶ 42. When Smith gave those instructions to Sallie, he knew of the grave danger Cesar presented to Sallie. Am. Compl., DE 16 at ¶¶ 10, 16, 18, 20, 22. And he had to have known that Ceaser did not want to take that trip. No reasonable person would have given Sallie those instructions under the circumstances. Foreseeably, Ceaser resisted the trip by committing a violent act.

At the heart of Plaintiff's action is that the immediate cause of Sallie's death was Smith instructing her to get a man Smith knew was dangerous into a car for a trip, as shown by Ceaser's prior actions, he did not want to take. Smith's instructions to Sallie were negligent instructions whether Ceaser was a Marine or not. Thus, the negligence claim against Smith is independent of Ceaser's status as a Marine.

Second, the M&R, in finding that "there is no reason that Smith would have told Sallie to take Ceaser to Camp Lejeune if not for his military status," uses the type of but-for contentions that have been rejected by the courts. Arguably in *Sheridan*, but for Carr's employment status, he would not have been at the hospital. Arguably in *Durden*, but for Pernell's employment status as a soldier, the Army would not have had any involvement with him. Arguably in *Lumsden*, but for the private's employment status as a Marine, he would not have had government ether, and the Marine Corps would not have had any involvement with his car. Yet in each of those cases, the court held that the FTCA's intentional tort exception did not bar the claim.

The court in *Lumsden* found that the private's government employment was irrelevant to the plaintiff's liability theory. That is also true in the present case.

Third, in stating that this case presents circumstances like those in *LaFrancis*, the M&R overlooks a critical difference between the two cases. In *LaFrancis*, the plaintiff alleged that she was injured as a result of the Navy's failure to issue appropriate orders, follow recommendations from a Family Advocacy Program, and otherwise take steps to ensure that her husband, a Navy member, did not assault her. The plaintiff alleged that the Navy had undertaken an independent duty to the plaintiff to supervise, retain, and control the plaintiff's husband, who was known to be dangerous and to have been violent toward the plaintiff. But the alleged failings of the Navy were in not acting in accordance with its alleged duty relating to one of its members, not in undertaking and negligently performing an active course of conduct toward a third-party. In the present case, Smith undertook an active course of conduct in instructing a third-party, Sallie, to take action, and those instructions constituted negligence independent of Ceaser's Marine status. That distinguishes the present case from the District of Connecticut *LaFrancis* case, which is not as helpful as the Fourth Circuit *Durden* case or the Eastern District of North Carolina *Lumsden* case.

## Conclusion

The magistrate judge erred in finding that Captain Smith's negligence was not independent of Cesar's status as a Marine and in recommending, therefore, that the court dismiss the case for lack of subject matter jurisdiction. The court should deny the United States' motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

This the 17th day of June 2022.

**MITCHELL GARNETT EVANS**

/s/ Robert C. Slaughter, III
Robert C. Slaughter, III
Slaughter & Lupton Law, PLLC
117 West Eden Street
Edenton, NC 27932
Phone: (252) 439-0700
Fax: (252)-689-8400
rslaughter@slaughterlupton.com
NC State Bar No.: 16515
*Attorney for Plaintiff*

/s/ Christopher R. Hedrick
Christopher R. Hedrick
Mason, Mason, Walker & Hedrick, P.C.
11848 Rock Landing Drive, Suite 201
Newport News, VA 23606
Phone: (757) 873-3909
Fax: (757) 873-1781
chedrick@masonwalker,com
NC State Bar No.: 19574
*Attorney for Plaintiff*

**Certificate of Service**

I certify that on June 17, 2022, I served this document electronically, using the CM/ECF

system, upon:

Sharon C. Wilson
Attorney for Defendant
United States Attorney's Office
Wells Fargo Building
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601

/s/ Christopher R. Hedrick
Christopher R. Hedrick
Mason, Mason, Walker & Hedrick, P.C.
11848 Rock Landing Drive, Suite 201
Newport News, VA 23606
Phone: (757) 873-3909
Fax: (757) 873-1781

6

chedrick@masonwalker,com
NC State Bar No.: 19574
*Attorney for Plaintiff*

No. 4:21-CV-45-FL

| | | |
|---|---|---|
| MITCHELL GARNET EVANS, | ) | |
| EXECUTOR OF THE ESTATE OF | ) | |
| SALLIE COPELAND EVANS, | ) | |
| | ) | UNITED STATES' |
| PLAINTIFF, | ) | RESPONSE TO PLAINTIFF'S |
| | ) | OBJECTIONS TO THE MAGISTRATE |
| V. | ) | JUDGE'S MEMORANDUM AND |
| | ) | RECOMMENDATION [D.E. 27] |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| DEFENDANT. | ) | |

This Court, upon *de novo* review, should deny Plaintiff's specific objections and,

upon "clear error" review, should deny Plaintiff's general objections to the Magistrate

Judge's Memorandum and Recommendations. [D.E. 27, 28]. This Court should adopt

the recommendations and dismiss Plaintiff's claim. Fed. R. Civ. P. 12(b)(1).

The intentional torts exception (ITE) to the Federal Tort Claims Act (FTCA),

28 U.S.C. § 2680(h), bars claims against the United States based on decedent's

murder by a United States Marine. To maintain this suit on behalf of decedent's

estate, Plaintiff must show that negligence of a federal employee, other than the

tortfeasor, proximately caused the murder. This negligence cannot have had anything

to do with the tortfeasor's status as a federal employee; critically, the United States'

ability to control the tortfeasor must have been independent of the employment

relationship. Plaintiff's specific and general objections fail because, as the Magistrate

Judge correctly found, there was no reason for decedent to ask the Marine Corps

1

(USMC) to retrieve the tortfeasor and, critically, no basis for the USMC to exercise control over the tortfeasor under the circumstances other than his status as a Marine. Hence, the ITE precludes waiver of sovereign immunity and Plaintiff's claim must be dismissed for lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1).

Like Plaintiff, the United States incorporates by reference all of its arguments set out in its memorandum in support of motion to dismiss [D.E. 19] and its reply [D.E. 25]. Fed. R. Civ. P. 10(c).

I.     PLAINTIFF'S SPECIFIC OBJECTIONS SHOULD BE DISMISSED.

Plaintiff's specific objections focus on the Magistrate Judge's finding that a non-tortfeasor federal employee's alleged negligence was not independent of the tortfeasor's federal employment. [D.E. 47, at 2-3]. Plaintiff advances three arguments in support and each fails.

First, Plaintiff argues that the Magistrate Judge erred by failing to recognize the "significance" that the other federal employee's actions constituted negligence under North Carolina law. [D.E. 28, at 3-4]. This argument is not persuasive because the determinative issue when analyzing the applicability of the ITE is whether the other employee's conduct was related to or independent of the tortfeasor's status as a federal employee. <u>Sheridan v. United States</u>, 487 U.S. 392 402 (1988). Here, the basis for Plaintiff's tort claim is that the tortfeasor's boss twice told decedent to take the tortfeasor to a place the tortfeasor did not want to go.[1] On its face, Plaintiff's claim is

---

[1] Though disputed, these allegations of fact, on Rule 12(b)(6) motion, are accepted as true. In particular, as noted in its prior briefing [D.E. 19, 25], Plaintiff pled facts that might support the tortfeasor did not want to return to Ft. Benning, but he did not plead facts that support the tortfeasor was averse to going to Camp Lejeune. [D.E. 16].

2

not independent of the tortfeasor's federal employment status and, thereby, it is barred by the ITE and must be dismissed. Fed. R. Civ. P. 12(b)(1).

Further, under governing caselaw, Plaintiff's objection fails because the non-tortfeasor federal employee's sole ability to exercise control over the tortfeasor was based on the tortfeasor's status as a Marine. See Durden v. United States, 736 F.3d 296, 308-09 (2013). No negligence is alleged independent of the employment relationship. [D.E. 16]. As such, Plaintiff's claim arises out of the assault/battery that tragically took decedent's life and, thereby, the claim is barred by the ITE and must be dismissed. Fed. R. Civ. P. 12(b)(1).

Second, Plaintiff argues the Magistrate Judge's finding that the non-tortfeasor employee's alleged negligence was not independent of the tortfeasor's federal employment is erroneous because it is based on "but-for contentions"[2] rejected in Sheridan, Durden, and Lumsden[3]. Durden and Lumsden do not support Plaintiff's argument. In both cases the courts held the ITE was inapplicable because, when the employment status of the tortfeasor was removed from the equation, the United States still owed a duty to plaintiff under the circumstances. Sheridan, at 402; Lumsden, at 585. Here, if the tortfeasor's status as a Marine is removed from the fact pattern, the Marines do not owe decedent a duty.

In Sheridan, the duty to plaintiff who was shot by an inebriated person arose, not because the shooter was Navy personnel, but because Navy corpsmen

---

[2] The Magistrate Judge found the non-tortfeasor had no reason to speak with decent "but-for" the tortfeasor's "military status[.]" [D.E. 28, at 4].
[3] Lumsden v. United States, 555 F.Supp.2d 580 (2008).

3

encountered the inebriated person and his gun on Navy property prior to the shooting and did not have him taken into custody. In Lumsden, the duty arose to the plaintiffs injured by an ether-intoxicated driver, not because the driver was a Marine, but because immediately prior to the accident, other Marines returned to the driver, recently released from Marine detention for huffing ether, his car with Marine ether canisters in the trunk. In Sheridan and Lumsden, it was foreseeable that the federal employee's actions could cause the type of injury sustained. The shooter and the huffer's federal employee statuses did not alter the analysis. Here, the tortfeasor's federal employment status is the *sine qua non* to Plaintiff claim.[4] In short, Decedent would not have called to ask the Marines to retrieve the tortfeasor and the Marines would not have responded to decedent's contact absent the tortfeasor's status as a Marine. Hence, neither Sheridan nor Lumsden render the Magistrate Judge's finding erroneous.

Durden also does not support Plaintiff's argument. In Durden, the United States prevailed because plaintiff failed to demonstrate a duty owed to her under North Carolina law.[5] Durden, at 302-07. As an alternative basis for dismissal, the district court found the ITE would bar the claim because "but-for" the tortfeasor's federal employment, the government would not have known of the tortfeasor's "allegedly violent propensity" which was relevant to the analysis of a state law duty

_____

[4] Plaintiff did not plead facts that support the murder was foreseeable. See footnote 1.
[5] Here, Plaintiff failed to cite to a single case where an employer under North Carolina law would be liable (breaches a duty) for telling a family member, who asks the employer to retrieve an employee from private property, that the family member can take the employee to an employer's place of business. [D.E. 16, 22, 28].

(foreseeability). Id., at 308-09. On appeal, the Court rejected this "but-for" basis to apply the ITE. To overcome application of the ITE, the Court clarified that it is the United States' ability to control the tortfeasor that must be independent of the tortfeasor's federal employment. Id., at 309. Here, the Magistrate Judge found that the ITE applied to bar Plaintiff's claim, but not because the United States gained knowledge of the tortfeasor through his federal employment. To the contrary, in accord with Durden, the Magistrate Judge found that the ITE applied because the United States' ability to control the tortfeasor was not independent of the tortfeasor's federal employment status. [D.E. 27]; Durden, at 309.

Last, Plaintiff argues the Magistrate Judge's reliance on LaFrancis is erroneous because it is distinguishable. [D.E. 28, at 5 (citing LaFrancis v. United States, 66 F.Supp.2d 335 (D. Conn. 1999)]. Plaintiff's attempt to distinguish is in error. Plaintiff asserts that LaFrancis is distinguishable because, in that case, the Navy violated a duty to one of its "members" and did not "undertake" and violate a duty to a third-party, like decedent. [Id.]. Plaintiff is incorrect. The plaintiff in LaFrancis was a spouse, not an active duty servicemember, so she was a third-party to the Navy just like decedent.

The Magistrate Judge's reliance on LaFrancis was appropriate and in accord with controlling Fourth Circuit precedent. In both cases, a family member asked the military to control a service member and, after injury, claimed the military owed a duty independent of the servicemember's federal employment. The district court in LaFrancis, consistent with the Fourth Circuit in Durden, focused on control. The

court in <u>LaFrancis</u> found that "the duty to [Mrs. LaFrancis] was dependent on her husband's employment with the government because the 'control over [her husband] by his superiors was dependent upon that employment relationship.' Without it, 'the Navy would not have had the authority to supervise the conduct'" of her husband. [D.E. 27, at 10]. The fact patterns of <u>LaFrancis</u> and the instant case are nearly identical. Here, any duty owed to decedent was dependent on the tortfeasor's government employment because the only basis the Marines had to retrieve the tortfeasor from private property was because he was a Marine. See <u>Durden</u>, at 308-09. As such, the Magistrate Judge correctly found that the ITE applied and Plaintiff's claim should be dismissed for lack of subject matter jurisdiction. [D.E. 28, at 10-11]; Fed. R. Civ. P. 12(b)(1).

## II. PLAINTIFF'S GENERAL OBJECTIONS SHOULD BE DENIED.

Plaintiff's general objections are to the Magistrate Judge's finding that the court lacks subject matter jurisdiction. [D.E. 28, at ¶¶ 12-14]. Plaintiff presents no argument directed to the general objections. Hence, because the Magistrate Judge's findings on lack of subject matter jurisdiction are not clearly erroneous, this Court should adopt the recommendations and dismiss Plaintiff's claim. Fed. R. Civ. P. 12(b)(1).

## CONCLUSION

For all of these reasons, this Court should adopt the recommendations and dismiss Plaintiff's claim. Fed. R. Civ. P. 12(b)(1).

6

Respectfully submitted, this 1st day of July, 2022.

MICHAEL F. EASLEY, JR.
United States Attorney


By: /s/ Sharon C. Wilson
SHARON C. WILSON
Assistant United States Attorney
Civil Division
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4826
E-Mail: sharon.wilson2@usdoj.gov
N.C. Bar No. 18435
Attorney for Defendant

7

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this 1st day of July, 2022, served a copy of the foregoing by placing a copy of the same in the U.S. Mail and/or electronically, addressed as follows:

Robert C. Slaughter, III
Slaughter Law Firm, PLLC
117 West Eden Street
Edenton, NC 27932

Christopher R. Hedrick
Mason, Mason, Walker, & Hedrick, P.C.
11848 Rock Landing Drive, Suite 201
Newport News, Va 23606


BY: <u>/s/ Sharon C. Wilson</u>
SHARON C. WILSON
Attorney for Defendants
Assistant United States Attorney
Civil Division

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:21-CV-45-FL

MITCHELL GARNET EVANS, Executor )
of the Estate of Sallie Copeland Evans, )
                                        )
                Plaintiff,              )
                                        )
        v.                              )               ORDER
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                Defendant.              )

    This matter comes before the court on defendant's motion to dismiss pursuant to Federal

Rules of Civil Procedure 12(b)(1) and (6). (DE 18).  Pursuant to 28 U.S.C. § 636(b)(1)(B) and

Federal Rule of Civil Procedure 72(b), United States Magistrate Judge Robert T. Numbers, II,

entered memorandum and recommendation ("M&R"), wherein it is recommended that the court

grant the motion. (DE 27).  Plaintiff timely objected to the M&R.  In this posture, the issues raised

are ripe for ruling.  For the following reasons, the motion is granted.

## STATEMENT OF THE CASE

    Plaintiff commenced this action April 8, 2021, asserting that defendant is liable for the

wrongful death of plaintiff's mother, Sallie Copeland Evans (the "decedent"), at the hands of Isaiah

Evans Ceaser ("Ceaser"), plaintiff's nephew and decedent's grandson, based on negligent and

wrongful acts and omissions by defendant's employees, pursuant to the Federal Tort Claims Act

("FTCA"), 28 U.S.C. § 2671 et seq.   Plaintiff seeks compensatory damages and costs.

Plaintiff attaches to his operative, amended complaint[1] 1) a December 8, 2020, letter from the United States Department of the Navy denying plaintiff's administrative FTCA claim, 2) a "Communication Event Report" summarizing a conversation between law enforcement and a United States Marine Corps ("Marine Corps") sergeant from Fort Benning, Georgia, and 3) screenshots of text messages between a "Captain Smith" and plaintiff. Defendant moves to dismiss the complaint on the bases that the court lacks subject matter jurisdiction over plaintiff's claim and the complaint fails to state a claim upon which relief can be granted.

After referral, the magistrate judge heard argument from the parties and entered M&R thereafter. The magistrate judge recommends that defendant's motion be granted on the basis of the court's lack of subject matter jurisdiction. The magistrate judge did not reach defendant's Rule 12(b)(6) argument. Plaintiff objects specifically to the magistrate judge's conclusion and analysis regarding the court's subject matter jurisdiction.

## STATEMENT OF FACTS

The court incorporates herein for ease of reference the facts set forth in the M&R.

In March 2018, Isaiah Ceaser was stationed at Fort Benning in Georgia to attend combat training school with his unit. Am. Compl. ¶¶ 9, 10. At the end of the month, he left Georgia without permission and made his way to North Carolina. Id. ¶¶ 10, 12. Among the things that Ceaser left behind at Fort Benning was "a note stating that he was going to end it all and kill himself." Id. ¶ 10. Ceaser's commanding officer, Captain Smith, ["Smith"] learned about the note. Id. ¶ 10.

In response, a sergeant in Ceaser's unit contacted law enforcement in Nash County, North Carolina where some of Ceaser's acquaintances lived. Id. He shared that "Ceaser had gotten into trouble and left a note indicating that he was going to end it all[.]" Id. ¶ 11. The note also stated that Ceaser wanted to visit his mother who was at an inpatient medical facility in Halifax County, North Carolina. Id.

Several of Ceaser's family members called Smith to let him know that Ceaser was in North Carolina "and needed to be picked up by the Marine Corps[.]" Id. ¶ 12. In response, Smith arranged for Ceaser to fly from North Carolina back to

---

[1]   Hereinafter, all references to the complaint in the text or "Compl." in citations are to plaintiff's amended complaint. (Am. Compl. (DE 16)).

Georgia. Id. ¶ 13. Ceaser boarded the flight, but within a few days he returned to his grandfather's home in Halifax County. Id. ¶¶ 14, 15.

Upon Ceaser's return to the area, his family members again reached out to Smith. Id. ¶ 16. They told him that Ceaser was in Halifax County and that they "were concerned and afraid something could happen." Id. ¶ 16. [The decedent,] Sallie[,] asked Smith why the Marine Corps had not apprehended Ceaser and asked if Smith could have local law enforcement pick Ceaser up. Id. ¶ 17.

Sallie, along with her daughter-in-law, spoke to Smith again the next day. Smith shared that Ceaser was under investigation for fraud. Id. ¶ 18. He also told them he had found several "disturbing" letters and notes from Ceaser. Id. These writings revealed that Ceaser intended to harm himself and others. Id. Smith said that he was "very concerned" by the notes and advised Sallie to be careful around Ceaser. Id.

That same day, Sallie again reached out to Smith. Id. ¶ 19. She asked "Smith to have Ceaser detained." Id. He said that the Marine Corps had exhausted substantial resources trying to pick Ceaser up at the airport and would not commit to doing anything else. Id. ¶ 19.

A few days passed and Ceaser's family again called Smith to ask why Ceaser had not yet been picked up. Id. ¶ 20. They told him that they had found grenade parts that they believed belonged to Ceaser. Id. They also shared that Ceaser was acting aggressively, was easily agitated, and was posting on social media that he had purchased guns. Id. Despite acknowledging that these were concerning developments and saying that he "would see what he could do," Smith would not commit to doing anything in particular. Id.

Then, about three weeks after he arrived in North Carolina, Ceaser's family once again took him to the airport so he could fly back to Georgia. Id. ¶ 21. Ceaser boarded the flight and his family then called Smith. Id. ¶¶ 21, 22. They told him that Ceaser was on a plane to Atlanta and would need to be picked up at the airport. Id. ¶ 22. Smith eventually responded that "he could not have Ceaser detained at the airport, and Ceaser would need to" make his own way back to Fort Benning. Id.

But rather than make his way to Fort Benning, Ceaser made his way back to North Carolina the next day. Id. ¶ 23. Sallie once again contacted Smith and expressed her frustration with the situation and her concern that something bad would happen. Id.

In response, Smith told Sallie to take Ceaser to Camp Lejeune. Id. As Sallie was trying to persuade Ceaser to pack up and go with her to Camp Lejeune, he fatally shot her. Id. ¶ 26.

(M&R (DE 27) at 2-4).

3

## COURT'S DISCUSSION

A.     Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982).[2] Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Such motion may either 1) assert the complaint fails to state facts upon which subject matter jurisdiction may be based, or 2) attack the existence of subject matter jurisdiction in fact, apart from the complaint. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Where a defendant raises a "facial challenge[] to [subject matter jurisdiction] that do[es] not dispute the jurisdictional facts alleged in the complaint," the court accepts "the facts of the complaint as true as [the court] would in context of a Rule 12(b)(6) challenge." Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018).

---

[2]     Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

4

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

B.    Analysis

In the instant motion to dismiss, the government asserts that plaintiff's claim falls within the FTCA's exception for "claim[s] arising out of assault[ or] battery." 28 U.S.C. § 2680(h). Plaintiff argues that, pursuant to Sheridan v. United States, 487 U.S. 392 (1988), such exception does not apply because his claim of negligence by the United States furnishes a basis for governmental liability that is entirely independent of Ceaser's federal employment status. The magistrate judge cogently and thoroughly determined in the M&R that plaintiff's argument fails as a matter of law, even accepting the facts alleged as true. Upon de novo review, the court finds the determination by the magistrate judge to be correct.

The court separately addresses here plaintiff's specific objections: 1) that the M&R's conclusion is incorrect because Smith's instructions to decedent establish a duty to her independent of Ceaser's employment status; 2) that the M&R relied on the type of but-for rationale disapproved by the court in Durden v. United States, 736 F.3d 308 (4th Cir. 2013); and 3) that LaFrancis v. United States, 66. F. Supp. 2d 335 (D. Conn. 1999), which the M&R cites, is distinguishable. None merit concluding the magistrate judge's recommendation to dismiss plaintiff's complaint is erroneous.

5

The FTCA allows complainants to hold the United States liable for certain tort claims "in the same manner and to the same extent as a private individual," 28 U.S.C. § 2674, including "for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the [United States] while acting within the scope of his [or her] office or employment." Id. § 1346(b)(1). This is a limited waiver of the United States' general "immun[ity] from suit." Clendening v. United States, 19 F.4th 421, 426 (4th Cir. 2021); see also F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994) (explaining that "[s]overeign immunity is jurisdictional in nature" and thus "the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit"). "[T]hat waiver is curtailed by several exceptions," which "plaintiff bears the burden of showing" do not "apply to [his or her] particular claim." Clendening, 19 F.4th at 426.

One such exception is for "[a]ny claim arising out of assault, battery," or a number of other enumerated torts, 28 U.S.C. § 2680(h), sometimes referred to as the "intentional-tort exception." Durden, 736 F.3d at 308. However, "in at least some situations the fact that an injury was directly caused by an assault or battery will not preclude liability against the Government for negligently allowing the assault to occur." Sheridan, 487 U.S. at 398. One such situation, identified in Sheridan, is where the "negligence of other Government employees who allowed a foreseeable assault and battery to occur . . . furnish[es] a basis for Government liability that is entirely independent of [the tortfeasor's] employment status." Id. at 401; see also id. ("[I]n a case in which the employment status of the assailant has nothing to do with the basis for imposing liability on the Government, it would seem perverse to exonerate the Government because of the happenstance that [the assailant] was on a federal payroll.").

The United States Court of Appeals for the Fourth Circuit has construed Sheridan as standing for the principle that "the government's ability (i.e., legal duty) to control a tortfeasor

must be independent of the tortfeasor's status as a government employee," such as in <u>Sheridan</u>, where the "tortfeasor's status as a government employee was <u>wholly irrelevant</u> to imposing liability on the government for the [other government employees'] negligence." <u>Durden</u>, 736 F.3d at 308-09 (emphasis added). The facts of <u>Sheridan</u>, itself, clarify this principle. In that case, after encountering a severely inebriated servicemember in a naval hospital, a group of Navy corpsmen attempted to take him to the emergency room of that hospital. <u>Sheridan</u>, 487 U.S. at 394-95. He resisted and, in the process, revealed the barrel of a rifle, causing the corpsmen to flee, although they failed to inform any authorities. <u>Id.</u> at 395. The drunk serviceman proceeded to fire shots at plaintiffs' car, injuring them and their property. <u>Id.</u>

The Supreme Court explained that plaintiffs' suit was not barred by § 2680(h), despite plaintiffs' injuries being caused by the drunk serviceman's battery, because their claim was for negligence based not on the serviceman's employment status but the corpsmen and the government's negligence in preventing "a foreseeable assault and battery." <u>Id.</u> at 401. The Court clarified that, independent of any duty related to the shooter's employment, the corpsmen and the government had undertaken an independent duty of care by "[b]y voluntarily adopting regulations that prohibit the possession of firearms on the naval base and that require all personnel to report the presence of any such firearm" as well as "by further voluntarily undertaking to provide care to a person who was visibly drunk and visibly armed," through which specifically "the Government assumed responsibility to perform its good Samaritan task in a careful manner." <u>Id.</u> "Because neither [the shooter's] employment status nor his state of mind ha[d] any bearing on the basis for [plaintiffs'] claim for money damages, the intentional tort exception to the FTCA [was] not applicable." <u>Id.</u> at 403.

7

Plaintiff contends the same is true of his wrongful death claim brought on behalf of decedent based on the negligence of the government, specifically Smith, in failing to protect decedent from harm. Plaintiff analogizes Smith's direction to decedent to drive Ceaser to Camp Lejeune to the naval corpsmen's voluntarily undertaking to provide care for the plainly dangerous, drunken serviceman in <u>Sheridan</u>. The analogy is unavailing.

Plaintiff's claim of negligence by Smith related to Ceaser's assault and battery is not "entirely independent" of Ceaser's federal employment, <u>Sheridan</u>, 487 U.S. at 401, nor can it be said that Ceaser's "status as a government employee [is] wholly irrelevant to imposing liability" possibly on the government for Smith's alleged negligence. <u>Durden</u>, 736 F.3d at 309. On the facts pleaded, "[t]he government's ability . . . to control [Ceaser]" was not "independent of [his] status as a government employee," <u>id.</u>; rather, it is this exact ability to control Ceaser that decedent relied upon in requesting help from Smith as spurred his direction to her to drive Ceaser to Camp Lejeune, into the custody of the Marine Corps, Ceaser's employer. (<u>See</u> Compl. ¶¶ 17, 19-20, 23).

Plaintiff's argument that Smith's direction to decedent to drive Ceaser to Camp Lejeune creates a duty entirely independent of Ceaser's employment by the Marine Corps ignores the alleged events preceding that direction and the ultimate goal of Smith's direction and decedent's attempts: delivering Ceaser back into the control of his employer, the Marine Corps. Unlike <u>Sheridan</u>, there would be no basis for "liability" to "attach if [Ceaser] had been an unemployed civilian" in the home of decedent. <u>Sheridan</u>, 487 U.S. at 401; <u>see also</u> <u>Durden</u>, 736 F.3d at 305 ("The FTCA is clear . . . that the government is liable only under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. Thus, setting aside the Army's ability to control [the tortfeasor] that attached solely pursuant to his employment status as a soldier, the Army must have had some

8

other legal authority to control him.").  Plaintiff points to no authority that Smith "under[took] to render services to [decedent]" by giving her that direction, in the way the Army was alleged to have in <u>Durden</u> "by undertaking the task of monitoring and controlling [a tortfeasor] following his release from civilian confinement."  736 F.3d at 305.  Finally, plaintiff fails to point to alleged facts comparable to the other factors weighed by the <u>Sheridan</u> Court in concluding "the Government [had] assumed responsibility," such as adopting related regulations and affirmative reporting rules.  487 U.S. at 401.

Further, this conclusion does not require reliance on any rationale disapproved of in <u>Durden</u>.  In its own words, the Fourth Circuit held, among other things, that "knowledge of the tortfeasor's propensity for violence or criminal history gained as a result of [the tortfeasor's status as a government employee] does not, per se, nullify an FTCA claim."  <u>Durden</u>, 736 F.3d at 309. <u>Durden</u> does not jettison the use wholesale of causal reasoning in analyzing whether a plaintiff's FTCA claim is barred by § 2680(h).  Moreover, the court here does not grant the motion to dismiss plaintiff's FTCA claim because Smith's knowledge of Ceaser's propensity for violence was gained as a result of Ceaser's status as a member of the Marine Corps, but rather because plaintiff does not plausibly allege that Ceaser's employment status "ha[d] nothing to do with the [alleged] basis for imposing liability on the Government."  <u>Sheridan</u>, 487 U.S. at 402.

To the extent plaintiff faults the M&R's reliance on <u>LaFrancis v. United States</u>, 66. F. Supp. 2d 335 (D. Conn. 1999), such objection is of no moment where analysis independent from that authority leads to the same result.  Further, plaintiff's emphasis on <u>Lumsden v. United States</u>, 555 F. Supp. 2d 580 (E.D.N.C. 2008), as the most helpful exemplary analysis is misplaced.  In that case, the government, through its agents, "delivered [the tortfeasor's] car keys and the ether," through which he had previously become intoxicated, to the tortfeasor.  <u>Id.</u> at 584-85.  Liability

9

for this type of conduct was based not on the tortfeasor's employment status but rather the government negligently equipping the tortfeasor with the means to cause harm (which he did by driving intoxicated into the oncoming lane in which the <u>Lumsden</u> plaintiffs were driving).

In sum, plaintiff's objections to the M&R do not provide a basis for rejecting the magistrate judge's recommendation to dismiss plaintiff's FTCA claim for lack of subject matter jurisdiction.

## CONCLUSION

Based on the foregoing, defendant's motion (DE 18) is GRANTED. This action is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1). The clerk is DIRECTED to close this case.

SO ORDERED, this the 30th day of August, 2022.

LOUISE W. FLANAGAN
United States District Judge

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION


| | | |
|---|---|---|
| MITCHELL GARNET EVANS | ) | |
| *Executor of the Estate of Sallie Copeland* | ) | |
| *Evans* | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JUDGMENT** |
| | ) | 4:21-cv-45-FL |
| UNITED STATES OF AMERICA | ) | |
| Defendant. | ) | |

**Decision by Court.**

This action came before the Honorable Louise W. Flanagan, United States District Judge, for
consideration of defendant's motion to dismiss.

**IT IS ORDERED, ADJUDGED AND DECREED** in accordance with the court's order entered
August 30, 2022, and for the reasons set forth more specifically therein, defendants' motion to
dismiss is GRANTED. Plaintiff's complaint is DISMISSED WITHOUT PREJUDICE for lack of
subject matter jurisdiction.

**This Judgment Filed and Entered on August 30, 2022, and Copies To:**
Christopher R. Hedrick / Robert C. Slaughter, III  (via CM/ECF Notice of Electronic Filing)
Sharon C. Wilson (via CM/ECF Notice of Electronic Filing)

August 30, 2022                    PETER A. MOORE, JR., CLERK


                                     /s/ Sandra K. Collins
                                    (By) Sandra K. Collins, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Eastern Division
No. 4:21-CV-45-FL

MITCHELL GARNET EVANS,          )
Executor of the Estate of Sallie )
Copeland Evans,                  )
                                 )
     Plaintiff,            )
                                 )
v.                               )          **NOTICE OF APPEAL**
                                 )
UNITED STATES OF AMERICA,        )
                                 )
     Defendant.            )
_____)

Plaintiff appeals to the United States Court of Appeals for the Fourth Circuit from the final

judgment entered on August 30, 2022, and from the court's Order entered on August 30, 2022.

This the 27th day of September, 2022.

**MITCHELL GARNETT EVANS**


/s/ Robert C. Slaughter, III
Robert C. Slaughter, III
Slaughter & Lupton Law, PLLC
117 West Eden Street
Edenton, NC 27932
Phone: 252-439-0700
Fax: 252-689-8400
rslaughter@slaughterlupton.com
NC State Bar No.: 16515
*Attorney for Plaintiff*

1

**Certificate of Service**

I certify that on September 27, 2022, I served this document electronically, using the

CM/ECF system, upon:

Sharon C. Wilson
Attorney for Defendant
United States Attorney's Office
Wells Fargo Building
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601

/s/ Robert C. Slaughter, III
Robert C. Slaughter, III
Slaughter & Lupton Law, PLLC
117 West Eden Street
Edenton, NC 27932
Phone: 252-439-0700
Fax: 252-689-8400
rslaughter@slaughterlupton.com
NC State Bar No.: 16515
*Attorney for Plaintiff*