**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-2022**

_____

MITCHELL GARNET EVANS, Executor of the Estate of Sallie Copeland Evans,

Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville.  Louise W. Flanagan, District Judge.  (4:21-cv-00045-FL)

_____

Argued:  January 24, 2024                       Decided:  June 24, 2024

_____

Before GREGORY, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

_____

Affirmed by published opinion.  Judge Gregory wrote the opinion, in which Judge Benjamin joined.  Judge Quattlebaum concurred in the judgment and wrote a concurring opinion.

_____

**ARGUED:**  Walton Everett Lupton, SLAUGHTER & LUPTON LAW, PLLC, Virginia Beach, Virginia, for Appellant.  Sharon Coull Wilson, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina; Madison Dunbar, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Appellee.  **ON BRIEF:**  Michael F. Easley, Jr., United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

_____

GREGORY, Circuit Judge:

This case arises out of the events surrounding Sallie Copeland Evans's murder. Appellant Mitchell Garnet Evans, Executor of the Estate of Sallie Copeland Evans and Sallie's son, initiated the underlying action against the United States pursuant to the Federal Tort Claims Act asserting a claim for wrongful death under North Carolina law. The district court dismissed Evans's claim for lack of subject-matter jurisdiction, and this appeal followed.

We conclude that the district court erroneously dismissed Evans's claim under Federal Rule of Civil Procedure 12(b)(1) because the jurisdictional question and the merits of this case are inextricably intertwined. However, because Evans failed to state a wrongful death claim under North Carolina law, the district court's decision—though procedurally incorrect—was substantively proper. Accordingly, we affirm the district court's decision on alternative grounds and dismiss the case under Rule 12(b)(6).

I.

Isaiah Evans Ceasar, Sallie's grandson and Evans's nephew, was a lance corporal in the United States Marine Corps. In March 2018, Ceasar was stationed at Fort Benning, Georgia, where he participated in combat school. On or about March 30, 2018, Ceasar left Fort Benning without permission. He left behind a note stating that he "was going to end it all and kill himself." J.A. 7 ¶ 10. A classmate found the note and someone informed Ceasar's commander, Marine Corps Captain Smith, of its contents. Ceasar was classified as absent without leave ("AWOL") from his unit or place of required duty sometime thereafter.

2

On April 1, 2018, a sergeant in Ceasar's Marine Corps unit contacted local law enforcement officials in Nash County, North Carolina, where Ceasar's girlfriend and friends lived at the time. The sergeant informed local law enforcement that "Ceasar had gotten into trouble and left a note indicating that he was going to end it all, but before committing suicide, Ceasar wanted to visit his mother." J.A. 8 ¶ 11. At the time, Ceasar's mother was in an inpatient medical facility in Halifax County, North Carolina.

Sometime after leaving Fort Benning, Ceasar traveled to Halifax County. When Ceasar's family learned that he was there, they called Capt. Smith to advise him that Ceasar needed to be picked up by the Marine Corps. Capt. Smith arranged for Ceasar to return to Fort Benning unsupervised sometime after that call. On April 5, 2018, Ceasar boarded a flight from Raleigh-Durham International Airport ("RDU") to Atlanta, Georgia, per the travel arrangements Capt. Smith made.

On April 10, 2018, Ceasar's family learned that he had returned to Halifax County and was at his grandfather's home. Ceasar's family called Capt. Smith to inform him that Ceasar had returned and "that they were concerned and afraid something could happen." J.A. 8 ¶ 16. That same day, Sallie asked Capt. Smith "why the Marine Corps had not picked up Ceasar" and requested that Capt. Smith arrange for North Carolina law enforcement officials to retrieve Ceasar. J.A. 9 ¶ 17. Capt. Smith took no action.

On or about April 11, 2018, Capt. Smith told Ceasar's family that he found several notes from Ceasar that were "disturbing." J.A. 9 ¶ 18. The notes allegedly "expressed Ceasar's intent of violence" against himself and others. *Id*. During that conversation, Capt. Smith "stated that he was very concerned because of the notes' contents" and advised Sallie

that she "should be careful if she came in contact with Ceasar." *Id*. Sallie again requested that Capt. Smith have Ceasar detained. In response, Capt. Smith stated that the Marine Corps had exhausted significant resources in making the previous travel arrangements for Ceasar and "would not commit to making any further effort to find and detain" him. J.A. 9 ¶ 19.

On April 17, 2018, Ceasar's family called Capt. Smith to inquire about why the Marine Corps had not retrieved Ceasar and to inform Capt. Smith that they "found grenade parts they believed Ceasar had acquired." J.A. 9 ¶ 20. They also told Capt. Smith that Ceasar's Facebook posts indicated that he had purchased guns. The family again requested that the Marine Corps have local law enforcement detain Ceasar. This time, they noted that Ceasar was "acting aggressive" and "easily agitated" and that they were "concerned something would happen." *Id*. Capt. Smith stated that the information "was concerning" and that "he would see what he could do," but again noted that the Marine Corps had already exhausted significant resources in a failed attempt to return Ceasar to Fort Benning. *Id*.

At some point, the family purchased Ceasar a ticket for a flight from RDU to Atlanta. On or about April 22, 2018, Sallie and Evans transported Ceasar to RDU and watched him board his flight. They called Capt. Smith to notify him that Ceasar had boarded the flight and needed to be detained at the airport. Capt. Smith informed them that he did not have the resources to have Ceasar detained at the airport and thus Ceasar would need to arrange his own transportation from the airport to Fort Benning.

The next day, Ceasar returned to Halifax County. Sallie again contacted Capt. Smith "who refused to take any action to have Ceasar detained" and instructed Sallie to take Ceasar

4

to Marine Corps Base Camp Lejeune ("Camp Lejeune") near Jacksonville, North Carolina. J.A. 10 ¶ 23. Sallie informed Evans of her conversation with Capt. Smith and became emotional regarding the Marine Corps' lack of action. Evans then texted Capt. Smith the following message:

> We put Isaiah on a plane yesterday flew him back to you once again And you didn't pick him up cause he's back here in NC at moms house She worried I'm worried Y'all need to pick his ASS up before something happens!!

J.A. 10–11 ¶ 24. Capt. Smith did not respond to Evans's text message.

On or about April 24, 2018, Capt. Smith again suggested that Sallie drive Ceasar to Camp Lejeune. As Sallie tried to convince Ceasar to gather his belongings for the trip, Ceasar shot her in the back of the head with a 9mm pistol. Sallie's dead body was located several days later. Ceasar was subsequently arrested at a hotel and charged with first-degree murder. At the time of his arrest, Ceasar had Sallie's car and credit card, as well as unidentified "explosive devices," in his possession. J.A. 11 ¶ 27.

## II.

Evans filed a wrongful death claim with the Marine Corps alleging that the agency was liable for Sallie's murder. The Marine Corps denied Evans's claim on October 13, 2020. Evans then filed a timely complaint in federal court, which he later amended with leave from the district court. The Government moved to dismiss the amended complaint. In its motion, the Government contended that the district court lacked subject-matter jurisdiction because Evans's claim was prohibited under the FTCA, and, alternatively, that Evans failed to state a wrongful death claim under North Carolina law. Evans opposed the motion, arguing that

his claim is permitted under the FTCA because it is based on Capt. Smith's negligence, not Ceasar's actions, and that his allegations plausibly stated a claim. The district court referred the motion to a magistrate judge for a report and recommendation.

The magistrate judge held a hearing and subsequently recommended that Evans's claim be dismissed for lack of subject-matter jurisdiction. *See* J.A. 72, 108. In making this determination, the magistrate judge relied heavily on the Supreme Court's decision in *Sheridan v. United States*, 487 U.S. 392, 398 (1988), which established that the government can only be held liable for a federal employee's negligence that results in a foreseeable assault or battery where the basis for imposing government liability is independent of the intentional tortfeasor's federal employment.

The magistrate judge determined that under *Sheridan*, federal court jurisdiction in this case depended on whether Capt. Smith's alleged negligence was independent of Ceasar's status as a Marine. J.A. 104. The magistrate judge concluded that Evans's theory of liability depended on Ceasar's status as a Marine because the Marine Corps' authority to control, retrieve, or detain Ceasar derived from Ceasar's military status, and, absent that status, it was unlikely that Capt. Smith would have assisted Sallie. J.A. 103–04, 108. The magistrate judge did not address the parties' arguments regarding the merits of the case.

Evans objected to the magistrate judge's recommendation. He contended that Ceasar's employment was irrelevant to his claim because Capt. Smith's instruction to Sallie to drive Ceasar to Camp Lejeune was negligent absent Ceasar's military status. J.A. 112. In response, the Government argued that the objections should fail because Capt. Smith's

ability to control Ceasar was based on Ceasar's status as a Marine, and, absent that employment relationship, the Marine Corps did not owe Sallie a duty.

The district court adopted the recommendation. Like the magistrate judge, the district court found that Evans's basis for imposing liability on the government was not independent of Ceasar's employment with the Marine Corps. *Evans v. United States*, 2022 WL 3924222, at *4 (E.D.N.C. Aug. 30, 2022). On this point, the court noted that Ceasar's family relied on the Marine Corps' ability to control Ceasar as his employer in requesting help from Capt. Smith. *Id*. The court also found that Evans failed to identify any legal authority indicating that Capt. Smith voluntarily assumed a duty to Sallie by telling her to drive Ceasar to Camp Lejeune. *Id*. at *5. Accordingly, the district court concluded that Evans's claim was barred under the FTCA and dismissed the case for lack of subject-matter jurisdiction.

III.

We review a district court's dismissal for lack of subject-matter jurisdiction de novo. *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013). Under the principle of sovereign immunity, the United States cannot be sued without Congress's consent. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). In 1946, Congress enacted the Federal Tort Claims Act ("FTCA" or the "Act"), a limited waiver of the United States's sovereign immunity for certain causes of action against the federal government. 28 U.S.C. § 1346. The Act grants federal courts exclusive jurisdiction over claims against the United States for "personal injury or death caused by the negligent or wrongful act or omission of any

employee of the Government while acting within the scope of his office or employment."
*Id*.; *see also Levin v. United States*, 568 U.S. 503, 507 (2013).

Because the FTCA confers jurisdiction only over claims covered by the Act, district courts lack subject-matter jurisdiction over claims against the government that fall outside of the statute's purview. *Sherwood*, 312 U.S. at 586 ("The terms of the government's consent to be sued in any court define that court's jurisdiction to entertain suit."). Thus, claims presented in federal court that are not covered under or are explicitly prohibited by the FTCA are dismissed under Rule 12(b)(1). *Bullock v. Napolitano*, 666 F.3d 281, 284 (4th Cir. 2012), *cert. denied*, 133 S. Ct. 190 (2012) ("Sovereign immunity is not only a bar to liability but also a bar to the court in which suits against the United States can be filed"). Relevant here, the Act prohibits claims that arise out of an assault or battery committed by a federal employee. 28 U.S.C. § 2680(h). This is known as the intentional tort exception. *Levin*, 568 U.S. at 507.

The Supreme Court has stated that the phrase "any claim arising out of" as used in the context of the intentional tort exception is "unquestionably broad enough to bar all claims based *entirely* on an assault or battery" but that "[t]he import of these words is less clear . . . when they are applied to a claim arising out of two tortious acts, one of which is an assault or battery and the other of which is a mere act of negligence." *Sheridan v. United States*, 487 U.S. 392, 398 (1988) (emphasis in original). As stated above, the court below relied on the Supreme Court's decision in *Sheridan v. United States*, in dismissing Evans's case. Given the import of that case to the court's decisions and the parties' arguments on appeal, an illustration of *Sheridan* is warranted.

8

In *Sheridan*, three naval corpsmen encountered an intoxicated man at a hospital on a naval base. 487 U.S. 392, 395 (1988). They learned that the man was armed during a scuffle that ensued when they attempted to take him to the emergency room. *Id*. They fled and did not alert anyone of the encounter even though the naval base prohibited possession of firearms and required personnel to report any violations of the prohibition. *Id*. at 401. Later that day, the intoxicated man, who was later identified as an off-duty serviceman, fired several shots into a car near the hospital injuring several passengers. *Id*. at 395. The injured passengers filed suit alleging that their injuries were caused by the corpsmen's negligence in allowing the intoxicated serviceman to leave the hospital with a loaded rifle. *Id*. at 394.

The Supreme Court held that because the injured passengers' claim was predicated on the alleged negligence of the corpsmen and not the serviceman's employment status or state of mind, the intentional tort exception was inapplicable. *Id*. at 403. The Court reasoned that because the Navy adopted regulations that prohibited on-base possession of firearms and required personnel to report violations, and because the corpsmen undertook to provide care to a visibly intoxicated and armed person, the government had "assumed responsibility to perform [a] good Samaritan task." *Id*. at 401. The Court equated that "good Samaritan task" to a voluntarily undertaken duty and concluded that the government's failure to execute its "good Samaritan task" in a careful manner could serve as the basis for a negligence claim. *Id*.

Under *Sheridan*, whether Evans's claim is permitted or prohibited under the FTCA depends on whether the intentional tort exception applies and thus whether Capt. Smith

was negligent on a basis unrelated to Ceasar's employment with the Marine Corps. The Government, which characterizes Evans's claim as one "for injury resulting from murder," maintains that the intentional tort exception bars Evans's claim. Resp. Br. 12. In contrast, Evans contends that the intentional tort exception is inapplicable because Sallie's death resulted from two tortious acts—Ceasar's shooting and Capt. Smith's negligence—and he seeks to impose liability on the Government for only the latter. He maintains that because the facts essential to determining the merits (whether Capt. Smith was negligent) and jurisdiction are inextricably intertwined, the district court erred in dismissing his claim for lack of subject-matter jurisdiction.

Admittedly, our jurisprudence appears unclear on its face regarding how we review district court dismissals on jurisdictional grounds where, as here, the facts essential to determining federal court jurisdiction and the merits are indistinguishable. In some instances, we have interpreted the district court's jurisdictional dismissal as if it were on the merits, reviewed the court's decision for accuracy and affirmed the dismissal on the merits. *See, e.g.*, *Durden v. United States*, 736 F.3d 296 (4th Cir. 2013); *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236 (4th Cir. 1988). In others, we have determined that the district court's dismissal on jurisdictional grounds was improper, vacated that decision, and remanded for discovery on the jurisdictional issue. *See Kerns v. United States*, 585 F.3d 187 (4th Cir. 2009). Although we have acknowledged the discrepancy in our treatment of the issue, *see Durden*, 736 F.3d at 301, we have never explained the rationale behind our decisions or clarified under what circumstances each

approach should be applied. We take the opportunity to do so now and begin with a brief discussion of our relevant jurisprudence.

In *Rivanna*, we reviewed the district court's dismissal of the plaintiffs' federal securities law claims for lack of subject-matter jurisdiction following the defendant's motion to dismiss which the court converted into a summary judgment motion. *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236 (4th Cir. 1988) (internal quotation omitted). We held that the district court properly accepted jurisdiction over these claims and considered them on the merits despite the court's "technically incorrect" statements dismissing the claims for lack of subject-matter jurisdiction. *Id*. at 239. We therefore interpreted the district court's dismissal as a grant of the defendant's motion for summary judgment and affirmed the dismissal on the merits. *Id*. at 239, 243.

In *Kerns*, the plaintiff asserted an FTCA claim alleging that a government employee's negligent driving caused her husband's death. *Kerns v. United States*, 534 F. Supp. 2d 633, 635 (D. Md. 2008), *vacated*, 585 F.3d 187 (4th Cir. 2009). The district court held that the claim was not cognizable under the FTCA because the driver was not acting within the scope of her employment at the time of the accident. *Id*. at 640. On appeal, the plaintiff argued that because whether the negligent driver was acting within the scope of her employment was central to the court's jurisdiction and the merits of her claim the district court should have reached the merits. *Kerns*, 585 F.3d at 192. We agreed. *Id*. at 195. In vacating the district court's jurisdictional dismissal, we said, our "general rule[,]" is that "[a] district court should assume jurisdiction and assess the merits of the claim when the relevant facts—for jurisdictional and merits purposes—are inextricably intertwined."

11

*Id.* We remanded the case for discovery on the jurisdictional issue without opining on the merits. *Id.* at 196.

Most recently in *Durden*, we reviewed another dismissal of an FTCA claim on jurisdictional grounds. *Durden*, 736 F.3d at 298. In our analysis, we acknowledged the discrepancy between our treatment of the appeals in *Rivanna* and *Kerns*, two cases we said arose under the same procedural posture as *Durden*. *Id.* Specifically, we noted that we vacated the district court's dismissal for lack of subject-matter jurisdiction in *Kerns*, but we treated the district court's jurisdictional dismissal in *Rivanna* "as one for failure to state a claim that had been converted into a motion for summary judgment." *Id.*

We characterized *Durden* as "more akin to *Rivanna* than *Kerns* insofar as the government argued" that jurisdiction was lacking even if the allegations in the complaint were accepted as true. *Id.* We concluded that in assessing the motion, the district court adequately considered the merits of the plaintiff's claim despite its "technically incorrect statement" purporting to dismiss the case for lack of subject-matter jurisdiction. *Id.* at 302. As we had done in *Rivanna*, we interpreted the district court's dismissal as a grant of summary judgment to the government and affirmed. *Id.* at 309.

Although we only characterized the facts relevant to the merits and jurisdictional issue in *Kerns* as "inextricably intertwined," the phrase is equally applicable to *Rivanna* and *Durden*. In *Rivanna*, we considered whether a partnership interest qualified as a security, which was both an element of the federal claim and federal jurisdiction. *Rivanna*, 840 F.2d at 239. Meanwhile, in *Durden*, the Army's alleged negligence undergirded both jurisdiction and the merits of Durden's FTCA claim. *Durden*, 736 F.3d at 301. Since *Kerns*, *Rivanna*,

and *Durden* all involved inextricably intertwining facts, the relevant material difference between *Kerns* on the one hand and *Rivanna* and *Durden* on the other was the type of jurisdictional challenge the defendants made in each case—a factual challenge in *Kerns*, and facial challenges in *Durden* and *Rivanna*. Our approach on appellate review in cases in which the merits and jurisdictional questions overlap thus differs depending on the type of jurisdictional challenge asserted before the district court. This distinction is logical given the difference in the approach district courts employ when assessing each type of challenge.

Where a defendant challenges the factual predicate of subject-matter jurisdiction, the district court need not assume the truth of the allegations, may decide disputed issues of fact, and may venture outside of the pleadings to resolve the challenge. *Kerns*, 585 F.3d at 192. Considering the standard and the array of evidence the district may review under it, we cannot assume on appeal that the district court assessed the merits in making a jurisdictional determination following a factual challenge. This is especially so at the motion to dismiss stage where, on the merits, the district court must limit its consideration to the pleadings and accept the facts as true. Fed. R. Civ. P. 12(b)(6). Accordingly, as a court of review, we refrain from assessing the merits under these circumstances and remand for the district court to conduct the appropriate analysis in the first instance. That was the approach we applied in *Kerns*. *Id*. at 196.

The same concerns regarding the district court's assessment of the merits are not present in the context of facial challenges. Under a facial challenge, where the defendant contends that the allegations in the complaint are insufficient to confer subject-matter jurisdiction, the district court assesses the motion under the same standard as one brought

13

under Rule 12(b)(6). *Id*. at 192. In evaluating such a challenge, the district court accepts all allegations as true and determines whether those allegations are sufficient to invoke jurisdiction. *Id*. Because the Rule 12(b)(1) and Rule 12(b)(6) analyses are materially identical in this scenario, our review of the district court's decision (which necessarily included an assessment of the merits) does not improperly circumvent the district court's role. Thus, under these circumstances, it is appropriate for us to interpret the district court's dismissal as though it followed a challenge to the merits of the case as we did in *Rivanna* and *Durden*.

We now apply that approach to the district court's dismissal in this case. Evans brought a wrongful death claim pursuant to the FTCA premised on his assertion that Sallie's death resulted (at least in part) from Capt. Smith's negligence. If Evans's assertion is correct, *Sheridan* dictates that the claim is not barred by the intentional tort exception. By contrast, if Capt. Smith was not negligent and Ceasar's act alone caused Sallie's death Evans's suit is prohibited under the intentional tort exception and the principle of sovereign immunity. As such, whether Capt. Smith was legally negligent is determinative of whether federal courts have jurisdiction over this case. The facts essential to determining jurisdiction and assessing the merits of Evans's claim are therefore inextricably intertwined and the district court erred in dismissing the case under Rule 12(b)(1).[*]

---

[*] In *Brownback v. King*, 592 U.S. 209 (2021), the Supreme Court addressed whether the FTCA's judgment bar provision prevents a plaintiff whose claim was previously dismissed for lack of subject-matter jurisdiction from asserting another action against the same defendants for the same injuries. In a footnote in that case, the Court stated that in (Continued)

IV.

Our determination that the district court erred in dismissing Evans's claim under Rule 12(b)(1) does not end our analysis because the Government facially challenged subject-matter jurisdiction. As discussed above, because the standards that district courts apply in assessing Rule 12(b)(6) motions and facial jurisdictional challenges are identical, the district court necessarily considered the merits of Evans's claim in deriving its jurisdictional conclusion. Accordingly, we now assess the district court's decision as though it occurred under Rule 12(b)(6).

This Court reviews a district court's dismissal under Rule 12(b)(6) de novo. *See Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). Dismissal is only appropriate where a complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). To demonstrate plausibility, the complaint must plead facts beyond those that are "merely consistent with a defendant's liability." *Id*. In assessing the sufficiency of the complaint under this standard we must draw all reasonable inferences in favor of the plaintiff. *Roane*, 948 F.3d at 226. A complaint may only survive

---

cases "where a plaintiff fails to plausibly allege an element that is both a merit element of a claim and a jurisdictional element, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6). Or both." *Id*. at 218 n.8. Because that statement is dicta and can be read in line with circuit precedent, we proceed to the merits. *See Short*, 87 F.4th at 605 (4th Cir. 2023) ("If it is possible for us to read our precedent harmoniously with Supreme Court precedent, we must do so." (internal quotation omitted)); *Carrera v. E.M.D. Sales Inc.*, 75 F.4th 345, 352 (4th Cir. 2023) ("We do not lightly presume that the law of our circuit has been overturned or rendered no longer tenable") (internal quotation and citation omitted)).

a motion to dismiss where its factual allegations "raise a right to relief above the speculative level, thereby nudging the claims across the line from conceivable to plausible." *Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020) (internal quotations and citations omitted).

V.

The United States may only be held liable for negligence under the FTCA if an individual could be held liable for the same actions under the law of the state where the alleged negligence occurred. *See Kerns,* 585 F.3d at 194 (*citing* 28 U.S.C. § 1346(b)(1)). Capt. Smith was in Georgia at all relevant times, but Sallie was murdered in North Carolina. The parties agree that North Carolina law governs Evans's claim as the law of the place of injury. Opening Br. 8; Resp. Br. 18; *see also Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 779 (4th Cir. 2023) ("We conclude that choice of law is waivable, not jurisdictional, and AXA waived the possible application of Connecticut law by affirmatively litigating under the substantive law of North Carolina.").

Under North Carolina law, a personal representative may recover damages a decedent would have been entitled to for injuries or death caused by the "wrongful act, neglect, or default" of another. N.C. Gen. Stat. Ann. § 28A-18-2. We have recognized that, in North Carolina, an individual may expose himself to negligence liability by assisting or attempting to assist another person when he does not have an obligation to do so. *See Durden*, 736 F.3d at 305. Under that circumstance, the individual has voluntarily undertaken a duty and may be held liable for injuries that result from his breach of that duty, or failure to exercise reasonable care when executing it. *Id.*

Evans maintains that Capt. Smith voluntarily undertook to assist Sallie by instructing her to drive Ceasar to Camp Lejeune. Tellingly, Evans failed to identify any legal authority indicating that a person or private employer could be held liable under similar circumstances. And even if he had, the facts in the complaint do not sufficiently allege that Capt. Smith voluntarily undertook a duty to Sallie at any time they were in contact. Indeed, even with all inferences drawn in Evans's favor, the facts suggest the opposite. Notably, prior to telling Sallie to drive Ceasar to Camp Lejeune, Capt. Smith explicitly informed her on several occasions that the Marine Corps would not take any further action to locate or retrieve Ceasar. True to that position, he took no action in response to Sallie's requests for him to involve local law enforcement. With that context, their conversations regarding Camp Lejeune are better understood as Capt. Smith suggesting actions Sallie could take to resolve her issue than him attempting to assist her.

Evans's allegation regarding Capt. Smith arranging for Ceasar to fly to Georgia following the family's initial call is likewise insufficient. Indeed, nothing in the complaint suggests that Capt. Smith arranged Ceasar's travel to Fort Benning to assist Ceasar's family. Rather, the allegations suggest that Capt. Smith attempted to return an AWOL soldier to base after he learned where the AWOL soldier fled to. Our conclusion may have been different if Capt. Smith had not repeatedly stated that the Marine Corps would not take any further action to assist Ceasar's family, or if he had traveled to North Carolina to retrieve Ceasar or authorized others to detain Ceasar. However, given the absence of any facts alleging that Capt. Smith acted to assist or benefit Sallie, Evans cannot state a claim premised on a voluntary undertaking.

17

Similarly, to the extent Evans's claim is predicated on a special relationship between the Marine Corps and Ceasar, the claim still fails. We have previously stated that FTCA claims based on a special relationship may only survive if the government had authority to control the tortfeasor independent of the tortfeasor's employment status. *Durden*, 736 F.3d at 305. Because the complaint is devoid of facts alleging that the Marine Corps had any authority to control Ceasar independent of Ceasar's status as a Marine, Evans has not plausibly alleged a special relationship. *See id*.; *see also LaFrancis v. U.S.*, 66 F. Supp. 2d 335 (1999) (holding that plaintiff's FTCA claims were barred by the intentional tort exception because any duty allegedly owed to her was dependent upon the alleged tortfeasor's employment with the Navy and "without the employment relationship, the Navy would not have had the authority to supervise the conduct of [the tortfeasor]").

Moreover, even if Capt. Smith had voluntarily undertaken a duty to Sallie or the Marine Corps had a special relationship with Ceasar, Evans's claim would still be foreclosed under North Carolina law. In North Carolina, "[n]o legal duty exists unless the injury to the plaintiff [or decedent] was foreseeable and avoidable through due care." *Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 328 (2006). Accepting the facts as pleaded here, we cannot conclude that Sallie's death was foreseeable under the circumstances. Our decision in *Durden* is instructive.

In *Durden*, an Army specialist expressed his desire to kill himself and members of his unit to his staff sergeant and told a fellow soldier that he was unable to sleep due to alcohol and drug use. *Durden*, 736 F.3d at 299. The specialist later burglarized a civilian home and assaulted its occupants with a pellet gun. *Id*. After serving time in a civilian

18

jail, the specialist returned to the military base where his superiors imposed certain restrictions on him because of his crimes.  *Id*.  Nearly two months after his return, the specialist unlawfully entered a woman's home on the base while intoxicated and raped her in front of her children.  *Id*. at 300.

The woman sued the government alleging that the Army was aware that the specialist posed a threat of danger to others, had a duty to protect her from that danger, and breached that duty by not continuing to enforce the restrictions imposed because of the specialist's prior crimes.  *Id*.  On appeal we concluded that the woman failed to state a negligence claim because even if the Army had assumed a duty in monitoring the specialist, the woman's rape was not foreseeable under the circumstances.  *Id.* at 303–04.  We said that although the woman alleged that the Army had knowledge of the specialist's prior crime, drug and alcohol use, and desires to kill himself and others, those facts did not indicate that the specialist had a propensity for rape.  *Id*.  As such, we determined that the facts were insufficient to indicate that the Army should have recognized that continued enforcement of the restrictions imposed was necessary to protect the woman from being raped.  *Id*.

In an attempt to distinguish *Durden*, Evans maintains that unlike the rape in that case, Sallie's murder was foreseeable because, in the days preceding it, (1) Ceasar's family notified Capt. Smith that Ceasar posed an immediate risk of harm to Sallie and others, (2) Capt. Smith expressed concern about Ceasar's actions, and (3) Capt. Smith communicated that the Marine Corps had exhausted substantial resources to retrieve Ceasar and would not commit to taking any additional action.  Evans argues that these allegations demonstrate that Capt. Smith knew

that Ceasar posed an immediate danger to others when he told Sallie to drive Ceasar to Camp Lejune.  We disagree.

As a threshold matter, we note that the complaint does not allege that the family told Capt. Smith that Ceasar was a danger to Sallie, his family, or anyone else.  Rather, at best, the allegations indicate that (1) Ceasar's family was gravely concerned "something could happen," J.A. 9 ¶ 20, (2) Ceasar's family expressed concern to Capt. Smith about Ceasar's general behavior, actions, weapons possession, and agitated temperament, (3) Ceasar left notes at Fort Benning indicating an intent to harm himself and others, and (4) Capt. Smith was concerned regarding the information Ceasar's family provided and the contents of Ceasar's notes.  It does not follow from these allegations that Ceasar would murder someone, much less a family member.

Further to that point, the timing of events in this case precludes a conclusion that Sallie's murder was foreseeable.  Ceasar left Fort Benning in late March, first appeared at a family member's residence in early April and killed Sallie later that month.  Over the course of several weeks in April, Ceasar visited family members' residences and rode to the airport with family members on at least two occasions without incident.  He also repeatedly returned to his family in North Carolina each time he was sent to Georgia.  Even accepting that Ceasar's behavior during that time was concerning, these facts do not allege that he posed an immediate danger to his family, and certainly fall short of alleging that any such danger was foreseeable.

Nonetheless, throughout his brief, Evans repeatedly contends that Capt. Smith knew or should have known of the "immediate risk of harm" Ceasar posed to himself and others.

20

*See e.g.* Opening Br. 22.  On this basis, he urges this Court to distinguish *Durden* and apply the district court's rationale in *Lumsden v. United States*, 555 F. Supp. 2d 580, 582 (E.D.N.C. 2008).

In *Lumsden*, a Marine Corps private had a reputation among government agents for inhaling ether, a chemical compound.  *Id*. at 582.  On one occasion, the Marine Corps discovered that the private had inhaled ether that the Government had stored in his car.  *Id*.  The government agents impounded the private's car for several days before returning it to the private with the ether still inside.  *Id*.  Sometime after receiving his car, the private inhaled a "sufficient quantity" of the ether to become "extremely intoxicated."  *Id*.  While in an "extremely intoxicated" state, the private drove head-on into a vehicle killing one passenger and severely injuring others.  *Id*.  The injured passengers filed suit alleging that government agents were negligent in returning the car with the ether to the private knowing of his propensity to abuse the compound.  *Id*. at 583.  The district court held that the intentional tort exception was inapplicable because the plaintiffs' claims were premised on the agents' actions, not the private's actions or employment status.  *Id*.

Evans's reliance on *Lumsden* is misplaced.  Unlike in *Lumsden*, the complaint here does not allege that Capt. Smith knew that Ceasar desired to harm his family members or that any of his previous conduct suggested that he did.  There are also no allegations that Capt. Smith knew Ceasar had a propensity to kill or harm others, or that Capt. Smith gave Ceasar the gun used to kill Sallie knowing of any such propensity.  Rather, as alleged, Capt. Smith, who was repeatedly contacted by Ceasar's family for assistance, offered a suggestion that would allow the family to procure the relief they sought—Ceasar's return to the Marine Corps' custody.  Thus, this case is unlike *Lumsden*.  Under the circumstances in this case, although

the Marine Corps had knowledge that Ceasar engaged in conduct that caused concern, the facts do not plausibly allege that Sallie's death was foreseeable to Capt. Smith.

## VI.

For the foregoing reasons, we conclude that the district court erroneously dismissed Evans's wrongful death claim for lack of subject-matter jurisdiction. However, because we have determined that the conclusion reached by the court below was proper, we affirm the judgment on alternative grounds and dismiss the case for failure to state a claim.

*AFFIRMED.*

QUATTLEBAUM, Circuit Judge, concurring in judgment:

I agree with much of the majority opinion. But to me, a recent Supreme Court opinion, *Brownback v. King*, 592 U.S. 209 (2021), requires us to affirm regardless of whether the district court treated the dismissal as one under Rule 12(b)(1) or Rule 12(b)(6). In *Brownback*, the Supreme Court observed that the FTCA is unique in that "all elements of a meritorious claim are also jurisdictional." *Id.* at 217. The Court continued that "where, as here, pleading a claim and pleading jurisdiction entirely overlap, a ruling that the court lacks subject-matter jurisdiction may simultaneously be a judgment on the merits." *Id.* at 218. Since the issues are one and the same, a court does not assume jurisdiction by disposing of the case on the merits. Accordingly, the Court added:

> In cases such as this one where a plaintiff fails to plausibly allege an element that is both a merit element of a claim and a jurisdictional element, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6). Or both. The label does not change the lack of subject-matter jurisdiction, and the claim fails on the merits because it does not state a claim upon which relief can be granted. However, in other cases that overlap between merits and jurisdiction may not exist. In those cases, the court might lack subject-matter jurisdiction for non-merits reasons, in which case it must dismiss the case under just Rule 12(b)(1).

*Id.* at 218 n.8. Following *Brownback*, I would not hold that the district court erred in dismissing Evans' complaint under Rule 12(b)(1) instead of under Rule 12(b)(6). Since I would affirm the district court on its own terms and not on alternative grounds, I concur in the judgment.